## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

NATIONAL RELIGIOUS BROADCASTERS, *et al.*,

*Plaintiffs*,

v.

BILLY LONG, *in his official capacity as* COMMISSIONER OF THE INTERNAL REVENUE SERVICES, *et al.*,

*Defendants*.

Civil Action No. 6:24-cv-00311

## BRIEF OF *AMICUS CURIAE* AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE IN OPPOSITION TO JOINT MOTION FOR ENTRY OF CONSENT JUDGMENT

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ 1

TABLE OF AUTHORITIES ........................................................................................ 2

INTEREST OF AMICUS CURIAE ............................................................................ 6

STATEMENT OF ISSUES .......................................................................................... 7

SUMMARY OF ARGUMENT .................................................................................... 7

ARGUMENT ................................................................................................................ 7

    I.    Introduction ....................................................................................................... 7

    II.    The Court Lacks Subject Matter Jurisdiction Over This Case. ......................... 9

        A.    Plaintiffs' Claims Are Barred By the Anti-Injunction Act. ......................... 10

        B.    Plaintiffs Lack Article III Standing. ........................................................... 16

        C.    Plaintiffs' Claims Are Not Ripe for Adjudication ...................................... 19

        A.    Having Failed to Obtain Relief Through the Political Process, the Parties Improperly Seek to Impose Their Preferred Policy By Judicial Decree. ................................................. 21

        C.    The Proposed Consent Decree Misinterprets the Federal Establishment Clause. ........ 27

    IV.    Conclusion ...................................................................................................... 32

CERTIFICATE OF SERVICE ................................................................................... 33

## TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Gardner,*
    387 U.S. 136 (1967)). ................................................................. 19

*Abraugh v. Altimus,*
    26 F.4th 298 (5th Cir. 2022)........................................................ 10

*Alexander v. Ams. United, Inc.,*
    416 U.S. 752 (1974).............................................. 10, 11, 12, 15

*Babbit v. United Farm Workers Nat'l Union,*
    442 U.S. 289 (1979)....................................................................... 18

*Bob Jones Univ. v. Simon,*
    416 U.S. 725 (1974)...................................................... 10, 14, 15

*Bolling v. Sharpe,*
    347 U.S. 497 (1954)....................................................................... 30

*Bowen v. Georgetown Univ. Hosp.,*
    488 U.S. 204 (1988)....................................................................... 24

*Branch Ministries v. Rossotti,*
    211 F.3d 137 (D.C. Cir. 2000).............................................. *passim*

*Catholic Charities Bureau, Inc. v. Wisconsin Labor & Industry*
    *Review Commission,*
    145 S. Ct. 1583 (2025).......................................................... *passim*

*Choice Inc. of Texas v. Greenstein,*
    691 F.3d 710 (5th Cir. 2012) ...................................................... 19

*City of Cleburne v. Cleburne Living Ctr.,*
    473 U.S. 432 (1985)....................................................................... 30

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013)............................................................... 16, 17

*Conservation Nw. v. Sherman,*
    715 F.3d 1181 (9th Cir. 2013) .................................................... 25

*Cornerstone Credit Union League v. Consumer Fin. Prot. Bureau,*
    No. 4:25-CV-16-SDJ, 2025 WL 1920148,
    (E.D. Tex. July 11, 2025) ............................................................... 9

*Cotton v. Hinton,*
    559 F.2d 1327 (5th Cir. 1977)..................................................... 24

*CREATE (Christian, Rsch., Educ., Tech. Enter., Inc. v. C.I.R),*
    634 F.2d 803 (5th Cir. 1981)....................................................... 15

*Emp. Div, Dep't of Hum. Res. of Or. v. Smith,*
    494 U.S. 872 (1990)....................................................................... 30

*Freedom from Religion Found. v. Shulman,*
    961 F. Supp. 2d 947 (W.D. Wisc. 2013) .................................... 31

*Glass v. Paxton,*
    900 F.3d 233 (5th Cir. 2018)....................................................... 17

*Ibarra v. Tex. Emp't Comm'n,*
    823 F.2d 873 (5th Cir. 1987)....................................................... 20

*Jennings v. Rodriguez,*
   583 U.S. 281 (2018) .................................................................................. 26

*Kemlon Prods. & Dev. Co. v. United States,*
   638 F.2d 1315 (5th Cir. 1981) .................................................................. 10

*Laird v. Tatum,*
   408 U.S. 1 (1972) ..................................................................................... 17

*Larson v. Valente,*
   456 U.S. 228 (1982) ............................................................................ 29, 30

*League of United Latin Am. Citizens, Council No. 4434 v. Clements (LULAC),*
   999 F.2d 831 (5th Cir. 1993) .............................................................. 20, 24

*Linn v. Chivatero,*
   714 F.2d 1278 (5th Cir. 1983) ..................................................... 10, 11, 15

*Loper Bright Enterps. v. Raimondo,*
   603 U.S. 369 (2024) ............................................................................ 24, 26

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) .................................................................................. 16

*McCabe v. Alexander,*
   526 F.2d 963 (5th Cir. 1976) ............................................................. 12, 16

*McGowan v. Maryland,*
   366 U.S. 420 (1961) .................................................................................. 30

*MedImmune, Inc. v. Genentech, Inc.,*
   549 U.S. 118 (2007) .................................................................................. 19

*New Orleans Pub. Serv., Inc. v. Council of New Orleans,*
   833 F.2d 583 (5th Cir. 1987) .................................................................... 19

*Overton v. City of Austin,*
   748 F.2d 941 (5th Cir. 1984) .................................................................... 21

*Planned Parenthood of Hou. & Se. Tex. v. Sanchez,*
   403 F.3d 324 (5th Cir. 2005) .................................................................... 26

*Regan v. Taxation With Representation of Wash.,*
   461 U.S. 540 (1983) ........................................................................ 11, 12, 28

*Rivero v. Fidelity Investments, Inc.,*
   1 F. 4th 340 (5th Cir. 2021) ..................................................................... 16

*South Carolina v. Regan,*
   465 U.S. 367 (1984) .................................................................................. 13

*Speech First, Inc. v. Fenves,*
   979 F.3d 319, 330 (5th Cir. 2020) ................................................ 16, 17, 18, 19

*Susan B. Anthony List v. Driehaus,*
   573 U.S. 149 (2014) ......................................................................... 16, 17, 19

*Texas Monthly, Inc. v. Bullock,*
   489 U.S. 1 (1989) ............................................................................... 13, 31

*Total Gas & Power N.A., Inc. v. FERC,*
   859 F.3d 325 (5th Cir. 2017) .................................................................... 19

*United States v. City of Miami (Miami I),*
   614 F.2d 1322 (5th Cir. 1980) .................................................................. 20

*United States v. City of Miami (Miami II),*
   664 F.2d 435 (5th Cir. 1981) .................................................................... 20

*Urantia Foundation v. C.I.R.*,
   684 F.2d 521 (7th Cir. 1982) ...................................................................... 14, 15
*Williams v. City of New Orleans*,
   729 F.2d 1554 (5th Cir. 1984) .................................................................... 20, 31
*Wood v. Collier*,
   836 F.3d 534 (5th Cir. 2016) .............................................................................. 30
*Z Street v. Koskinen*,
   791 F.3d 24 (D.C. Cir. 2015) ........................................................................ 11, 13

## Statutes

26 U.S.C. § 501(c)(3) ........................................................................................... *passim*
26 U.S.C. § 501(c)(4) .................................................................................... 11, 29, 32
26 U.S.C. § 7409(a) ...................................................................................................... 17
26 U.S.C. § 7421(a) ................................................................................................ 6, 10
28 U.S.C. § 1346 ............................................................................................................. 15
26 U.S.C. § 7428 ...................................................................................... 13, 14, 15, 16
28 U.S.C. § 2201 ................................................................................................... 15, 16
5 U.S.C. § 553 ................................................................................................................ 25

