# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

NATIONAL RELIGIOUS
BROADCASTERS, *et al.*,

    Plaintiffs,

      v.

BILLY LONG, *in his official capacity as*
COMMISSIONER OF THE INTERNAL
REVENUE SERVICE, *et al.*,

    Defendants.

No. 6:24-cv-311-JCB

---

**BRIEF OF *AMICI CURIAE* CAMPAIGN LEGAL CENTER,
PUBLIC CITIZEN, AND COMMON CAUSE OPPOSING THE PARTIES' JOINT
MOTION FOR ENTRY OF CONSENT JUDGMENT**

Adav Noti*
Kevin P. Hancock*
Sejal Jhaveri*
Heather Szilagyi
CAMPAIGN LEGAL CENTER
1101 14th Street NW, Ste. 400
Washington, DC 20005
(202) 736-2200
anoti@campaignlegalcenter.org
khancock@campaignlegalcenter.org
sjhaveri@campaignlegalcenter.org
hszilagyi@campaignlegalcenter.org

*Counsel for Amici Curiae*

*Applications for Pro Hac Vice admission
forthcoming*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

INTEREST OF *AMICI* ...................................................................................................1

INTRODUCTION ...........................................................................................................1

ARGUMENT ...................................................................................................................2

I.      The Court Should Reject the Consent Decree Because It Would Trigger a New
Flood of Secret Election Spending by Religious 501(c)(3)s ...........................................3

          A.      Secret Election Spending Undermines Voters' Right to Know Who Is
Attempting to Influence Their Votes...................................................................4

          B.      The Johnson Amendment Subsidizes Charitable, Educational, and
Religious Nonprofits While Ensuring That Taxpayers Do Not Fund
Campaign Activity ...........................................................................................7

          C.      The Proposed Consent Judgment Would Violate the Johnson Amendment ....10

          D.      Exempting Religious 501(c)(3)s from the Johnson Amendment
Would Lead to the Creation of a New Class of Religious Super
Dark Money Groups ........................................................................................13

II.     The Johnson Amendment Does Not Violate the Free Speech Clause..........................18

          A.      The Johnson Amendment Does Not Burden Speech ......................................18

          B.      The Johnson Amendment Is Viewpoint Neutral .............................................21

          C.      The Johnson Amendment Is Supported by Compelling Interests ..................23

CONCLUSION................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**                                                                              **Pages**

*Association of the Bar of the City of New York v. Commissioner of Internal Revenue,*
    858 F.2d 876 (2d Cir. 1988)...................................................................9

*Bob Jones Univ. v. United States*, 461 U.S. 574 (1983) ......................................24

*Branch Ministries v. Rossotti*, 211 F.3d 137, 139 (D.C. Cir. 2000) .............................9, 19, 22, 24

*Buckley v. Valeo*, 424 U.S. 1 (1976).................................................................4, 9

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014)......................................19

*Christian Echoes National Ministry, Inc. v. United States*, 470 F.2d 849 (10th Cir. 1972)...........9

*Citizens United v. FEC*, 558 U.S. 310 (2010).....................................1, 4, 6, 8, 17, 21, 24

*Cammarano v. United States*, 358 U.S. 498 (1959) ............................................18, 19

*Frederick Douglass Foundation, Inc. v. District of Columbia*, 82 F.4th 1122
    (D.C. Cir. 2023)...........................................................................22

*Fulani v. League of Women Voters Educ. Fund*, 882 F.2d 621 (2d Cir. 1989) ...........................9

*Harris v. McRae*, 448 U.S. 297 (1980) ...............................................................18

*League of United Latin American Citizens, Council No. 4434 v. Clements*,
    999 F.2d 831 (5th Cir. 1993) ................................................................3

*McConnell v. FEC*, 540 U.S. 93 (2003).............................................................9, 12

*Regan v. Taxation With Representation of Washington*,
    461 U.S. 540 (1983)...........................................7, 15, 18, 19, 20, 21, 24

*SpeechNow.org v. FEC*, 599 F.3d 686 (D.C. Cir. 2010) ...........................................4

*Stovall v. City of Cocoa, Florida*, 117 F.3d 1238 (11th Cir. 1997) ...............................23

*United States v. City of Miami*, 614 F.2d 1322 (5th Cir. 1980) ...................................2

*United States v. American Library Association*, 539 U.S. 194 (2003) ...........................20

*United States v. Louisville Jefferson County Metro Government*, No. 3:24-CV-722-BJB,
    2025 WL 238010 (W.D. Ky. Jan. 18, 2025)...................................................3

*United States v. Young*, No. 23-CR-241, 2024 WL 3030656 (D.D.C. June 17, 2024)..................22

*Wisconsin Education Association Council v. Walker*, 705 F.3d 640 (7th Cir. 2013)..................21

*Ysursa v. Pocatello Education Association*, 555 U.S. 353 (2009)..................................18

## Statutes and Regulations

26 U.S.C. § 170(c)(2) ............................................................................................7

26 U.S.C. § 501(c)(3) ...........................................................................1, 7, 10, 12

26 U.S.C. § 508(c) ...............................................................................................14

26 U.S.C. § 6033 ..............................................................................................5, 14

26 U.S.C. § 6033(a)(1) .........................................................................................14

26 U.S.C. § 6033(a)(3)(A) ....................................................................................14

26 U.S.C. § 6103(a) ...............................................................................................5

26 U.S.C. § 6104(d)(3)(A) ......................................................................................5

26 U.S.C. § 7611 ...................................................................................................14

52 U.S.C. § 30101 ..................................................................................................4

52 U.S.C. § 30101(a)(22) .......................................................................................9

52 U.S.C. § 30102 .............................................................................................4, 16

52 U.S.C. § 30103 .............................................................................................4, 16

52 U.S.C. § 30104(a) ..............................................................................................4

52 U.S.C. § 30104(b) ..............................................................................................4

52 U.S.C. § 30104(c) ..............................................................................................5

52 U.S.C. § 30106 ..................................................................................................5

52 U.S.C. § 30107 ..................................................................................................5

R.I. Gen. Laws § 17-25.3-1(b) ............................................................................17

R.I. Gen. Laws § 17-25.3(2) ................................................................................17

R.I. Gen. Laws § 17-25.3(19) ..............................................................................17

Treas. Reg. § 1.501(c)(3)-1(c)(3)(iii) ....................................................................8

Treas. Reg.  § 301.6104(b)-1(b)(1)-(2) ..................................................................5

## Other Authorities

100 Cong. Rec. 9128 (1954) ...................................................................................8

Adav Noti and Erin Chlopak, *et al.*, *Why the FEC is Ineffective*, Campaign Legal Ctr.