## Other Authorities

100 Cong. Rec. 9604 (1954) ....................................................................................... 8
Brendan Fischer, Campaign Legal Ctr., *Destroying the Johnson Amendment:*
   *How Allowing Charities to Spend on Politics Would Flood the Swamp That*
   *President Trump Promised to Drain* (2017),
   http://bit.ly/4obqLB1 ............................................................................................ 21
Brief of *Amici Curiae* Americans United for Separation of Church
   and State and People for the American Way Foundation on Behalf of Appellee,
   *Branch Ministries v. Rossotti*,
   211 F.3d 137 (D.C. Cir. 2000), No. 99-5097 ................................................. 6
*Charities, Churches and Politics*, Internal Revenue Serv.,
   http://bit.ly/4kV9f14 (last updated May 29, 2025) ...................... 8, 22, 28
Complaint, *Freedom From Religion Found., Inc. v. Trump*,
   No. 17-CV-330 (W.D. Wisc. May 4, 2017), ECF No. 1 ............................. 22
Daniel Burke et al., *IRS Says Churches Can Now Endorse Political Candidates*,
   NPR.org (July 8, 2025), http://bit.ly/4eZFUks ............................................. 9
David A. Fahrenthold, *I.R.S. Says Churches Can Endorse Candidates From the Pulpit*,
   N.Y. Times, July 7, 2025, http://bit.ly/40yfL6B ........................................... 9
Executive Order 13,798 (May 9, 2017) ............................................................ 18, 21
Free Speech Fairness Act, H.R. 2501, 119th Cong. (2025),
   http://bit.ly/4lOu0g5 ............................................................................................ 23
Free Speech Fairness Act, S. 1205, 119th Cong. 119 (2025),
   http://bit.ly/41aElKM ......................................................................................... 23
*Freedom From Religion Found., Inc. v. Trump*, No. 17-CV-330

(W.D. Wisc. Aug.  22, 2017), ECF No. 17....................................................... 18, 22

H.R. 1, 115th Cong. § 5201(a)(1)(A)–(B) (2018),

    http://bit.ly/4f5NpGR ................................................................................. 22

*Intervene*, *Merriam-Webster's Dictionary* (2025) ............................................ 26

IRS Revenue Ruling 2007-41,

    https://www.irs.gov/pub/irs-drop/rr-07-41.pdf .......................................... 25

Jeremy Schwartz & Jessica Priest, *Churches Are Breaking the Law and*

    *Endorsing In Elections, Experts Say. The IRS Looks the Other Way*,

    Tex. Tribune-Pro Publica Investigation Unit (Oct. 30, 2022),

    http://bit.ly/4f6C7lH/ .............................................................................. 12

Project Fair Play, *The Tax Bill*, Ams. United for Separation of Church & State,

    http://bit.ly/3IGZZA8 (last visited July 25, 2025). ................................... 22

*Protecting the Johnson Amendment and Nonprofit Nonpartisanship*,

    Nat'l Council of Nonprofits,

    http://bit.ly/4o26gqh (last visited July 25, 2025) ........................... 7, 8, 23

Pub. Religion Rsch. Inst., *Most Americans Oppose Churches Endorsing*

    *Political Candidates* (July 8, 2025),

    http://bit.ly/4kW7bpu ................................................................................ 8

Rob Boston, *Partisan Politics Has No Place in America's Houses of Worship*,

    Ams. United (Aug. 14, 2024), http://bit.ly/4f6C7lH....................................... 13

Tom Gjelten, *Another Effort to Get Rid of the 'Johnson Amendment' Fails*,

    NPR.org (Mar. 22, 2018), http://bit.ly/4kQ0q8J ...................................... 8

## Rules

Local Rule CV-7(a)(1........................................................................................ 6

## Regulations

26 C.F.R. § 1.501(c)(3)-1(c)(3)(iii)................................................................... 25

## INTEREST OF AMICUS CURIAE

Americans United for Separation of Church and State ("Americans United") is a national, nonsectarian, public interest organization that seeks to preserve the separation of church and state as a vital component of democratic government, and to advance the free exercise rights of individuals and religious communities to worship as they see fit. Because Americans United is a § 501(c)(3) nonprofit organization that is subject to the "Johnson Amendment," its rights will be directly and adversely impacted if the Court grants the Parties' Joint Motion for Entry of Consent Judgment, ECF No. 35. As described in its pending Motion to Intervene as Defendant, ECF No. 37, Americans United has a demonstrated and particular interest in preventing churches and other nonprofits from engaging in partisan political campaigns, as well as a long history of defending the Johnson Amendment.[1] Americans United files this brief pursuant to the Court's July 14, 2025 Order, ECF No. 42, to detail its objections to the Proposed Order and Final Judgment, ECF No. 35-1 ("Proposed Consent Decree" or "Decree").

Americans United believes that government may properly exempt religious institutions or activities from legal requirements in certain circumstances to lift burdens on religious exercise and avoid governmental interference with religion. But it opposes transformation of this principle into a rule that would permit religious organizations to avoid legal obligations generally. Consistent with Americans United's support for the separation of church and state, the organization opposes a legal framework that exempts churches from the requirement that § 501(c)(3) organizations refrain from campaign involvement.

---

[1] *See e.g.*, Boston Decl. ¶¶ 5–8, ECF No. 37-1; Brief of *Amici Curiae* Americans United for Separation of Church and State and People for the American Way Foundation on Behalf of Appellee, *Branch Ministries v. Rossotti*, 211 F.3d 137 (D.C. Cir. 2000), No. 99-5097.

**STATEMENT OF ISSUES**

Consistent with Local Rule CV-7(a)(1), Americans United declares that the issues in this *amicus* brief are: (1) whether the Anti-Injunction Act, 26 U.S.C. § 7421(a), bars the present lawsuit; (2) whether the Plaintiffs have Article III standing; (3) whether this case is ripe for adjudication; and (4) whether the Court should reject the Proposed Consent Decree as unlawful, unconstitutional, unreasonable, or contrary to public policy.

**SUMMARY OF ARGUMENT**

The Court lacks subject matter jurisdiction over the present case. The Anti-Injunction Act bars this lawsuit. Even if the Anti-Injunction Act did not apply, Plaintiffs would lack Article III standing and their claims are not ripe for adjudication.

If the Court concludes that it has jurisdiction to hear the case, it should nonetheless reject the Proposed Consent Decree because it is unlawful, contrary to public policy, unreasonable, or unconstitutional. The Decree represents the Parties' attempt to eliminate the Johnson Amendment through litigation, improperly bypassing Congress. The statutory interpretation that the Parties propose cannot be squared with the text of the Johnson Amendment and misreads the Supreme Court's Establishment Clause precedent. Finally, the Proposed Consent Decree would lead to unequal treatment of similarly situated nonprofit organizations— a result that is both unreasonable and proscribed by law.

**ARGUMENT**

**I.    Introduction**

In 1954, Congress amended the Internal Revenue Code to provide that organizations "operated exclusively" for religious or charitable purposes under Section 501(c)(3) may not "participate in, or intervene in" political campaigns by endorsing or opposing candidates for public

office. 26 U.S.C. § 501(c)(3). Popularly known as the "Johnson Amendment," this law was enacted with broad bipartisan support, and retains widespread public support more than seventy years later. *See* 100 Cong. Rec. 9604 (1954); *Protecting the Johnson Amendment and Nonprofit Nonpartisanship*, Nat'l Council of Nonprofits, http://bit.ly/4o26gqh (last visited July 25, 2025); Pub. Religion Rsch. Inst., *Most Americans Oppose Churches Endorsing Political Candidates* (July 8, 2025), http://bit.ly/4kW7bpu.