(Aug. 8, 2022), https://perma.cc/CDQ4-TAMB ...........................................5, 17

Ann M. Murphy, *Campaign Signs and the Collection Plate—Never the Twain Shall Meet?*, 1

Pittsburgh Tax Rev. 35 (2003) ........................................................................8

Anna Massoglia, *Dark Money Hit a Record High of $1.9 Billion in 2024 Races*,
Brennan Ctr. For Justice (May 7, 2025), https://perma.cc/R6YC-KKEE ...............................5

Brendan Fischer, *Destroying the Johnson Amendment: How Allowing Charities to Spend on
Politics Would Flood the Swamp That President Trump Promised to Drain*, Campaign Legal
Ctr. (May 3, 2017), https://perma.cc/A986-RC59 ....................................................12, 13, 16

Congressional Budget Office, *Options for Changing the Tax Treatment of Charitable Giving*
(May 2011), https://perma.cc/E9AQ-VCC5 ...........................................................................13

Ellen P. Aprill, *Misunderstanding National Religious Broadcasters*, Tax Notes
(July 25, 2025), https://perma.cc/Q4DY-BBGB.................................................................11, 13

First Baptist Church Waskom, https://fbcwaskom.org/ (last visited July 29, 2025), including via a
YouTube channel, *see* https://www.youtube.com/@FirstBaptistChurchWaskom (last visited
July 29, 2025).................................................................................................................1, 10, 11

IRS Rev. Rul. 2007-41, 2007-25 I.R.B. (June 18, 2007)................................................................8

*IRS: Challenge to Tax Exempt Status of Crossroads GPS, Priorities USA, American Action
Network and Americans Elect, Issued by Campaign Legal Center and Democracy 21*
(Sept. 27, 2011), https://perma.cc/P9GE-JZG3 .....................................................................15

Lloyd Hitoshi Mayer, *How the US government can stop 'churches' from getting treated like real
churches by the IRS*, The Conversation (Sept. 26, 2024), https://perma.cc/9RAN-CVEX.....16

Maha Quadri, *CLC Takes Action to Keep Dark Money Out of Elections*,
Campaign Legal Ctr. (July 18, 2025), https://perma.cc/4T3A-MQY9.....................................5

Megan McAllen, *Delay, Deadlock, Dismiss: Pras Michel Indictment Exposes How FEC
Dysfunction Opens Our Elections to Foreign Meddling*, Campaign Legal Ctr.
(May 15, 2019), https://perma.cc/Q7G7-RL3R .......................................................................7

National Philanthropic Trust, *Charitable Giving Statistics*, https://perma.cc/K7K6-ZSME.........16

Noah Bookbinder, *Push to repeal the Johnson Amendment could open pandora's box for money
in politics*, CREW (Oct. 4, 2016), https://perma.cc/DS56-Z7K8 ...............................12, 13, 16

Roger Colinvaux, *The Political Speech of Charities in the Face of Citizens United:
A Defense of Prohibition*, 62 Case W. Res. L. Rev. 685 (2012)...............................................8

Sands Springs Church, *Sermons*, https://www.sandsspringschurch.com/sermons
(last visited July 29, 2025).......................................................................................................11

v

Taylor Lincoln & Craig Holman, *Fading Disclosure: Increasing Number of Electioneering Groups Keep Donors' Identities Secret*, Pub. Citizen (2010), https://perma.cc/7A55-H7JY ............................................................................................6

## INTEREST OF *AMICI*

This brief is filed by Campaign Legal Center, Public Citizen, and Common Cause. *Amici* are nonpartisan, nonprofit organizations that work in the areas of campaign finance, ethics, and election law to ensure that government is accountable, accessible, and transparent. *Amici* have a longstanding interest in the promotion and defense of measures that protect the integrity of government and believe the parties' proposed consent judgment threatens to erode those protections. All three organizations have participated as *amici* in numerous campaign finance cases, including, for example, *Citizens United v. FEC*, 558 U.S. 310 (2010).

## INTRODUCTION

*Amici* oppose the parties' proposed consent judgment because its adoption would unlawfully exempt religious groups organized under 26 U.S.C. § 501(c)(3) from the Johnson Amendment's prohibition on political campaign intervention. Such a decree would not only violate federal law but also create a dangerous new channel for anonymous, tax-deductible election spending—an unprecedented expansion of "dark money" in American politics.

The proposed judgment would allow houses of worship to endorse or oppose political candidates in their published communications, even when those messages are distributed publicly via broadcast and digital platforms. While facially limited to the Plaintiff Churches (Sand Springs Church and First Baptist Church Waskom), Defendant Internal Revenue Service ("IRS") could not reasonably enforce the Johnson Amendment against other 501(c)(3) religious organizations if its new "interpretation" is adopted in a court order. This would allow such groups to transform into unregulated vehicles for partisan campaigning, funded by taxpayers and shielded from public scrutiny.

This result is incompatible with long-established statutory requirements, judicial precedent, and compelling public policy interests. The Johnson Amendment ensures that public subsidies—through tax exemption and deductibility—support charitable work, not partisan political advocacy. Eliminating this safeguard would open the door to electioneering by groups exempt from financial reporting and disclosing their donors.

The exemption to the Johnson Amendment for religious 501(c)(3)s that the consent decree would create is not required by the First Amendment's freedom of speech, as the parties suggest. The Johnson Amendment imposes no restriction on speech; instead, it conditions eligibility for a taxpayer funded subsidy on a commitment to abstain from campaign intervention. This longstanding, viewpoint-neutral framework has been repeatedly upheld by courts, including the Supreme Court.

In sum, the proposed consent decree improperly seeks to accomplish through judicial fiat what Congress has not authorized. Because the consent decree is unlawful, contrary to public policy, and threatens profound harm to campaign finance transparency and nonprofit integrity, the Court should reject it.

## ARGUMENT

The parties' proposed consent decree must be rejected. Although a proposed consent decree between the parties to a suit is presumptively valid, a district court may only approve a consent decree if it "is not unconstitutional, unlawful, contrary to public policy, or unreasonable." *United States v. City of Miami*, 614 F.2d 1322, 1333 (5th Cir. 1980) (citation omitted). The Fifth Circuit has warned that "[c]ourts must be especially cautious when parties seek to achieve by consent decree what they cannot achieve by their own authority" because "[c]onsent is not enough when litigants seek to grant themselves powers they do not hold outside of court." *League of United*

2

*Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 846 (5th Cir. 1993). Entering a consent decree is an "'extraordinary' step," particularly when it requires "the judge's direct involvement in that policymaking [which] represents a further encroachment on the democratic process." *United States v. Louisville Jefferson Cnty. Metro Gov't*, No. 3:24-CV-722-BJB, 2025 WL 238010, at *1 (W.D. Ky. Jan. 18, 2025).