The Johnson Amendment protects nonprofits, including churches and other houses of worship, from becoming conduits for partisan politics. It ensures that special interests, corporations, and wealthy donors cannot co-opt nonprofits in the service of political campaigns or candidates. And it particularly preserves the integrity of houses of worship, in keeping with the principles underlying the constitutional separation of church and state; as James Madison wrote, religion and government "both exist in greater purity, the less they are mixed together." Letter from James Madison to Edward Livingston (July 10, 1822), https://bit.ly/3lwDDlo. Over the years, Congress has repeatedly refused calls to weaken or abolish the Johnson Amendment, including President Trump's efforts to "destroy" the Johnson Amendment. *See Charities, Churches and Politics*, Internal Revenue Serv., http://bit.ly/4kV9f14 (last updated May 29, 2025); Tom Gjelten, *Another Effort to Get Rid of the 'Johnson Amendment' Fails*, NPR.org (Mar. 22, 2018), http://bit.ly/4kQ0q8J; Nat'l Council on Nonprofits, *Protecting the Johnson Amendment*, *supra.*

In August 2024, Plaintiffs—four nonprofit organizations, including two churches—filed a lawsuit arguing that the Johnson Amendment violates the First and Fifth Amendments to the U.S. Constitution and the Religious Freedom Restoration Act. Compl. ¶¶ 101–43, ECF No. 1. While Defendants initially sought to defend the Johnson Amendment, *see generally* Mot. to Dismiss, ECF No. 13, they abruptly changed course under the new Trump administration. In July 2025, the

Parties jointly moved for entry of a consent decree that would radically reinterpret the Johnson Amendment. In defiance of the plain language of 26 U.S.C. § 501(c)(3), the Proposed Consent Decree announces that "communications from a house of worship to its congregation in connection with religious services through its usual channels of communication on matters of faith do not run afoul of the Johnson Amendment." Proposed Consent Decree ¶ 3. By its express terms, the Decree only enjoins the government from enforcing the Johnson Amendment against Plaintiffs Sand Springs Church and First Baptist Waskom. *Id.* ¶ 7. But its sweeping legal pronouncements imply— if not outright effect—wholesale invalidation of the Johnson Amendment with respect to houses of worship.[2]

Unable to achieve their aims through the political process, the Parties seek to destroy the Johnson Amendment via binding judicial decree. In doing so, the Parties attempt an end run around Congress, the courts, and other procedural safeguards that the IRS would otherwise need to clear to achieve its desired outcome. The Court should deny this attempt and reject the Proposed Consent Decree because it lacks subject matter jurisdiction to hear this case. If the Court reaches the substance of the Proposed Consent Decree, it should reject the Parties' proposal as unreasonable, unlawful, unconstitutional, or contrary to public policy.

## II.    The Court Lacks Subject Matter Jurisdiction Over This Case.

This Court is obliged to reject the Proposed Consent Decree because it lacks subject matter jurisdiction over this action as a whole. Federal courts have a "constitutional duty . . . to decline subject matter jurisdiction where it does not exist," even if no party has affirmatively raised the

---

[2] At minimum, the Decree has been publicly perceived as broadly applicable, and will embolden politicians and houses of worship nationwide to disregard the Johnson Amendment. *See, e.g.*, David A. Fahrenthold, *I.R.S. Says Churches Can Endorse Candidates From the Pulpit*, N.Y. Times, July 7, 2025, http://bit.ly/40yfL6B; Daniel Burke et al., *IRS Says Churches Can Now Endorse Political Candidates*, NPR.org (July 8, 2025), http://bit.ly/4eZFUks.

issue. *Abraugh v. Altimus*, 26 F.4th 298, 304 (5th Cir. 2022). If the Court does not have jurisdiction over this case, it necessarily lacks jurisdiction to enter a proposed consent decree. *See, e.g.*, *Cornerstone Credit Union League v. Consumer Fin. Prot. Bureau*, No. 4:25-CV-16-SDJ, 2025 WL 1920148, at *74 (E.D. Tex. July 11, 2025).

The present lawsuit is barred under the Anti-Injunction Act ("AIA"), 26 U.S.C. § 7421. Even if it were not, Plaintiffs lack standing to pursue their claims, and their claims are not ripe for adjudication. The Court should therefore dismiss this case for lack of jurisdiction and decline to enter the Proposed Consent Decree.

### A.  Plaintiffs' Claims Are Barred By the Anti-Injunction Act.

#### i.    This Lawsuit Relates to Assessment or Collection of Taxes.

The AIA provides that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." 26 U.S.C. § 7421(a). The Fifth Circuit has interpreted the AIA broadly, confirming that it applies "not only to the assessment and collection of taxes, but [also] to 'activities which are intended to or may culminate in the assessment or collection of taxes.'" *Linn v. Chivatero*, 714 F.2d 1278, 1282 (5th Cir. 1983) (quoting *Kemlon Prods. & Dev. Co. v. United States*, 638 F.2d 1315, 1320 (5th Cir. 1981)). To determine whether the AIA bars suit, courts inquire whether "a primary purpose" of the lawsuit is to prevent tax collection or assessment. *Bob Jones Univ. v. Simon*, 416 U.S. 725, 738 (1974).

There can be "little doubt" that, when the harm at issue is the loss of § 501(c)(3) status, "a primary purpose of [the] lawsuit is to prevent [the IRS] from assessing and collecting" taxes from the organization and/or its donors. *See id.*; *see also Alexander v. Ams. United, Inc.*, 416 U.S. 752, 760 (1974) ("Under any reasonable construction of the statutory term 'purpose,' the objective of

this suit [challenging revocation of § 501(c)(3) status] was to restrain the assessment and collection of taxes from respondent's contributors"). Plaintiffs argue that this lawsuit has "no implications for tax collection," because what is truly at issue is the "chilling effect" the Johnson Amendment has on their free speech and free exercise rights. Am. Compl. ¶ 106, ECF No. 20 (quoting *Z Street v. Koskinen*, 791 F.3d 24, 30 (D.C. Cir. 2015)). But this alleged "chilling effect" is inextricably linked to Plaintiffs' concern that they will lose § 501(c)(3) status. *See id.* ¶¶ 37–40 (Plaintiffs would take certain actions "but for the fact that the Johnson Amendment would threaten their nonprofit status or subject them to other penalties within the Internal Revenue Code.") Revocation of § 501(c)(3) status would not legally prevent Plaintiffs, including the Plaintiff churches, from operating. If all that Plaintiffs wanted was to endorse or oppose political candidates, they could create a § 501(c)(4) entity through which to do so. *See Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 552 (1983) (Blackmun, J., concurring) ("A § 501(c)(3) organization's right to speak is not infringed, because it is free to make known its views . . . through its § 501(c)(4) affiliate without losing tax benefits for its [charitable] activities."); *Branch Ministries v. Rossotti*, 211 F.3d 137, 143 (D.C. Cir. 2000) (churches that wish to engage in political communications can "form a related organization under [§] 501(c)(4)").

In other words, the real issue in this case is whether Plaintiffs can receive tax benefits under § 501(c)(3) for speech that endorses or opposes political candidates. It is hard to see why Plaintiffs "would . . . be interested in obtaining the declaratory and injunctive relief requested if that relief did not effectively restrain the taxation" of the organizations themselves and their contributors. *See Ams. United*, 416 U.S. at 761; *see also Linn*, 714 F.2d at 1285 ("[The Fifth Circuit has] stated in unequivocal terms that the fact that [a] lawsuit involves a constitutional claim does not mean that the Anti-Injunction Act is inapplicable" if the "primary purpose" of the lawsuit is related to the

collection and assessment of taxes). Because this lawsuit is related to the collection and assessment of taxes, it falls within the purview of the AIA.

### ii.    Plaintiffs Are Not Certain to Succeed on the Merits of Their Constitutional or Statutory Claims.

In the case of a pre-enforcement action, the AIA bars suit unless: (i) the plaintiff is certain to succeed on the merits; and (ii) the plaintiff will suffer irreparable harm in the absence of an injunction. *Ams. United*, 416 U.S. at 758. Plaintiffs bear the "heavy burden of demonstrating that under no circumstances could the Government prevail." *McCabe v. Alexander*, 526 F.2d 963, 965 (5th Cir. 1976).