As detailed below, the proposed consent decree should be rejected as unlawful, contrary to public policy, and unreasonable. First, the decree would unlawfully exempt religious 501(c)(3) organizations from the Johnson Amendment, creating a powerful new class of "dark money" entities capable of engaging in secret, tax-deductible campaign spending. This new loophole would erode longstanding federal safeguards adopted to ensure that charitable subsidies are not used to finance partisan political activity, flood elections with undisclosed money, and severely undermine public trust in the integrity of U.S. campaign finance laws. *See infra* Part I.

Second, the damage the consent judgment would do to the Johnson Amendment and campaign-finance disclosure is not justified by the First Amendment's protections for freedom of speech. The Johnson Amendment is not a restriction on speech but rather a condition on a tax benefit, is viewpoint neutral, and serves compelling government interests. *See infra* Part II.

## I.    The Court Should Reject the Consent Decree Because It Would Trigger a New Flood of Secret Election Spending by Religious 501(c)(3)s

If adopted, the parties' proposed consent decree would open a gaping loophole in the nation's campaign finance disclosure system by exempting Plaintiffs and other religious organizations from the Johnson Amendment's prohibition on electoral campaign activity by section 501(c)(3) organizations. Religious 501(c)(3)s would thereby be tax-deductible conduits for anonymous political spending—similar to the 501(c)(4) "social welfare" groups that already plague the political system—but with even greater secrecy and fewer safeguards. The risks to the

3

integrity and transparency of U.S. elections are profound. Allowing religious organizations to operate as political campaign vehicles while maintaining their 501(c)(3) tax-exempt status would undermine statutory disclosure requirements for campaign contributions and expenditures, increase taxpayer subsidization of partisan activity, and erode public confidence in a campaign finance regime already under siege from abuse.

A.    **Secret Election Spending Undermines Voters' Right to Know Who Is Attempting to Influence Their Votes**

Disclosure of spending on elections serves compelling government interests and is a cornerstone of the federal campaign finance system. As the Supreme Court has emphasized, "enlightened self-government" depends on voters knowing "who is speaking about a candidate shortly before an election," so that they may "make informed choices in the political marketplace." *Citizens United*, 558 U.S. at 339, 367, 369. Disclosure requirements not only equip voters with the information necessary to evaluate political messages but also serve to "deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity." *Buckley v. Valeo*, 424 U.S. 1, 67 (1976) (*per curiam*). Congress has also recognized that transparency is essential to the enforcement of its substantive limits on campaign contributions—including restrictions on donations from foreign nationals, federal contractors, corporations, and unions. *See, e.g.*, *SpeechNow.org v. FEC*, 599 F.3d 686, 698 (D.C. Cir. 2010) (*en banc*).

For these reasons, Congress required broad disclosure of campaign-finance spending in the Federal Election Campaign Act ("FECA"). *See* 52 U.S.C. § 30101, *et seq*. FECA requires that entities spending money to influence federal elections disclose the sources and amounts of their funding. The law establishes a two-tiered disclosure regime. First, organizations whose "major purpose" is federal campaign activity must register as political committees (called "PACs") and

file regular, detailed reports of all non-trivial contributions and expenditures *See id.* §§ 30102, 30103, 30104(a), (b). Second, groups that are not political committees must file event-driven reports if they engage in certain electoral spending, such as for ads expressly advocating the election or defeat of a candidate or broadcast messages targeting voters shortly before an election. *Id.* § 30104(c).

FECA tasks the FEC—a six-member bipartisan agency—with administering and enforcing these rules. *See* 52 U.S.C. § 30106. The FEC has authority to investigate violations, impose penalties, and ensure compliance with both the registration and disclosure requirements. *See id.* § 30107. However, the FEC's effectiveness has been hampered by partisan gridlock, as any enforcement action requires four votes, allowing a bloc of three commissioners to block investigations and dismiss complaints, even when the agency's General Counsel recommends enforcement. *See* Adav Noti and Erin Chlopak, *et al.*, *Why the FEC is Ineffective*, Campaign Legal Ctr. (Aug. 8, 2022), https://perma.cc/CDQ4-TAMB.

Section 501(c)(4) "social welfare" organizations have exploited this dysfunction and regulatory loopholes to become central players in the rise of "dark money"—funding intended to influence elections without public disclosure of its sources. *See* Anna Massoglia, *Dark Money Hit a Record High of $1.9 Billion in 2024 Races*, Brennan Ctr. For Justice (May 7, 2025), https://perma.cc/R6YC-KKEE. The IRS allows these groups to make independent expenditures, run political ads, and support or oppose candidates, so long as these activities are not their primary activity. *See* Treas. Reg. §1.501(c)(4)-1(a)(2)(i); IRS Rev. Rul. 2004-06. These 501(c)(4) nonprofits are thus able to avoid registering with the FEC as political committees while still spending heavily on election-related ads. *See, e.g.*, Maha Quadri, *CLC Takes Action to Keep Dark Money Out of Elections*, Campaign Legal Ctr. (July 18, 2025), https://perma.cc/4T3A-MQY9.

Under the Internal Revenue Code, 501(c)(4)s file minimal reports with the IRS that do not require donor disclosure. *See* 26 U.S.C. §§ 6033, 6103(a), 6104(d)(3)(A); Treas. Reg. § 301.6104(b)-1(b)(1)-(2). And by asserting that their donors do not "earmark" contributions for specific election-related activities, 501(c)(4) groups sidestep FECA's event-driven disclosure requirements for non-political committees. *See, e.g.*, Taylor Lincoln & Craig Holman, *Fading Disclosure: Increasing Number of Electioneering Groups Keep Donors' Identities Secret*, Pub. Citizen at 4-5 (2010), https://perma.cc/7A55-H7JY. Although the Supreme Court's decision in *Citizens United* invalidated longstanding restrictions on corporate (including corporate nonprofit) election spending, the ruling upheld robust disclosure laws. *See* 558 U.S. at 366-71. Yet the FEC, through regulatory loopholes and nonenforcement, has allowed 501(c)(4) organizations to conceal their donors while engaging in substantial campaign activity. This limited disclosure regime combined with a permissive political activity threshold has made 501(c)(4) organizations a popular vehicle for political actors seeking to circumvent federal campaign-finance laws. Although donations to 501(c)(4)s are not tax-deductible, they offer the significant advantage of secrecy in comparison to other forms of election spending where the donor must be disclosed, such as contributions made directly to a political committee, political party, or candidate. *See* 52 U.S.C. § 30104. And because the IRS and FEC have failed to enforce the line between political activity and social welfare purposes, many of these organizations operate as *de facto* political committees without registering or reporting as such.