Plaintiffs cannot carry this burden. It is far from certain that they will succeed on any of their constitutional or statutory claims—and indeed, Plaintiffs face a steep uphill battle on the merits. The D.C. Circuit has previously rejected similar allegations that the Johnson Amendment violated a church's free exercise and free speech rights, concluding that the Johnson Amendment is "viewpoint neutral" because it "prohibit[s] intervention in favor of all candidates for public office by all tax-exempt organizations, regardless of candidate, party, or viewpoint." *Branch Ministries*, 211 F.3d at 144; *see also Regan*, 461 U.S. at 546 (holding, in the context of lobbying restrictions, that § 501(c)(3) does not violate the First Amendment).[3] And while several of Plaintiffs' claims hinge on allegations that the Johnson Amendment is discriminatorily enforced against conservative and/or religious organizations, Plaintiffs fall far short of proving that this is

---

[3] In both *Branch Ministries* and *Regan*, the AIA did not apply and the constitutionality of the Johnson Amendment was properly before the court. This was because the IRS had already taken concrete action in relation to the plaintiffs' tax-exempt status. *See Branch Ministries*, 211 F.3d at 138 (IRS revoked church's § 501(c)(3) status); *Regan*, 461 U.S. at 542 (IRS denied application for § 501(c)(3) status). *See* Section II.A(iii), *infra.*

the case.[4] Nor is it clear from the facts that the Johnson Amendment indisputably constitutes a burden on Plaintiffs' religious exercise as required under the Free Exercise Clause or the Religious Freedom Restoration Act, *see* Am. Compl. ¶ 145, or that an exemption would be required even if such a burden existed. *See, e.g.*, *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 20 (1989) (explaining that a religious tax exemption to state sales tax would not be constitutionally required unless religious objectors demonstrated "an infringement on their free exercise rights" that was "sufficiently serious to overcome the State's countervailing interest in collecting sales tax"). The AIA conclusively bars a pre-enforcement suit in this case.

### iii.    Plaintiffs Have an Adequate Legal Alternative.

The AIA does not apply if the plaintiff would be left with no other recourse. *South Carolina v. Regan*, 465 U.S. 367, 378 (1984). For example, the D.C. Circuit held that the AIA does not apply when an organization "[sought] an order prohibiting the IRS from *delaying* consideration of [its § 501(c)(3)] application," because this harm would not be redressed even if the IRS subsequently granted tax-exempt status. *Z Street*, 791 F.3d at 31 (emphasis added).

In this case, the AIA applies because Plaintiffs have an alternative remedy through the Internal Revenue Code, 26 U.S.C. § 7428. Plaintiffs are not challenging the process through which the IRS will determine their tax eligibility: they are seeking assurance that the IRS will not revoke their § 501(c)(3) status if they engage in activities that are prohibited under the Johnson

---

[4] While the Amended Complaint cites multiple incidents in which the IRS ostensibly failed to enforce the Johnson Amendment against left-leaning nonprofits and churches, *see* Am. Compl. ¶¶ 54-98, it fails to mention comparable (and equally numerous) instances in which the IRS did not enforce the Johnson Amendment against right-leaning churches and nonprofits. *See, e.g.*, Jeremy Schwartz & Jessica Priest, *Churches Are Breaking the Law and Endorsing In Elections, Experts Say. The IRS Looks the Other Way*, Tex. Tribune-Pro Publica Investigation Unit (Oct. 30, 2022), http://bit.ly/4f6C7lH/; Rob Boston, *Partisan Politics Has No Place in America's Houses of Worship*, Ams. United (Aug. 14, 2024), http://bit.ly/4f6C7lH.

Amendment. Section 7428 provides an adequate—and exclusive—remedy for organizations that wish to challenge § 501(c)(3) status determinations.

In *Bob Jones University v. Simon*, an organization sued to stop the IRS from revoking or threatening to revoke its § 501(c)(3) status, arguing that such revocation would violate its First Amendment, due process, and equal protection rights. 416 U.S. at 725. Critically, the lawsuit was filed after the IRS had announced that it would revoke status, but before any taxes had been collected. The Supreme Court held that the AIA barred suit, and that the plaintiff's only recourse was to petition the Tax Court for review after taxes had been collected. Even though this remedy "present[ed] serious problems of delay, during which the flow of donations to the organization [would] be impaired and . . . perhaps terminated," it was sufficient to support application of the AIA. *Id.* at 748. The Cout lamented the "harsh regime" the AIA imposed on § 501(c)(3) organizations, but noted that it was up to Congress to provide additional relief. On the same day, the Court issued a similar ruling in *Alexander v. Americans United, Inc.*, holding the AIA barred suit even after the IRS formally revoked an organization's § 501(c)(3) status. 416 U.S. at 755.

Congress enacted 26 U.S.C. § 7428 in direct response to *Bob Jones* and *Americans United*, intending to mitigate the impact of the AIA on nonprofits seeking to challenge adverse determinations of their § 501(c)(3) status. *See Urantia Foundation v. C.I.R.*, 684 F.2d 521, 524 (7th Cir. 1982). But Congress cabined this new remedy in several important ways. First, Section 7428 only applies to organizations challenging an actual, adverse determination of their own tax classification. 26 U.S.C. § 7428(a), (b)(1). Second, Section 7428 requires exhaustion of administrative remedies. *See id.* § 7428(b)(2). Third, petitioners must file their lawsuit in the U.S. Tax Court, the Court of Federal Claims, or the U.S. District Court for the District of Columbia. *Id.* § 7428(a)(2).

14

In their Amended Complaint and Motion for Summary Judgment, Plaintiffs contend that the AIA does not apply because plaintiffs have no alternative means of challenging the IRS's action. *See* ECF No. 20, ¶ 104; ECF No. 23 at 11-12. They are mistaken. Section 7428 is the sole appropriate remedy for organizations challenging the loss or denial of § 501(c)(3) status. Plaintiffs did not seek to bring this lawsuit under § 7428, and for good reason: since the IRS has not actually made a determination on Plaintiffs' status, there is no actual controversy for the court decide. *See also CREATE (Christian, Rsch., Educ., Tech. Enter., Inc.) v. C.I.R*, 634 F.2d 803, 811 (5th Cir. 1981) (Section 7428 requires an actual controversy respecting an organization's tax classification); *Urantia Foundation*, 684 F.2d at 524 (a "hypothetical or superfluous ruling by the IRS [is] not reviewable under [Section 7428]"). This does not mean, however, that Plaintiffs have no adequate legal remedy for the harms they allege. Rather, they must wait until the IRS makes an actual determination on their status, and then pursue relief through the appropriate channels. Contrary to Plaintiff's suggestion, *see* Mot. Summ. J. 11, ECF No. 23 this requirement is the same when plaintiffs raise constitutional objections. *See Linn*, 714 F.3d at 1282 (taxpayer cannot "avoid the proscriptions of the Anti-Injunction Act [by] styl[ing] his complaint to allege a constitutional violation"); *see also Ams. United*, 416 U.S. at 759 ("[D]ecisions of this Court make it unmistakably clear that the constitutional nature of a taxpayer's claim . . . is of no consequence under the Anti-Injunction Act.").