These deregulatory trends have had dramatic consequences. Since the Supreme Court's 2010 decision in *Citizens United*, 501(c)(4) dark money groups have spent at least $4.3 billion to influence federal elections. *See* Massoglia, *supra* p. 5. Nearly one-third of all independent political spending reported to the FEC since 2010 has come from these groups, while their donors remain

anonymous. Much of this money is either directly spent on electioneering or funneled into super

PACs, which themselves disclose only their immediate contributors—*i.e.*, the 501(c)(4)—not the

original sources of dark money donations, who remain hidden. *See id.* The net result is an erosion

of the FECA disclosure regime and a flood of anonymous campaign funding from prohibited or

restricted sources. Corporations, unions, federal contractors, and foreign nationals—none of whom

FECA permits to contribute directly to candidates—have used 501(c)(4)s to make end-runs around

the law and influence elections in secret. *See, e.g.*, Megan McAllen, *Delay, Deadlock, Dismiss:*

*Pras Michel Indictment Exposes How FEC Dysfunction Opens Our Elections to Foreign*

*Meddling*, Campaign Legal Ctr. (May 15, 2019), https://perma.cc/Q7G7-RL3R. This result has

undermined the public's ability to hold political actors accountable and has reduced transparency,

integrity, and trust in the electoral system.

>**B.     The Johnson Amendment Subsidizes Charitable, Educational, and Religious**
>         **Nonprofits While Ensuring That Taxpayers Do Not Fund Campaign Activity**

Unlike 501(c)(4)s, an entity organized under section 501(c)(3) must be "operated

exclusively" for religious, charitable, or educational purposes, and they may not "participate in, or

intervene in (including the publishing or distributing of statements), any political campaign on

behalf of (or in opposition to) any candidate for public office." 26 U.S.C. § 501(c)(3). In exchange

for compliance with this prohibition on electoral activity—called the "Johnson Amendment"—

501(c)(3)s are exempt from federal income tax, and contributions made to them are deductible

from the donor's taxable income. *See* 26 U.S.C. § 170(c)(2). This tax-exempt status and the

deductibility of contributions function similarly to government grants. *See Regan v. Taxation With*

*Representation of Wash.*, 461 U.S. 540, 544 (1983) (observing that "[a] tax exemption has much

the same effect as a cash grant to the organization" and that deductible contributions are "similar

to cash grants of the amount of a portion of the individual's contributions"). Thus, by reducing the

tax liabilities of both qualifying organizations and their donors, the federal government effectively channels public resources to promote nonprofit activity deemed beneficial to the broader public. *See id.*

The Johnson Amendment was introduced in 1954 by then-Senator Lyndon B. Johnson and enacted by a Republican-controlled Congress with little debate or controversy. *See* 100 Cong. Rec. 9128 (1954). The provision responded to concerns about the growing use of tax-exempt organizations to influence electoral outcomes while shielding donors from public scrutiny. *See id.* Congress's enactment of the Johnson Amendment reflected a longstanding bipartisan recognition that tax-exempt charitable entities should not serve as conduits for political advocacy. *See* Roger Colinvaux, *The Political Speech of Charities in the Face of Citizens United: A Defense of Prohibition*, 62 Case W. Res. L. Rev. 685, 692 (2012). Contrary to later characterizations, the amendment was not narrowly targeted at religious institutions but broadly applied to all section 501(c)(3) entities. *See* Ann M. Murphy, *Campaign Signs and the Collection Plate—Never the Twain Shall Meet?*, 1 Pittsburgh Tax Rev. 35, 48-49 (2003).

Since Congress enacted the Johnson Amendment, the IRS and the courts have made clear that spending on public communications regarding elections qualifies as prohibited participation or intervention in a political campaign. The IRS's guidance states that campaign participation or intervention includes "the publication or distribution of written or printed statements or the making of oral statements on behalf of or in opposition to such a candidate." Treas. Reg. § 1.501(c)(3)-1(c)(3)(iii); *see also* IRS Rev. Rul. 2007-41 at 9, 2007-25 I.R.B. (June 18, 2007) (stating that a 501(c)(3) group making issue advocacy communications "is particularly at risk of political campaign intervention when it makes reference to candidates or voting in a specific upcoming election"). And courts have repeatedly held that public support or opposition to candidates is

inconsistent with 501(c)(3) status. *See, e.g.*, *Branch Ministries v. Rossotti*, 211 F.3d 137, 139 (D.C. Cir. 2000) (upholding the IRS's revocation of a church's 501(c)(3) status for "plac[ing] full-page advertisements in two newspapers in which it urged Christians not to vote for then-presidential candidate Bill Clinton because of his positions on certain moral issues"); *Fulani v. League of Women Voters Educ. Fund*, 882 F.2d 621, 629 (2d Cir. 1989) ("[W]e agree that an organization's selective promotion of certain parties over others would be inconsistent with its section 501(c)(3) tax-exempt status."); *Ass'n of the Bar of the City of New York v. Comm'r*, 858 F.2d 876, 880 (2d Cir. 1988) (holding that rating candidates is campaign intervention under the Johnson Amendment); *Christian Echoes Nat'l Ministry, Inc. v. United States*, 470 F.2d 849, 856 (10th Cir. 1972) (concluding that "Christian Echoes intervened in political campaigns" by "us[ing] its publications and broadcasts to attack candidates and incumbents who were considered too liberal," "urg[ing] its followers to elect conservatives," and endorsing a candidate at its annual convention).

The Johnson Amendment is especially important given the nature of modern election campaigns. The expenditure of large sums of money to publish and distribute communications endorsing or opposing candidates is a fundamental aspect of campaigning and has only continued to grow in importance over the last several decades. Nearly 50 years ago, the Supreme Court recognized that "[t]he electorate's increasing dependence on television, radio, and other mass media for news and information has made these expensive modes of communication indispensable instruments of effective political speech." *Buckley*, 424 U.S. at 19. As a result, "'[p]ublic communications' that promote or attack a candidate for federal office . . . undoubtedly have a dramatic effect on federal elections." *McConnell v. FEC*, 540 U.S. 93, 169 (2003). For this reason, federal campaign finance law is primarily focused on regulating the large amounts of spending necessary to pay for public communications to ensure transparency and prevent corruption and its

appearance. *See, e.g.*, 52 U.S.C. 30101(a)(22) (defining "public communication" to mean "a communication by means of any broadcast, cable, or satellite communication, newspaper, magazine, outdoor advertising facility, mass mailing, or telephone bank to the general public, or any other form of general public political advertising").

By reserving its taxpayer-funded subsidy for organizations that do not publicly endorse or oppose candidates, the Johnson Amendment has played a vital role in preserving the nonpartisan character of the charitable sector while protecting U.S. elections from those seeking to disguise campaign activity as charitable work.