Plaintiffs may perceive this requirement as unsatisfying or unfair. It is nonetheless the law. *Cf. Bob Jones*, 416 U.S. at 749–50 ("In holding that [the AIA] blocks the present suit, we are not unaware that Congress has imposed an especially harsh regime on [§] 50(c)(3) organizations threatened with loss of tax-exempt status . . . But this matter is for Congress."). In response to *Bob Jones* and *Americans United*, Congress could have designed a more permissive scheme that would

15

permit pre-enforcement challenges like Plaintiffs'. It chose not to. Because "[t]his is not a case in which an aggrieved party has no access at all to judicial review," the AIA bars suit. *Id.* at 748.[5]

### B.  Plaintiffs Lack Article III Standing.

Even if the AIA did not apply, Plaintiffs would not have standing to bring this lawsuit. To establish Article III standing, a plaintiff must show (1) an injury-in-fact, (2) that was caused by or is fairly traceable to the actions of the defendant, and (3) that is capable of resolution and likely to be redressed by judicial decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). "An injury sufficient to satisfy Article III must be 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Lujan*, 504 U.S. at 560). An allegation of future injury is "concrete" only "if the threatened injury is 'certainly impending' or there is a 'substantial risk' that the harm will occur." *Id*. (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)). This is not the case here.

Here, plaintiffs have filed a pre-enforcement challenge to the Johnson Amendment.[6] In this context, a plaintiff must establish an injury-in-fact by demonstrating it "1) has an 'intention to engage in a course of conduct arguably affected with a constitutional interest,'" (2) the "intended

---

[5] Plaintiffs also assert jurisdiction under 28 U.S.C. § 1346 and the Declaratory Judgment Act, 28 U.S.C. § 2201. Am. Compl. ¶¶ 17, 19. Neither of these statutes permit Plaintiffs or the Court to bypass the AIA. 28 U.S.C. § 1346(a) applies to actions "for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected." This is inapplicable where, as here, the IRS has not yet assessed or collected taxes. Similarly, the Declaratory Judgment Act contains an exception for actions "with respect to Federal taxes other than actions brought under [26 U.S.C. § 7428]." 28 U.S.C. § 2201. Because this exception is "at least as broad as" the AIA, the Court similarly lacks jurisdiction under the Declaratory Judgment Act. *Rivero v. Fidelity Investments, Inc.*, 1 F. 4th 340, 345 (5th Cir. 2021) (quoting *McCabe*, 526 F.2d at 965)); 22 U.S.C. § 2201.

[6] As discussed in Section II.A(ii), *supra*, a stricter standard applies in the context of pre-enforcement suits that fall under the purview of the AIA, even where such suits involve First Amendment claims. The Court should engage in a traditional standing analysis only if first concludes that the AIA does not bar suit.

future conduct is 'arguably . . . proscribed'" by the challenged policy, and (3) "'the threat of future enforcement . . . is substantial.'" *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020) (citing *Susan B. Anthony List*, 573 U.S. at 161–64). And in pre-enforcement freedom of speech claims, while a chilling effect sometimes confers standing, *Speech First*, 979 F.3d at 331, to show a "chilling effect" sufficient to confer standing, plaintiffs must also show a specific and objective threat of present or future harm, *see Glass v. Paxton*, 900 F.3d 233, 238–39 (5th Cir. 2018) (quoting *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972) ("'Allegations of a subjective "chill" are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm.'").

Plaintiffs cannot show a substantial threat of future enforcement. In general, plaintiffs do not have standing if their injury relies on a "speculative chain of possibilities" that "require guesswork as to how independent decisionmakers will exercise their judgment." *See Clapper*, 568 U.S. at 413–414. The Secretary of Internal Revenue "may" bring a civil action against a § 501(c)(3) organization "only if" the IRS issues a formal warning and the Commissioner of Internal Revenue "personally determine[s]" both that the organization "flagrantly" violated the prohibition on political campaigning and that injunctive relief is appropriate to "prevent future political expenditures." 26 U.S.C. § 7409(a). After affirming the Commissioner's findings, the court "may" enjoin the organization from making political expenditures or grant other appropriate relief, such as revocation of § 501(c)(3) status. *Id.* § 7409(b). The likelihood that the Johnson Amendment will be enforced against plaintiffs thus relies on a chain of speculative possibilities insufficient to confer standing. *See Clapper*, 568 U.S. at 413.

Furthermore, the government has publicly and repeatedly disclaimed its intent to enforce the Johnson Amendment against houses of worship. The Proposed Consent Decree acknowledges that the IRS "generally has not enforced the Johnson Amendment against houses of worship for

17

speech concerning electoral politics in the context of worship services," and cites to a 2017 Executive Order pledging that that the government would not take "any adverse action against any . . . house of worship . . . on the basis that such . . . organization speaks of or has spoken about moral or political issues from a religious perspective where speech of similar character has, consistent with law, not ordinarily been treated as participation or intervention in a political campaign . . . by the Department of the Treasury." Proposed Consent Decree ¶ 4 (quoting Executive Order 13,798 (May 9, 2017)). In a 2017 court filing defending the Executive Order, the IRS confirmed that it did not intend to "take adverse actions against religious organizations that it would not take against other organizations in the enforcement of [the Johnson Amendment]." *See* Mot. to Dismiss at 1, *Freedom From Religion Found., Inc. v. Trump*, No. 17-CV-330 (W.D. Wisc. Aug. 22, 2017), ECF No. 17. The IRS further assured secular nonprofits that there was "no reason to believe" that the Johnson Amendment would be implemented in a discriminatory fashion. *Id.* It is difficult to reconcile such statements with the notion that houses of worship are at substantial risk of discriminatory enforcement.

While lack of past enforcement does not, alone, doom standing, *Speech First, Inc.*, 979 F.3d at 336, the government's failure to enforce the Johnson Amendment in the past constitutes persuasive evidence that there is no "impending" likelihood of enforcement here. Defendants have never investigated or threatened to investigate Plaintiffs. As Plaintiffs acknowledge in their Amended Complaint, Defendants have not enforced the Johnson Amendment against ostensibly clear violations in the past. Am. Compl. ¶¶ 89–98. And Defendants have explicitly "disavowed any intention" of invoking the provision against Plaintiffs. *Cf. Babbit v. United Farm Workers Nat'l Union*, 442 U.S. 289 (1979) (holding that future enforcement was likely where the government did not disavow its intent to enforce the law). The Fifth Circuit generally assumes a

18

credible threat of prosecution under a non-moribund law in the absence of "contrary evidence." *Speech First*, 979 F.3d at 335. Here, there is ample "contrary evidence" to overcome that presumption and to demonstrate that Plaintiffs do not face a substantial risk of enforcement. *See id.*

### C.  Plaintiffs' Claims are Not Ripe for Adjudication

For similar reason, Plaintiffs' claims are not ripe for adjudication. "[T]he Article III standing and ripeness issues" in a pre-enforcement challenge like this one, turning on whether there is actual, imminent injury, "'boil down to the same question.'" *Susan B. Anthony List*, 573 U.S. at 157 n.5, 158 (2014) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8 (2007). Ripeness doctrine tells courts to avoid "premature adjudication." *Choice Inc. of Texas v. Greenstein*, 691 F.3d 710, 715 (5th Cir. 2012) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967)). Courts must "dismiss a case for lack of 'ripeness' when the case is abstract or hypothetical." *Choice Inc. of Texas*, 691 F.3d at 715. And "[i]n determining whether a case is ripe," the Fifth Circuit "rel[ies] on two 'key considerations': 'the fitness of the issues for judicial resolution and the hardship to the parties of withholding court consideration.'" *Total Gas & Power N.A., Inc. v. FERC*, 859 F.3d 325, 333 (5th Cir. 2017) (quoting *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 833 F.2d 583, 586 (5th Cir. 1987)). Pre-enforcement claims are likewise "subject to the ripeness requirement," and are ripe only when "actual controversy" exists. *Id.*

If "constitutional arguments [for relief] are . . . predicated on uncertain future events," as they are in this case, then the claims are not justiciable. *Id.* at 335. For example, in *Total Gas & Power*, the Fifth Circuit held that a challenge to the Federal Energy Regulatory Commission's authority to adjudicate violations of the Natural Gas Act was premature in part because FERC had not yet determined that the plaintiffs had actually violated the Natural Gas Act. *Id.* This was true

even though the government agency had already initiated enforcement proceedings when the court

held that the claim was not yet justiciable. *Id.* at 336. The claims in this case are even less ripe:

there has not yet been any determination that the plaintiffs have violated the Johnson Amendment,

nor has the government indicated any intent to investigate Plaintiffs, even if they were to engage

in the conduct described in the Amended Complaint.