### C.    The Proposed Consent Judgment Would Violate the Johnson Amendment

The parties' proposed consent judgment would violate the Johnson Amendment by effectively exempting houses of worship and potentially other religious 501(c)(3)s from its requirements. The proposed consent judgment would permanently enjoin the IRS "from enforcing the Johnson Amendment against Plaintiff Churches (Sand Springs Church and First Baptist Church Waskom) based on speech by a house of worship to its congregation in connection with religious services through its customary channels of communication on matters of faith, concerning electoral politics viewed through the lens of religious faith." ECF No. 35-1 ¶ 7. The proposed consent judgment would state that such speech is not prohibited by the Johnson Amendment because it is allegedly not "participation" or "intervention" in a political campaign and more akin to a mere "family discussion concerning candidates." *Id.* ¶ 3.

In reality, the proposed consent judgment plainly allows Plaintiff Churches to violate the Johnson Amendment by "publishing or distributing . . . statements" supporting or opposing candidates—which the text of section 501(c)(3) itself describes as a form of campaign "interven[tion]." 26 U.S.C. § 501(c)(3). Even if Plaintiff Churches do not "take out political ads

in newspapers," ECF No. 43 at 8-9, other forms of publishing and distributing remain available, and indeed both Plaintiff Churches publish recorded and live versions of their sermons on the internet, *see* Sands Springs Church, *Sermons*, https://www.sandsspringschurch.com/sermons (last visited July 29, 2025); First Baptist Church Waskom, https://fbcwaskom.org/ (last visited July 29, 2025), including via a YouTube channel, *see* https://www.youtube.com/ @FirstBaptistChurchWaskom (last visited July 29, 2025). Plaintiff Churches admit that if the consent decree is entered, their broadcast sermons given "in close proximity to the election" would include discussion of "stands taken by the major candidates nationally," "compar[ison of] the views of each of the relevant candidates and/or the major political parties," "urg[ing] the congregation to vote and to do so in accordance with the [church's] principles and viewpoints," and live appearances by "[c]andidates for state and local offices" for whom Plaintiffs would urge their congregations to vote. ECF No. 20 ¶¶ 38-39.

While the proposed consent decree would technically apply only to the Plaintiff Churches in this case, the IRS could not reasonably enforce the Johnson Amendment against other 501(c)(3) religious organizations if its new "interpretation" is adopted in a court order. The decree would thus effectively enshrine a generally applicable exception. *See, e.g.*, Ellen P. Aprill, *Misunderstanding National Religious Broadcasters*, Tax Notes (July 25, 2025), https://perma.cc/Q4DY-BBGB ("Many churches would undoubtedly see such language in a final order as permission to ignore the Johnson Amendment in a variety of church settings."). And regardless of whether the Plaintiff Churches do or do not envision distributing their political endorsements beyond their respective congregations, the consent decree's sweeping language could be interpreted by similar organizations to allow exactly this. The terms of the proposed decree appear to exempt electoral communications to the public via broadcast and digital media

provided that these media are a religious organization's "customary channels of communication" to its "congregation." ECF No. 35-1 ¶ 7. For example, the decree's language would allow existing or newly created religious 501(c)(3)s that engage regularly in public education activities on "matters of faith" through radio, television, or the internet to focus their communications more acutely on candidates or issues clearly identified with candidates as election day approaches. The groups could then claim that these radio, television, or internet ads are part of their "customary channels of communication on matters of faith" to the group's congregation, thus making it permissible under the consent judgment to use anonymous tax-exempt funds to influence an election.[1] Far from being analogous to a mere "family discussion concerning candidates," ECF No. 35-1 ¶ 3, the consent decree could be interpreted to allow the very type of "public communications" that the Supreme Court has said have a "dramatic effect on federal elections," *McConnell v. FEC*, 540 U.S. at 169.

The parties attempt to support their claim that the proposed decree does not violate the Johnson Amendment by citing a dictionary's definition of "participate" ("to take part") and of "intervene" ("to interfere with the outcome or course"). ECF No. 35-1 ¶ 3. There are several problems with this line of argument. To start, the public communications endorsing or opposing candidates the consent decree allows would comfortably qualify as "tak[ing] part" in or "interfer[ing] with the outcome or course" or a political campaign in any event. *See, e.g.*, *McConnell*, 540 U.S. at 169. And importantly, the Johnson Amendment itself makes clear that the definition of "intervention" is even broader than the parties claim. The statute defines

---

[1]    *See* Brendan Fischer, *Destroying the Johnson Amendment: How Allowing Charities to Spend on Politics Would Flood the Swamp That President Trump Promised to Drain*, Campaign Legal Ctr. (May 3, 2017), https://perma.cc/A986-RC59; Noah Bookbinder, *Push to repeal the Johnson Amendment could open pandora's box for money in politics*, CREW (Oct. 4, 2016), https://perma.cc/DS56-Z7K8.

"interven[tion]" in a political campaign as "including the publishing or distributing of statements," 26 U.S.C. § 501(c)(3), demonstrating that the parties' selected definitions are unduly narrow. Finally, other, broader, definitions of "participate" and "intervene" are more consistent with section 501(c)(3)'s text. *See, e.g.*, April, *supra* p. 11 (describing how other dictionaries define "intervene" as "to come in . . . so as to affect . . . or prevent a result," and to "involve oneself").

The proposed consent judgment is therefore unlawful under section 501(c)(3).

### D.    Exempting Religious 501(c)(3)s from the Johnson Amendment Would Lead to the Creation of a New Class of Religious Super Dark Money Groups

If permitted to ignore the Johnson Amendment, religious 501(c)(3)s would pose even more of a dark money threat than 501(c)(4)s do now, for a few reasons. First, and most importantly, religious 501(c)(3)s would be able to offer donors both secrecy *and* a charitable tax deduction—something no 501(c)(4) can do.  A charitable tax deduction allows a donor to a 501(c)(3) to lessen their tax burden, and empirical studies find that taxpayers respond to this powerful incentive by increasing their donations. *See* Congressional Budget Office, *Options for Changing the Tax Treatment of Charitable Giving* at 2 (May 2011), https://perma.cc/E9AQ-VCC5. But only taxpayers who choose to itemize their deductions on their income tax returns rather than claiming the standard deduction can take advantage of this tax break, which "favor[s] high-income people, who face relatively higher marginal tax rates." *Id.* Allowing 501(c)(3)s to spend on elections therefore would create a perverse incentive structure in which wealthy individuals and political operatives would have incentive to shift their dark money spending away from 501(c)(4)s and into newly politicized churches and religious nonprofits. *See* Fischer, *supra* p. 12 n.2; Bookbinder, *supra* p. 12 n.2; April *supra* p. 11. As a result, religious 501(c)(3)s would likely become the preferred entities for donors seeking to anonymously fund electioneering targeted to religious audiences. Because the consent decree would allow churches to use their own websites, webcasts,

and other media channels aimed at their members (which could include over-the-air or cable broadcasts of religious services), they may in many instances be able to reach large audiences of voters who access such religious channels of communication.