### III.    The Court Should Reject the Proposed Consent Decree as Unconstitutional, Unlawful, Contrary to Public Policy, or Unreasonable.

If the Court concludes that it has subject matter jurisdiction to consider this case, it should

nonetheless reject the Proposed Consent Decree.

Before approving a consent decree, a trial court must ensure that the proposed agreement

is not "unconstitutional, unlawful . . . contrary to public policy, or unreasonable." *United States v.*

*City of Miami (Miami I)*, 614 F.2d 1322, 1333 (5th Cir. 1980). A consent decree is a "judicial act"

that requires the court to "exercise equitable discretion." *League of United Latin Am. Citizens,*

*Council No. 4434 v. Clements (LULAC)*, 999 F.2d 831, 845–846 (5th Cir. 1993). Although

proposed consent decrees are generally entitled to a presumption of validity, *see Miami I*, 614 F.2d

at 1333, the court must engage in "careful . . . scrutiny" before "put[ting] the court's sanction on

and power behind" the parties' agreement. *Ibarra v. Tex. Emp't Comm'n*, 823 F.2d 873, 878 (5th

Cir. 1987) (quoting *United States v. City of Miami* (*Miami II*), 664 F.2d 435, 441 (5th Cir. 1981)

(Rubin, J., concurring)). When a consent decree "has the potential to affect third parties," courts

must make an "additional finding" that the impact on third parties is "neither unreasonable nor

proscribed." *Williams v. City of New Orleans*, 729 F.2d 1554, 1560 (5th Cir. 1984) (quoting *Miami*

*II*, 664 F.2d at 440 (Rubin, J., concurring)). "Courts must [also] be especially cautious when parties

seek to achieve by consent decree what they cannot achieve by their own authority." *LULAC*, 999

F.2d at 846.

The Proposed Consent Decree is unlawful, contrary to public policy, and unreasonable. The Decree raises serious constitutional concerns under the Establishment Clause, the Equal Protection Clause, and the Separation of Powers doctrine. And it will have an unreasonable and unlawful impact on third parties, including Americans United. At minimum, and in light of the concerns raised in this brief and in the public sphere, this Court has "at the very least discretion, if not indeed the duty, to hold [an evidentiary] hearing before acting" on the Proposed Consent Decree. *Overton v. City of Austin*, 748 F.2d 941, 953 (5th Cir. 1984).[7]

### A. Having Failed to Obtain Relief Through the Political Process, the Parties Improperly Seek to Impose Their Preferred Policy By Judicial Decree.

Early in his first administration, President Trump vowed to "get rid of and totally destroy the Johnson Amendment." *See* Brendan Fischer, Campaign Legal Ctr., *Destroying the Johnson Amendment: How Allowing Charities to Spend on Politics Would Flood the Swamp That President Trump Promised to Drain* 1 (2017), http://bit.ly/4obqLB1. Shortly afterward, the President issued an Executive Order directing the IRS not to take "any adverse action" against houses of worship or religious nonprofits "on the basis of . . . [prior or ongoing speech] about moral or political issues from a religious perspective, where speech of similar character has, consistent with law, not ordinarily been treated as participation or intervention in a political campaign." Exec. Order No. 21,675, 82 Fed. Reg. 21675, 21675 (May 4, 2017). The President initially announced that this Order was intended to undercut the Johnson Amendment and empower religious leaders to speak

---

[7] The Proposed Consent Decree has attracted substantial attention and critique outside the courtroom. *See, e.g.*, Letter from members of the Congressional Freethought Caucus to Billy Long, Com'r, IRS (July 18, 2025), http://bit.ly/3GHC9nl (urging IRS to reconsider the Proposed Consent Decree); Nat'l Council of Nonprofits, *Statement from the National Council of Nonprofits on IRS Request to Allow Churches to Endorse Political Candidates* (July 7, 2025), http://bit.ly/4o4BqNx (criticizing the Proposed Consent Decree and noting that "[t]he vast majority of nonprofit, faith, philanthropic, and public service communities support the Johnson Amendment and oppose efforts to repeal it").

about politics from the pulpit—though the IRS later conceded that executive authority did not extend so far and that the Johnson Amendment remained binding law that all nonprofits must abide by. *See* Compl. ¶¶ 5–7, *Freedom From Religion Found., Inc. v. Trump*, No. 17-CV-330 (W.D. Wisc. May 4, 2017), ECF No. 1;  Mot. to Dismiss at 1, *supra*. In the end, the Executive Order suggested that the IRS would not enforce the Johnson Amendment against churches, but did not change the way the IRS interpreted the statutory requirements or alter the status of the Johnson Amendment. It simply reiterated the unremarkable constitutional principle that the IRS must treat religious and nonreligious organizations equally under the law.

While the Trump Administration and its supporters launched high-profile attacks on the Johnson Amendment, Congress remained unmoved. As the IRS itself acknowledges, "[t]o the extent that Congress has revisited the [Johnson Amendment] over the years, it has in fact strengthened the ban [on political campaign activity by charities and churches]." *Charities, Churches and Politics*, *supra*. The Johnson Amendment survived substantial tax code revisions that occurred during the Regan administration. Over the last several years in particular, Congress has had many opportunities to reconsider the Johnson Amendment and to adopt an exception for houses of worship speaking to their congregations through ordinary faith channels. It has not done so.

A bill introduced in 2017 would have amended the Internal Revenue Code to permit houses of worship to endorse or oppose political candidates "in the ordinary course of the organization's regular and customary activities," so long as the organization did not incur "more than de minimis incremental expenses." *See* H.R. 1, 115th Cong. § 5201(a)(1)(A)–(B) (2018), http://bit.ly/4f5NpGR. The "house of worship" language was changed during committee consideration and did not end up as part of the enacted bill. *See* Project Fair Play, *The Tax Bill*,

Ams. United for Separation of Church & State, http://bit.ly/3IGZZA8 (last visited July 25, 2025). Additional legislation to weaken the Johnson Amendment has been regularly introduced in Congress since 2017. *See* Nat'l Council of Nonprofits, *Protecting the Johnson Amendment*, *supra*. None of these bills have passed, and the version that is presently before Congress has gained very little traction. *See* Free Speech Fairness Act, S. 1205, 119th Cong. (2025), http://bit.ly/41aElKM; Free Speech Fairness Act, H.R. 2501, 119th Cong. (2025), http://bit.ly/4lOu0g5. Time and time again, Congress has declined to modify the Johnson Amendment to permit political campaigning by § 501(c)(3) organizations, or to carve out an exception for houses of worship.

Having failed to secure the desired exemption through political advocacy or executive action, the Parties now seek to achieve the same objective through judicial decree. The Proposed Consent Decree asserts that "the Johnson Amendment does not reach speech by a house of worship to its congregation, in connection with religious services through its customary channels of communications on matters of religious faith" that "concern[s] electoral politics viewed through the lens of faith." Proposed Consent Decree ¶ 6. The Parties ask the Court to legitimize this assertion as a matter of law, and to create the exception that Congress refuses to create. In an attempt to downplay the magnitude of this request, the Parties insist that formally exempting houses of worship as described simply aligns the law with the "IRS's treatment of the Johnson Amendment in practice." *Id.* ¶ 4. But make no mistake: Congress was (and remains) aware that the IRS does not generally choose to "enforce[] the Johnson Amendment against houses of worship for speech concerning electoral politics in the context of worship services." *See id.* Still, Congress has declined to codify this exception as a matter of law. Since neither the IRS nor the private Plaintiffs have the authority to override Congress's determination, they now ask the Court to take this consequential step on their behalf.