Second, religious 501(c)(3)s are required to report even less information about themselves than other 501(c)(3)s and 501(c)(4)s. Under current law, most section 501(c) organizations must file annual Form 990 informational returns with the IRS, which disclose basic information about their finances and operations. *See* 26 U.S.C. § 6033(a)(1). But churches and certain religious organizations are categorically exempt from this filing requirement. *See id.* § 6033(a)(3)(A). As a result, if the Johnson Amendment were gutted as to religious 501(c)(3)s, their campaign activities would be even more opaque than those of 501(c)(4) dark money groups. These new entities would operate in near-total secrecy, with no public financial disclosures and incomplete reporting of their political expenditures. *See supra* p. 5-6 (describing FECA's event-driven reporting requirements and their evasion by 501(c)(4)s).  Donors could not be identified. Spending could not be tracked. The public would have no way to follow the money.

Third, and finally, religious 501(c)(3)s also face fewer upfront regulatory requirements than other nonprofit organizations. Churches presumptively qualify as 501(c)(3)s and so are not required to apply to the IRS for tax-exempt status, unlike other 501(c)(3)s. *See* 26 U.S.C. § 508(c). And churches are also subject to special audit procedures that further insulate them from oversight. *See* 26 U.S.C. § 7611. These features would make religious 501(c)(3)s ideal vehicles for anonymous campaign activity if the Johnson Amendment's restrictions were removed.

Critically, the transformation of religious 501(c)(3)s into campaign entities would also constitute an unprecedented expansion of taxpayer-subsidized political spending. Both tax exemption under section 501(c)(3) and the charitable deduction under 26 U.S.C. § 170 constitute

government subsidies, which Congress has long conditioned on the prohibition of campaign activity. *See Regan*, 461 U.S. at 544. That condition ensures that the public does not underwrite partisan politics under the guise of charitable giving. If the Johnson Amendment were eviscerated, donors could deduct the cost of campaign expenditures funneled through religious nonprofits, and the government would, in effect, subsidize electoral advocacy. This would invert the purpose of the charitable deduction and erode longstanding public policy designed to separate tax-deductible charity from political partisanship.

The scale of potential political spending by religious 501(c)(3)s is enormous. If these entities were allowed to engage in electoral activity, the IRS would likely apply to them the same lax enforcement standards it has applied to 501(c)(4)s. Though section 501(c)(4) nominally requires that organizations be "operated exclusively" for the promotion of social welfare, the IRS has interpreted this to mean "primarily," and it allows up to 49 percent of expenditures to go toward political activity. *See supra* p. 5. This interpretation has been exploited by politically active groups, which have pushed the boundaries of what constitutes campaign intervention and avoided sanctions even when that threshold is exceeded.[2] If the IRS were to apply the same permissive approach to religious 501(c)(3)s, there would be little to stop them from devoting nearly half their expenditures to campaign activities—while still qualifying for tax-deductible donations. What is more, because the consent decree defines certain communications by houses of worship endorsing or opposing candidates as not qualifying as campaign intervention under section 501(c)(3) in the

---

[2]    *See, e.g.*, *IRS: Challenge to Tax Exempt Status of Crossroads GPS, Priorities USA, American Action Network and Americans Elect, Issued by Campaign Legal Center and Democracy 21* (Sept. 27, 2011), https://perma.cc/P9GE-JZG3 ("Spending millions of dollars running attack ads against vulnerable incumbents in non-election years does not constitute the 'promotion of social welfare' that their tax status – and thus their ability to hide the identities of their funders - is dependent upon.").

first place, the consent decree could be interpreted as allowing churches to engage in political messaging *without limit*. The amounts of money potentially at issue are significant given that the number of religious 501(c)(3)s in the United States is estimated to be approximately 340,000, *see* National Philanthropic Trust, *Charitable Giving Statistics*, https://perma.cc/K7K6-ZSME, and some of these groups report spending tens of millions in a single fiscal year, *see* Bookbinder, *supra* p. 12 n.2. Even if the scope of the consent decree were limited to the subset of religious 501(c)(3)s that qualify as churches, the IRS does little to police the blurry line between the two. *See* Lloyd Hitoshi Mayer, *How the US government can stop 'churches' from getting treated like real churches by the IRS*, The Conversation (Sept. 26, 2024), https://perma.cc/9RAN-CVEX.

Furthermore, while the Johnson Amendment's bright-line rule has historically constrained 501(c)(3) political activity, its removal would erase that barrier. Decades of history show that politically active donors and operatives quickly adapt to new spending options, and the same would happen here, routing money through religious organizations to take advantage of the tax deduction and the lack of disclosure. Liberal and conservative churches alike would be pressured to accept partisan contributions, and their leaders would be incentivized to act as campaign operatives rather than spiritual guides. *See* Fischer, *supra* p. 12 n.2 The same flood of dark money that has overwhelmed the 501(c)(4) space would surge into the newly politicized 501(c)(3) domain—only now, it would be taxpayer-subsidized and largely invisible.

Finally, the FEC—the agency responsible for enforcing FECA's disclosure provisions— cannot be relied upon to fill the gap left by a weakened Johnson Amendment. *See supra* p. 5. Although FECA requires entities whose "major purpose" is federal campaign activity to register as political committees and report all significant contributions and expenditures, *see* 52 U.S.C. §§ 30102, 30103, 30104, the FEC has shown little interest or ability to enforce these rules, *see*

16

Noti and Chlopak, *et al.*, *supra* p. 5. Since *Citizens United*, the Commission has failed to voluntarily find *any* nonprofit organization to be a political committee, despite overwhelming evidence in many cases. Dysfunction and partisan gridlock at the FEC have allowed politically active nonprofits to spend hundreds of millions on elections while avoiding registration, disclosure, and accountability. There is no reason to believe that the FEC would treat religious 501(c)(3)s any differently—especially when it has already abdicated its responsibility to police 501(c)(4) activity. States may also not be able to fill the void left by the lack of IRS and FEC enforcement, given that many state campaign disclosure laws were enacted against a background assumption that section 501(c)(3)s are not permitted to engage in election spending. For example, Rhode Island requires comprehensive reporting for election spending by non-political committees, *see* R.I. Gen. Laws § 17-25.3-1(b), but those laws apply to any "person" or "business entity," both of which are defined to specifically exclude section 501(c)(3) nonprofits, *id.* §§ 17-25-3(2), (19). If 501(c)(3)s were suddenly permitted to spend on elections, they would be uniquely exempt from the state's reporting regime by happenstance.