The Court should reject the Parties' attempt to "employ the injunctive power of the federal court to achieve a result that the [government] and plaintiffs were not able to achieve through the political process." *See LULAC*, 999 F.2d at 845. Permitting the Parties to bypass Congress would fundamentally undermine the balance of power among the three branches of government. Such a result is at minimum unreasonable and contrary to public policy, if not outright unconstitutional. Indeed, it raises the risk of improper collusion between the government and private parties to secure certain policy objectives. *Cotton v. Hinton*, 559 F.2d 1327, 1330 (5th Cir. 1977) (consent decree cannot be the "product of collusion between the parties"); *see also LULAC*, 999 F.2d at 846 ("Consent is not enough when litigants seek to grant themselves power they do not hold outside of court."). Even the possibility of such collusion should dissuade the Court from approving the Proposed Consent Decree. *Cotton*, 559 F.2d at 1330.

### B.  The Proposed Consent Decree Asks the Court to Endorse the Parties' Incorrect Interpretation of a Federal Statute.

In matters of statutory interpretation, it is the Court, not the agency, that has the final word. *See Loper Bright Enterps. v. Raimondo*, 603 U.S. 369, 394 (2024). The Proposed Consent Decree postulates a radical reinterpretation of the Johnson Amendment—one which is at odds with the IRS's decades-old understanding of what the law regulates, and which runs counter to the plain language of the statute—and asks the Court to slap its blessing on this legally defective interpretation. The Court should refuse to do so. *Cf. Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988) (rejecting a "novel[]" legal interpretation that was "wholly unsupported by regulations, rulings, or administrative practice," departed from the agency's prior position, and "appear[ed] to be nothing more than an agency's convenient litigating position").

The Johnson Amendment defines a § 501(c)(3) organization, in relevant part, as an organization that "does not participate in, or intervene in (including the publishing or distributing

24

of statements), any political campaign on behalf of (or in opposition to) any candidate for public office." 26 U.S.C. § 501(c)(3). Under decades-old IRS regulations, activities that constitute "participation or intervention in a political campaign" include "the making of oral statements on behalf of or in opposition to" a candidate for public office. 26 C.F.R. § 1.501(c)(3)-1(c)(3)(iii). Historically, the IRS has been clear that the Johnson Amendment applies to statements by faith leaders that are made "at an official church function, in an official publication, or otherwise us[ing] the church's assets." IRS Revenue Ruling 2007-41, at 4, https://www.irs.gov/pub/irs-drop/rr-07-41.pdf. [8]

This interpretation follows logically from the clear and unambiguous language of the statute. When a person openly endorses or opposes a political candidate, they are making a statement that the candidate is (or is not) aligned with that person's values. Endorsements are explicitly directed at others, generally with the intent of informing or influencing how others vote—and thus of impacting the outcome of the campaign. This is particularly evident in the context of faith leaders, whose congregants explicitly look to them for guidance. As the Parties themselves acknowledge, religious leaders often wish to "instruct[] their congregation regarding all aspects of life, including . . . the impact of faith on the choices inherent in electoral politics" in the course of religious services. *See* Joint Mot. for Entry of Consent Judgment ¶ 9, ECF No. 35. It is difficult to fathom how telling congregants who to vote for does not, by intent and design,

---

[8] The IRS's abandonment of its longstanding interpretation of the Johnson Amendment also places the Proposed Consent Decree in tension with the Administrative Procedure Act, which requires agencies go through notice-and-comment rulemaking before announcing a new substantive rule. *See* 5 U.S.C. § 553. "[A] district court abuses its discretion when it enters a consent decree that permanently and substantially amends an agency rule that would otherwise have been subject to statutory rulemaking procedures." *Conservation Nw. v. Sherman*, 715 F.3d 1181, 1187 (9th Cir. 2013).

"interfere with the outcome or course" of a political campaign. *See id.* ¶ 7 (citing *Intervene*, *Merriam-Webster's Dictionary* (2025) (defining "intervene")). The notion that a one-way sermon delivered by a moral authority figure to dozens or hundreds of eligible voters is somehow comparable to a private family discussion about political candidates, *see id.*, strains credulity.

Nonetheless, the Proposed Consent Decree breaks with seventy years of precedent and asserts that the Johnson Amendment, when "properly interpreted," does not apply to "communications from a house of worship to its congregation in connection with religious services through its usual channels of communication on matters of faith." *Id.* ¶¶ 3, 5. To reach this tortured interpretation of the statute, the Parties improperly invoke the canon of constitutional avoidance. *Id.* ¶ 5.

The Parties' statutory reinterpretation, as set out in the Proposed Consent Decree, fails on multiple levels. To begin with, constitutional avoidance is inapplicable where, as here, the plain language of the statute leaves no room for ambiguity. *See Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018); *see also Planned Parenthood of Hou. & Se. Tex. v. Sanchez*, 403 F.3d 324, 341 (5th Cir. 2005) (constitutional avoidance does not apply where the alternate construction is "plainly contrary to legislative intent"). Even if the statutory language were ambiguous, there is no constitutional problem that must be avoided, as discussed in Part II.C, *infra*: the Parties fundamentally misread the Supreme Court's recent decision in *Catholic Charities Bureau, Inc. v. Wisconsin Labor & Industry Review Commission*, 145 S. Ct. 1583 (2025). And the Parties' newly proposed interpretation is, at best, a strained reading of the statute, and one which this Court is duty-bound to reject. *See Loper Bright*, 603 U.S. at 400 ("In the business of statutory interpretation, if it is not the best, it is not permissible.").

While the Parties strive to portray the Proposed Consent Decree as regulating a "narrow, clearly defined category of speech," *see* Opp'n to Mot to Intervene 3, ECF No. 46, the reality is far more ambiguous. To begin with, it is unclear what precisely is meant by "speech by a house of worship to its congregation in connection with religious services through its customary channels of communication on matters of faith, concerning electoral policies viewed through the lens of religious faith." *See* Proposed Consent Decree ¶ 6. For example: Does this language cover any person connected with the church, or just faith leaders? Is this language limited to oral communications, or can it also include written communications? Can these communications be broadly shared—on a website, in a newsletter, etc.—or must they be confined to conversations that occur within a congregation? Because the Parties created this category of speech from whole cloth, nonprofits have no guidance on what it means to speak "in connection with religious services" or through "customary channels of communication on faith." And while this decree nominally applies only to the two Plaintiff Churches, the IRS would be hard pressed to argue that other houses of worship cannot engage in similar conduct without opening itself up to future lawsuits. Far from resolving a statutory ambiguity, the Proposed Consent Decree inserts ambiguity into a previously clear statutory command. The Court should refuse to endorse the Parties' unlawful statutory interpretation.

### C. The Proposed Consent Decree Misinterprets the Federal Establishment Clause.[9]

The proposed consent decree fundamentally misreads the Supreme Court's recent holding in *Catholic Charities* and incorrectly asserts that interpreting the Johnson Amendment as it has

---

[9] The Parties' Joint Motion for Entry of Consent Judgment cites but does not dispute Plaintiffs' argument that "the Johnson Amendment unconstitutionally prohibits § 501(c)(3) organizations from engaging in political speech" and stipulates that "the Court has the power to provide" injunctive relief on this issue. Joint Mot. ¶¶ 4-5. Because this brief is narrowly focused on the

always been interpreted may violate the Establishment Clause. *See* Proposed Consent Decree ¶ 5. The Proposed Consent Decree states that allowing the Johnson Amendment to "reach communications" by religious organizations would "create serious tension with the First Amendment's Establishment Clause" by treating "religions that do not speak directly to matters of electoral politics more favorably than religions that do." *Id.* In upholding the Johnson Amendment as applied to the Plaintiff churches, this Court would not be doing anything of the sort, and would, to the contrary, be reinforcing a core Establishment Clause principle: that separation of church and state benefits religion and government alike.