In sum, the proposed consent decree would not merely create a narrow exception for Plaintiffs but would dismantle a vital safeguard in the federal campaign finance system. It would permit religious 501(c)(3)s to operate as unregulated, anonymous, and tax-deductible campaign entities—more opaque and more dangerous than existing dark money groups. Such a result is squarely contrary to public policy, inconsistent with decades of legislative and judicial precedent, and unreasonable in light of the grave risks it poses to democratic transparency and accountability.

## II.    The Johnson Amendment Does Not Violate the Free Speech Clause

The Johnson Amendment poses no First Amendment problem, and thus does not justify the proposed consent judgment, as the parties claim. *See* ECF No. 20 ¶¶ 1-15, 110-16; ECF No. 35-1 ¶ 5.

### A.    The Johnson Amendment Does Not Burden Speech

The Johnson Amendment does not suppress or penalize speech. Rather, it sets a condition on eligibility for government benefits—federal tax exemption and tax-deductible contributions. These benefits are functionally a "form of subsidy that is administered through the tax system." *Regan*, 461 U.S. at 544. Organizations, like Plaintiffs, that wish to engage in political campaign activity remain free to do so notwithstanding the Johnson Amendment; they simply must relinquish the taxpayer-funded subsidy provided by section 501(c)(3) if they choose that path.

While the First Amendment prohibits "plac[ing] obstacles in the path" of speech, *Regan*, 461 U.S. at 549 (citation omitted), nothing requires government to "assist others in funding the expression of particular ideas, including political ones," *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009); *see also Harris v. McRae*, 448 U.S. 297, 318 (1980) (noting that the Constitution "does not confer an entitlement to such funds as may be necessary to realize all the advantages of" a constitutional right).

As a result, for more than 85 years, courts have repeatedly upheld the constitutionality of conditions on eligibility for tax benefits. In *Cammarano v. United States*, the U.S. Supreme Court upheld a Treasury regulation that denied tax deductions for business expenses related to lobbying activity. *See* 358 U.S. 498, 513 (1959). The Court emphasized that "[p]etitioners are not being denied a tax deduction because they engage in constitutionally protected activities, but are simply being required to pay for those activities entirely out of their own pockets." *Id.*

Following *Cammarano*, the Court in *Regan* rejected a First Amendment challenge to a provision of section 501(c)(3) that denies tax-exempt status to organizations that engage in "substantial lobbying." 461 U.S. at 540-48. The Court explained that denying a subsidy is not equivalent to suppressing speech: "Congress has not infringed any First Amendment rights or regulated any First Amendment activity [but] has simply chosen not to" subsidize lobbying. *Id.* at 546.

Following *Regan*, the D.C. Circuit in *Branch Ministries*, concluded that the IRS has the statutory authority to revoke a church's tax-exempt status while explaining that "Congress has not violated an organization's First Amendment rights by declining to subsidize its First Amendment Activities." 211 F.3d at 141-44 (citation modified). The same logic applies here: the Johnson Amendment does not prevent Plaintiffs or any other religious organization or charity from engaging in political campaign intervention, but it does mandate that American taxpayers will not help pay for such activity.

Indeed, the Johnson Amendment leaves available a range of options to Plaintiffs and other 501(c)(3)s that want to participate or intervene in political campaigns. Plaintiffs can engage in political campaigns by choosing to forgo the benefits of section 501(c)(3) tax-exempt status and the ability to receive tax-deductible donations, including by choosing to operate as for-profit entities. As the Supreme Court has recognized, religious or charitable organizations "might organize as for-profit corporations because of the potential advantages of that corporate form, such as the freedom to participate in lobbying for legislation or campaigning for political candidates who promote their religious or charitable goals." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 712 (2014).

Organizations also have the option of maintaining section 501(c)(3) status for their nonpartisan activities while creating a separate section 501(c)(4) entity that may engage in limited campaign-related efforts. *See Regan*, 461 U.S. at 544 ("It also appears that TWR can obtain tax deductible contributions for its non-lobbying activity by returning to the dual structure it used in the past, with a § 501(c)(3) organization for non-lobbying activities and a § 501(c)(4) organization for lobbying."). In *Regan*, the Court noted that this dual-entity structure was a permissible way to balance advocacy goals with compliance under the tax code. Ultimately, it is up to Plaintiffs to decide whether to accept the conditions that come with section 501(c)(3) status. Having made that choice, they cannot plausibly claim that Congress has restricted their speech by defining the scope of a voluntary tax benefit.

Because the Johnson Amendment leaves Plaintiffs free to engage in their desired speech, their free speech claim presupposes a constitutional right to receive tax benefits while engaging in electioneering. But this claim finds no support in the Constitution or the caselaw. Courts have consistently held that there is no First Amendment entitlement to a tax exemption or to receive contributions deductible under section 170 of the IRC. For example, in *Regan*, the Court explicitly rejected the argument that denying section 501(c)(3) status to lobbying organizations imposed an unconstitutional condition. 461 U.S. at 545-46 As the Court explained, "[t]his Court has never held that the Court must grant a benefit such as [plaintiff] claims here to a person who wishes to exercise a constitutional right." *Id.* at 545; *see also id.* at 546 ("It is not irrational for Congress to decide that" tax-deductible contributions should be available only to those organizations that function exclusively for charitable and educational purposes). Similarly, in *United States v. American Library Ass'n*, the Supreme Court upheld a statute that conditioned receipt of federal funds on the use of internet filtering software in public libraries. *See* 539 U.S. 194 (2003). The Court explained

that "a refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity." *Id.* at 212 (plurality op.) (citation modified). So too here: the government's refusal to subsidize campaign intervention through the tax code does not penalize organizations or infringe their rights.

Finally, Plaintiffs' reliance on *Citizens United v. FEC*, does not support their free speech claim. ECF No. 20 ¶¶ 112-14. That case involved a statutory ban on independent election spending by corporations, both for profit and nonprofit, enforced by criminal penalties. 558 U.S. at 318. The law thus prohibited speech by barring certain speakers from spending money. *Id.* at 335-38. *Citizens United* did not involve a government subsidy, like the Johnson Amendment, nor did it address the boundaries of tax exemption. The Johnson Amendment, by contrast, imposes no criminal sanctions, does not ban any speech, and does not discriminate between types of 501(c)(3) organizations. As the Seventh Circuit has explained, "the First Amendment does not require government to subsidize all speech equally." *Wisconsin Educ. Ass'n Council v. Walker*, 705 F.3d 640, 648 (7th Cir. 2013). Because government subsidies for certain speech do not prohibit or burden other speech in the first place, it is beside the point whether those subsidies only apply to certain speakers. *See d*. *Citizens United* thus has no bearing on the constitutionality of a subsidy like the Johnson Amendment: "While . . . *Citizens United* support[s] the unconstitutionality of speaker-based discrimination in *statutes that prohibit or burden speech*, *Regan* controls on government subsidies of speech: speaker-based distinctions are permissible." *Id.* (citing *Regan*, 461 U.S. at 548-49) (emphasis added).