*Catholic Charities* says only that the government grants an impermissible denominational preference when it "explicitly differentiat[es] between religions based on theological practices." 145 S. Ct. at 1592. The Wisconsin Supreme Court exempted certain religiously-affiliated organizations, but not others, from the state's unemployment tax system based in part on whether they engaged in activities like proselytization, *id.* at 1587—a type of differentiation entirely absent here. The Johnson Amendment applies to religious and nonreligious organizations regardless of sect. At no point must the IRS or a court scrutinize any church's religious practices or beliefs. All nonprofits are subject to the law's eligibility requirements. To the extent they wish to engage in political campaigning, they are free to create a § 501(c)(4) entity. *See Branch Ministries*, 211 F.3d at 143; *Regan*, 461 U.S. at 553 (Blackmun, J., concurring). This is factually distinct from the

---

Proposed Consent Decree itself, and the Decree does not take a position on Free Speech, the brief does not address Plaintiffs' Free Speech claim on the merits. Similarly, the Proposed Consent Decree cites but does not dispute Plaintiffs' argument that the Johnson Amendment "imposes an impermissible burden" on their religious exercise. Proposed Consent Decree ¶ 2. Americans United reads this language in the Proposed Order as describing the nature of Plaintiffs' claim, and not as a concession by Defendants that the Johnson Amendment in fact burdens religious exercise. As such, this brief does not address the merits of Plaintiffs' Free Exercise claim. Americans United opposes each of Plaintiffs' claims on the merits and seeks the opportunity to respond in full as Defendant-Intervenors. *See* Mot. to Intervene.

Wisconsin court's overturned practice of categorizing some organizational purposes as religious, and others as not religious, based on criteria that did not apply to all religions equally.

The Supreme Court in *Catholic Charities* said directly that its holding does not apply to laws that contain "secular criteria that happen to have a disparate impact upon different religious organizations." 145 S. Ct. at 1592 (quoting *Larson v. Valente,* 456 U.S. 228, 247 n.23 (1982)) (citation modified). The Johnson Amendment is precisely such a law. All § 501(c)(3) organizations must abide by the restrictions on political campaigning: the law itself does not discriminate among religions. *See Branch Ministries*, 211 F.3d at 144 (Johnson Amendment "prohibit[s] intervention in favor of all candidates for public office by all tax-exempt organizations, regardless of candidate, party, or viewpoint."). Even if denominations that tend to "speak directly to matters of electoral politics" feel the impact of this law more strongly than others, this alone does not, as Parties would have this Court decree, mean that some religious organizations are treated more favorably under the law. The fact that only some groups wish to be free of the Johnson Amendment does not mean that the Johnson Amendment violates the Establishment Clause.

As the Parties note, *see* Proposed Consent Decree ¶ 5, *Catholic Charities* reinforced the holding in *Larson v. Valente* that "[t]he clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson*, 456 U.S. at 244; *Catholic Charities*, 145 S. Ct. at 1592. In *Larson*, the Supreme Court held that a law that imposed regulatory requirements only on religious organizations that "solicit more than fifty per cent of their funds from nonmembers" violated the Establishment Clause by discriminating among religious denominations. 456 U.S. at 230. Further, unlike here, the Court emphasized that the legislative history of the rule "demonstrate[d] that the provision was drafted with the explicit intention of including particular religious denominations and excluding others." *Id.* at 254. This is

29

clearly religious preference, and one that, like the one at issue in *Catholic Charities*, draws explicit distinctions among sects.

But the Supreme Court has long held that "regulation of conduct whose reason or effect merely happens to coincide or harmonize with the tenets of some or all religions" does not violate the Establishment Clause. *McGowan v. Maryland*, 366 U.S. 420, 442 (1961); *Larson*, 456 U.S. at 246 n.23; *see also Emp. Div, Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 882–83 (1990) (neutral and generally applicable laws do not trigger strict scrutiny under the Free Exercise Clause). And practically every law affects individuals and organizations to a different degree based on their desires. For this to be considered preferential treatment, as Parties would have this Court suggest, would call into question not only decades of Establishment Clause precedent but also the legitimacy of every law that happens to incidentally affect a religious organization.

### D.  The Proposed Consent Decree Treats Plaintiffs More Favorably Than Similarly-Situated Nonprofits, Including Americans United.

Americans United believes that the Johnson Amendment is lawful and that it should be applied equally all § 501(c)(3) organizations, whether religious or nonreligious. But once the government begins carving out exceptions to this generally applicable law, it cannot discriminate against, in favor of, or among different religions. *See Catholic Charities*, 145 S. Ct. at 1591. Nor can it subject similarly-situated organizations to disparate treatment under the law without sufficient justification. *See Wood v. Collier*, 836 F.3d 534, 538–39 (5th Cir. 2016) (citing *City of Cleburne v. Cleburne Living Ctr.* 473 U.S. 432, 439 (1985)); *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

The Proposed Consent Decree would permanently enjoin the government from enforcing the Johnson Amendment against the two Plaintiff churches. Proposed Consent Decree ¶ 7. The Consent Decree thus enshrines a policy of disparate treatment: these churches will be permitted to

oppose political candidates "through [their] customary channels of communication on matters of faith" while still maintaining their § 501(c)(3) status, whereas secular nonprofits like Americans United would remain bound by the Johnson Amendment. *See id.* From the moment the Consent Decree takes effect, Americans United will be subject to unequal treatment under the law. *Freedom from Religion Found. v. Shulman*, 961 F. Supp. 2d 947, 951 (W.D. Wisc. 2013); *see also Texas Monthly*, 489 U.S. at 17 (tax exemption that exempted only religious content would violate the Establishment Clause if it "lack[ed] a secular objective that would justify this preference along with similar benefits for nonreligious . . . groups"). Because the Proposed Consent Decree imposes burdens on third parties that are both "unreasonable" and "proscribed," the Court should reject the Decree. *See Williams*, 729 F.2d at 1560.

To be sure, the government may properly exempt religious institutions or activities from legal requirements in certain circumstances to lift burdens on religious exercise and avoid governmental interference with religion. But that is not the case here. *Cf. Texas Monthly*, 489 U.S. at 18 (state could not claim that its religious tax exemption was compelled by the Free Exercise Clause where "[n]o concrete need to accommodate religious activity has been shown."). Religious organizations are not alone in having members with whom they regularly communicate about key social issues. Many secular nonprofits—Americans United included—have members with whom they might wish to share political views. Under the terms of the Johnson Amendment, these organizations may not tell their members who to vote for, no matter how central a particular issue may be to their organizational mission. And if they wish to do so, they must create a § 501(c)(4) entity. Religious organizations have the same restrictions and the same alternatives. *See Branch Ministries*, 211 F.3d at 143. The Court should reject the Proposed Consent Decree as unlawful to ensure that all § 501(c)(3) organizations receive equal treatment under the law.

31

## IV.    Conclusion

For the foregoing reasons, the Court should reject the Proposed Consent Decree.

<u>Dated</u>: July 25, 2025

Respectfully submitted,

/s/ Alexandra Zaretsky

Alexandra Zaretsky*
Bar No. 5833561 (NY)
Jessica Zalph
Bar No. DC 90017719
Rebecca Markert*
Bar No. WI 1063232
AMERICANS UNITED FOR SEPARATION
OF CHURCH AND STATE
1310 L Street NW, Suite 200
Washington, DC 20005
zaretsky@au.org
zalph@au.org
markert@au.org
(202) 898-2145

*Not a member of the D.C. Bar. Authorized to practice before federal courts pursuant to D.C. App. Rule 49I(3).*

Martin Woodward
Kitner Woodward PLC
13101 Preston Road, Suite 110
Dallas, TX 75240
martin@kitnerwoodward.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 25, 2025, I electronically filed this motion with the Clerk of the Court for the United States District for the Eastern District of Texas by using the CM/ECF system. Counsel in this case are registered CM/ECF users and service will be accomplished using the CM/ECF system.

<u>/s/ Alexandra Zaretsky</u>