### B.  The Johnson Amendment Is Viewpoint Neutral

The Johnson Amendment is also constitutionally sound because it is viewpoint neutral. *See, e.g.*, *Wisconsin Educ. Ass'n*, 705 F.3d at 648 (explaining that while subsidies generally do not

burden speech, they cannot "discriminate on the basis of viewpoint") (citing *Regan*, 461 U.S. at 548). It prohibits all section 501(c)(3) organizations from intervening in political campaigns— whether in favor of or in opposition to any candidate. This distinguishes it from regulations that target specific viewpoints, which are subject to strict scrutiny under First Amendment doctrine.

For example, in *Branch Ministries*, the D.C. Circuit upheld the IRS's revocation of a church's section 501(c)(3) status after the church published a full-page newspaper advertisement opposing the candidacy of then-President Bill Clinton. 211 F.3d at 141-42 In upholding the constitutional validity of the Johnson Amendment, the court explained that the law does not constitute viewpoint discrimination: "The restrictions imposed by section 501(c)(3) are viewpoint neutral; they prohibit intervention in favor of all candidates for public office by all tax-exempt organizations, regardless of candidate, party, or viewpoint." *Id.* at 144.

Plaintiffs' as-applied challenge also fails to state a viable First Amendment claim and thus does not justify the proposed consent decree. Although selective enforcement of a facially neutral law can violate the Free Speech Clause if driven by content or viewpoint discrimination, the standard for such a claim is particularly demanding. As the D.C. Circuit has held, plaintiffs must overcome the presumption that the government acted lawfully by showing they were singled out for enforcement while others similarly situated were not. *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1141, 1146 (D.C. Cir. 2023); *United States v. Young*, No. 23-CR-241, 2024 WL 3030656, at *2 (D.D.C. June 17, 2024).

Plaintiffs offer only a handful of speculative and anecdotal examples, such as allegations about newspapers, churches, or isolated statements pulled from internet sources. These do not plausibly establish that the IRS has targeted Plaintiffs or treated them differently from similarly

22

situated organizations. Indeed, Plaintiffs do not claim that the Johnson Amendment has been enforced against them at all. *See* ECF No. 20.

Even assuming some progressive-leaning groups have engaged in campaign activity without consequence, as Plaintiffs' claim, *see, e.g.*, ECF No. 20 ¶¶ 89-98, Plaintiffs provide no evidence that similarly situated conservative organizations were treated less favorably. At most, they allege uneven enforcement, not content or viewpoint-based discrimination.[3]

Because the Johnson Amendment applies uniformly to all section 501(c)(3) organizations and because Plaintiffs have not plausibly alleged they were selectively targeted based on viewpoint, their First Amendment free speech claim is baseless.

## C.    The Johnson Amendment Is Supported by Compelling Interests

Even if the Johnson Amendment were treated as a speech restriction—which it is not—it would nonetheless survive First Amendment scrutiny. The government has at least two compelling interests in drawing a line between tax-subsidized charitable activity and partisan electoral activity.

First, as described in detail, *supra* Part I, the government has a compelling interest in ensuring that tax-deductible contributions made to charitable organizations do not become vehicles for financing political campaigns. Such a regime would result in religious organizations organized under 501(c)(3) becoming a preferred vehicle for wealthy donors to inject unlimited and undisclosed money into American elections. This would harm the public interest by allowing for indirect public financing of election campaigns, creating an unacceptable risk of *quid pro quo* corruption, and harming the right of voters in knowing "who is speaking about a candidate shortly

---

[3]    This Court should decline to enter a consent decree based on unsupported allegations in Plaintiffs' amended complaint. *See Stovall v. City of Cocoa, Fla.*, 117 F.3d 1238, 1243 (11th Cir. 1997) ("It is apparent to us that the record is not adequately developed to permit meaningful review of the proposed consent decree, either by this court or by the district court.").

before an election" so that they can "make informed choices in the political marketplace." *Citizens United*, 558 U.S. at 339, 367, 369 (citation omitted).

Second, the government has a strong interest in maintaining the integrity and neutrality of the charitable sector. Permitting tax-exempt entities to function as conduits for partisan advocacy would undermine the public's trust in charitable institutions and blur the line between public service and private political gain. *See, e.g.*, *Regan*, 461 U.S. at 550; *Bob Jones Univ. v. United States*, 461 U.S. 574, 586-87, 592 (1983) (recognizing that "[c]haritable exemptions are justified on the basis that the exempt entity confers a *public* benefit" (emphasis added)); *Branch Ministries*, 211 F.3d at 143-44 (emphasizing that the Johnson Amendment "prohibit[s] intervention in favor of all candidates for public office by all tax-exempt organizations, regardless of candidate, party, or viewpoint").

These interests are substantial and well-documented. The Johnson Amendment is directly and narrowly tailored to serve them.

**CONCLUSION**

For the foregoing reasons, *amici* respectfully request that the Court deny the parties' joint motion to enter their proposed consent judgment.


Dated: August 4, 2025                    Respectfully submitted,


                                         /s/ *Heather Szilagyi*
                                         Adav Noti* (DC Bar No. 490714)
                                         Kevin P. Hancock* (DC Bar No. 90000011)
                                         Sejal Jhaveri* (NY Bar No. 5396304)
                                         Heather Szilagyi (DC Bar No. 90006787)
                                         CAMPAIGN LEGAL CENTER
                                         1101 14th Street NW, Ste. 400
                                         Washington, DC 20005
                                         (202) 736-2200
                                         anoti@campaignlegalcenter.org
                                         khancock@campaignlegalcenter.org
                                         sjhaveri@campaignlegalcenter.org
                                         hszilagyi@campaignlegalcenter.org

                                         *Counsel for Amici Curiae*

                                         **Applications for* Pro Hac Vice *admission forthcoming*


**CERTIFICATE OF SERVICE**

I hereby certify that on August 4, 2025, I electronically filed this motion with the Clerk of the Court for the United States District for the Eastern District of Texas by using the CM/ECF system. Counsel in this case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

                                         /s/ *Heather Szilagyi*