IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

NATIONAL RELIGIOUS BROADCASTERS, *et al.*,

                    *Plaintiffs,*

          v.

BILLY LONG, *in his official capacity as* COMMISSIONER OF THE INTERNAL REVENUE SERVICES, *et al.*,

                    *Defendants.*

Civil Action No. 6:24-cv-00311

**BRIEF OF *AMICUS CURIAE* GRACE CHURCH ST. LOUIS AND NEW WAY CHURCH IN SUPPORT OF JOINT MOTION FOR ENTRY OF CONSENT JUDGMENT**

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. ii

TABLE OF AUTHORITIES ........................................................................................... iv

INTEREST OF AMICI .................................................................................................... 1

STATEMENT OF ISSUES ............................................................................................. 2

SUMMARY OF ARGUMENT ....................................................................................... 2

ARGUMENT ................................................................................................................... 3

    I.   Experience of the Amici Targeted by the IRS for Constitutionally Protected Activity. .... 3

        a.   Grace Church St. Louis................................................................................. 3

        b.   New Way Church........................................................................................... 5

    II.   The Johnson Amendment Upends Church Autonomy ...................................... 7

        a.   The IRS merely recognizes what is already true: churches are tax exempt.................. 7

        b.   The history of the Johnson Amendment and its chilling of constitutionally protected rights. ........................................................................................... 8

    III.   The IRS Shields the Johnson Amendment from Challenge While Chilling Constitutionally Protected Speech. ................................................................. 9

        a.   The futility of enforcing the Johnson Amendment. ........................................ 9

        b.   The onerous process of a church tax inquiry under the Johnson Amendment. ............ 12

        c.   The potential penalties available to the IRS to exert upon houses of worship it determines have violated the Johnson Amendment.................................................... 13

        d.   The doctrine of Taxpayer Standing insulates the Johnson Amendment from challenge until it's too late while inviting the political targeting of constitutional rights. .......... 14

    IV.   The Johnson Amendment Violates the Guarantees of Free Speech and Religious Liberty in Multiple Ways. ....................................................................................... 17

        a.   The doctrine of Church Autonomy undermines the Johnson Amendment's power..... 17

        b.   The Free Exercise Clause of the First Amendment to the U.S. Constitution protects

against the Johnson Amendment's threats. .................................................................. 17

c.    The Johnson Amendment violates the Free Speech Clause of the First Amendment to the U.S. Constitution. .............................................................................................. 18

d.    Enforcement of the Johnson Amendment against houses of worship constitutes unlawful viewpoint discrimination. ............................................................................ 20

e.    Giving the IRS nearly unfettered discretion to enforce the Johnson Amendment invites inequitable, politically-motivated application of the law. ........................................... 20

f.    Since 1954, the Johnson Amendment has bread unlawful hostility toward religion by the government and fomented it within the American culture. ................................... 21

g.    America's history and tradition counsels against the continuation of the Johnson Amendment's application against houses of worship. ................................................. 22

h.    The government cannot place unconstitutional conditions to compel a house of worship to comply with the Johnson Amendment. ....................................................... 23

CONCLUSION .............................................................................................................................. 24

Certificate of Service ................................................................................................................... 25

# TABLE OF AUTHORITIES

**CASES**

*Am. for Prosperity Foundation v. Bonta*, 594 U.S. 595 (2021) .................................... 19

*Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29 (2019) ........................................... 22

*Ass'n of the Bar of N.Y. v. Comm'r*, 858 F.2d 876 (2d Cir. 1988) ............................... 11

*Branch Ministries v. Rossotti*, 211 F.3d 137 (D.C. Cir. 2000) ............................ *passim*

*Christian Echoes Nat'l Ministry, Inc. v. United States*, 470 F.2d 849 (10th Cir. 1972) .............. 11

*Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993) ......................... 21

*Citizens United v. Federal Election Comm'n*, 558 U.S. 310 (2010) ...................... 18, 19

*Commonwealth of Massachusetts v. Mellon*, 262 U.S. 447 (1923) ........................ 14, 15

*FCC v. League of Women Voters*, 468 U.S. 364 (1984) ................................................ 18

*Flast v. Cohen*, 392 U.S. 83 (1968) ......................................................................... 15

*Fonticiella v. Comm'r of Internal Revenue*, 117 T.C.M. (CCH) 1377 (T.C. 2019) ................... 16

*Fulton v. City of Phila.*, 141 S. Ct. 1868 (2021) ................................................ 20, 21

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012) ............. 17

*Jones v. Wolf*, 443 U.S. 595 (1979) ....................................................................... 17

*Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022) ................................ 18, 19, 22

*Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 584 U.S. 617 (2018) ........................... 21

*Murdock v. Com. of Pennsylvania*, 319 U.S. 105 (1943) ............................................ 18

*NAACP v. State of Ala.*, 357 U.S. 449 (1958) ......................................................... 19

*Perry v. Sindermann*, 408 U.S. 593 (1972) ............................................................ 23

*Regan v. Taxation with Representation*, 461 U.S. 540 (1983) ...................................... 11

*Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819 (1995) ............................ 20

*Shurtleff v. City of Bos., Massachusetts*, 596 U.S. 243 (2022) ................................ 19, 22

*Town of Greece v. Galloway*, 572 U.S. 565 (2014) ................................................................... 22

*Trinity Lutheran Church of Columbia v. Comer*, 582 U.S. 449 (2017) ....................................... 22

*Walz v. Tax Comm'n of New York*, 397 U.S. 664 (1970) ............................................................ 23

*Watson v. Jones*, 80 U.S. (13 Wall.) 697 (1871) ....................................................................... 17

## STATUTES

26 U.S.C. § 170 ............................................................................................................................... 7

26 U.S.C. § 4955 ........................................................................................................................... 13

26 U.S.C. § 501 ................................................................................................................ 7, 8, 11, 12

26 U.S.C. §508 ................................................................................................................................ 7

26 U.S.C. § 6852 ........................................................................................................................... 13

26 U.S.C. § 7409 ........................................................................................................................... 13

26 U.S.C. § 7611 ..................................................................................................................... 12, 13

42 U.S. C. § 2000bb ................................................................................................................. 10, 18

## OTHER AUTHORITIES

Alexandra Simon and Dan Snyder, *Harris tells Philadelphia church election will 'decide the fate of our nation for generations to come,'* CBS News (Oct. 28, 2024, 4:48 AM), https://www.cbsnews.com/philadelphia/news/kamala-harris-philadelphia-campaign-rally/.... 16

Carmen Russel-Sluchansky, *Biden joins sermon at Church of God in Christ during 6th campaign visit to Philadelphia*, WHYY (July 7, 2024, 7:04 PM), https://whyy.org/articles/biden-pennsylvania-mount-airy-church-visit/. ................................................................................... 16

*Church Audit Process,* https://www.irs.gov/charities-non-profits/churches-religious-organizations/church-audit-process (last updated Dec. 4, 2023) .............................................. 13

E.O. 13798, "Promoting Free Speech And Religious Liberty," 82 FR 21675 (May 4, 2017) ....... 9

Editorial Board, *Editorial: Maryland Heights church deserves to have its tax-exempt status suspended*, St. Louis Post Dispatch (Mar. 9, 2022), https://archive.is/NcqZl#selection-3473.23-3477.73 ...................................................................................................................................... 4

I.R.S. Pub. 1828 at 2 (Rev. 8-2015), https://www.irs.gov/pub/irs-pdf/p1828.pdf......................... 7

IRC 501(c)(3) Political Activity Compliance Initiative........................................................... 13, 14

Patricia U. Bonomi, *Under The Cope Of Heaven: Religion, Society, And Politics In Colonial America* 216 (updated ed. 2003) ............................................................................. 22

Reece Barker, *A Memorial and Remonstrance Against Taxation of Churches*, 47 B.Y.U. L. Rev. 1001, 1031 (2022) ........................................................................................... 23

Shawn A Voyles, *Choosing Between Tax-Exempt Status and Freedom of Religion: The Dilemma Facing Politically-Active Churches*, 9 Regent U. L. Rev. 219, 226–30 (1997) ............... 22, 23

*Tax Guide for Churches & Religious Organizations* (Publication 1828 (Rev. 8-2015)) .............. 7

Vaughn E. James, *The African-American Church, Political Activity and Tax Exemption*, 37 Seton Hall L. Rev 371, 376 (2007). ................................................................................. 23

**RULES**

I.R.S. Pub. 1828 ...................................................................................................... 8

26 C.F.R § 1.501 .................................................................................................... 8

## INTEREST OF AMICI

Amici are churches targeted by the Internal Revenue Service ("IRS") for enforcement under the Johnson Amendment. Grace Church St. Louis and New Way Church do not speculate on the ways in which the Johnson Amendment may apply to them at some theoretical point in the future.  Rather, they have each suffered through the enforcement of the Johnson Amendment and received political opposition for the exercise of rights otherwise protected by the First Amendment to the U.S. Constitution.

Grace Church St. Louis is a praying church in Maryland Heights, MO, committed to confronting a godless culture with the truth of God's Word.  Founded in 1970 when Senior Pastor Ron Tucker started a worship/Bible study in his home, Grace Church St. Louis now touches the lives of thousands weekly across its two campuses in Missouri and Illinois.  The IRS launched an investigation of Grace Church St. Louis under the Johnson Amendment on April 30, 2024.

New Way Church describes itself in terms of family, hoping for the church to be a place where God is transforming lives one person, one couple, one family at a time.  Pastor Richard and Kimberly Summerlin founded the church in 2006 when the church met in a local high school.  In addition to the hundreds that gather at its primary campus in Palm Coast, Florida, New Way's ministry reach extends to locations in Florida, Pakistan, Kenya, Haiti, and the Dominican Republic.  The IRS launched an investigation of Grace Church St. Louis under the Johnson Amendment on June 14, 2024.

Both churches have an interest of avoiding future enforcement of the Johnson Amendmentagainst them, while hoping houses of worship like them from across the country will benefit from the Court's granting of the Joint Motion for Entry of Consent Judgement, ECF No. 35.

## STATEMENT OF ISSUES

Consistent with Local Rule CV-7(a)(1), Grace Church St. Louis and New Way church declares that the issues in this *amicus* brief are: (1) the experience of the amici as targets of enforcement under the Johnson Amendment, (2) the threat the Johnson Amendment  poses to Church Autonomy, (3) that the IRS shields the Johnson Amendment from judicial review while chilling core constitutional rights, and (4) that the Johnson Amendment violates the guarantees of the First Amendment and federal law in myriad ways.

## SUMMARY OF ARGUMENT

In an act of political retribution, then-Senator Lyndon Baines Johnson chilled the guarantees of the First Amendment to the U.S. Constitution for the last 70+ years.  His 31-word amendment to the Internal Revenue Code would tie his name to the suppression of church autonomy, free speech, religious liberty, and foment hostility toward religion billed as nonpartisanship.  It would further give approval to intimidating tactics by agents of the IRS who, in the name of the law, would set upon pastors and houses of worship with oppressive demands to examine records, bank accounts, membership lists, bylaws, statements of faith, sermon manuscripts, church bulletins, church services and church-sponsored events, religious publications, and even call into question the prayers of the faithful.  All the while, the IRS would dangle the carrot of compliance: cease anything resembling political activity and all will be forgiven; but, if we determine you have engaged in political activity, you lose your tax-exempt status.

The IRS does not grant tax-exemption to the nation's house of worship.  Yet agents with the IRS, and those politically motivated to silence the voice of pastors and religious adherents, have insisted that they can punish those houses of worship they unilaterally determine to have violated the Johnson Amendment by revoking such exemptions.  Thus, decades of IRS

enforcement has revealed the existence of a frustrating political scheme that chills constitutional guarantees: the only way to upend the law is to violate it—but only the IRS can say whether a house of worship is in violation.  The futile irony is that even if the IRS were to punish a house of worship by revoking its prior tax-exempt recognition, the house of worship remains tax-exempt *ab initio*.

Because the Johnson Amendment is woefully out of step with this nation's historic commitment to free speech, church autonomy, and religious liberty, it should be declared unlawful in its entirety and enjoined from ever being weaponized against houses of worship ever again.  But for now, this Court should secure these constitutional commitments by granting the modest Joint Motion for Entry of Consent Judgement proposed by the parties, ECF No. 35.

## ARGUMENT

I.    **Experience of the Amici Targeted by the IRS for Constitutionally Protected Activity.**

a.  *Grace Church St. Louis*

In 2022, during local school board elections, Grace Church St. Louis posted information on the church's website about positions local candidates held as a service to, and a means of educating, their congregation about the important issues at stake in the local election.  In addition, two members of the church put themselves forward as candidates after years of church leadership encouraging its members to take an active role in the community, including political office.  The church encouraged its members to support their fellow members for being willing to run for office. By "support," the church clearly meant to lend the encouragement and commendation to fellow parishioners who volunteered to run for office.  Yet, others could see only the political meaning of the word, "support."

The Editorial Board of the *St. Louis Post-Dispatch* was one such hostile group.  In a March 9, 2022 editorial, the Board excoriated the church publicly, declaring that it "needs to decide what it wants to be. It can be a tax-exempt megachurch that tends to the spiritual needs of its flock, or it can be a political entity that endorses politicians and spreads misleading information about candidates the church opposes."[1]  The editors bragged that it "took us about 10 seconds to locate" the Johnson Amendment and, with an air of superiority and authority, summarily concluded that, "Grace Church has stepped far beyond the boundaries and deserves a thorough review of its tax-exempt status." *Id.*

Perhaps the editors themselves notified the IRS.  Or, maybe inspired by their bombast, a local citizen undertook to file a complaint with the IRS.  However it started, the IRS opened an official investigation into the church over *two years* later during the Biden administration.  If the IRS was so determined to enforce the Johnson Amendment and if violating the Johnson Amendment was of such a serious nature as to merit a full-blown investigation by the IRS and, possibly, the revocation of a church's tax-exempt recognition, one wonders why the IRS would wait a full 783 days between the *Post-Dispatch's* editorial and the announcement of the IRS's investigation into Grace St. Louis.

In its late-arriving letter of April 30, 2024, the IRS stated its motivations plainly, "Our concerns are based on the content published on your website during tax year 2022 which potentially constitute political activity. Your website openly endorsed two of the members of your congregation who were running in a local school board election." *See* Exhibit A.  Despite taking more than two-years to launch its investigation, the IRS then invited the church to incriminate

---

[1] Editorial Board, *Editorial: Maryland Heights church deserves to have its tax-exempt status suspended*, St. Louis Post Dispatch (Mar. 9, 2022), https://archive.is/NcqZl#selection-3473.23-3477.73.

itself with such questions as:

- Did the Church publish flyers or voter information guides that provided a position either for or against a particular candidate for public office?

- Did the Church have a political candidate speak at the Church? If so, did the Church offer to have opposing candidates speak at the Church?

- Explain in detail what the Civic Engagement groups within the church do. What is their purpose and how do they accomplish the purpose?

Ignoring the fact that an affirmative answer to any of these questions would not violate the Johnson Amendment that the Federal government sanctioned such unconstitutional queries in the first place is troubling.  How a church speaks to its members, what it says, who it invites to speak from its pulpit, or what function groups within its ministry perform are not subject to inspection and evaluation by the federal government.  Yet, the Johnson Amendment gives the IRS sanction to impose itself upon the nation's houses of worship with audit-like powers and impose what it holds out as severe penalties.

Thankfully, the leaders of Grace Church St. Louis retained the undersigned counsel and, by the same, denied entry to the IRS.  Though the IRS retreated and dismissed its investigation, the damage had already been done because the investigation was the punishment.  A land that guarantees rights to free speech, free exercise, and association ought never countenance agents of the state examining the exercise of those rights by a pastor, congregation, or house of worship.

### b. *New Way Church*

In the same year that Grace Church St. Louis received the ire of the local editorial board, New Way Church in Palm Coast, FL, received a visit one Sunday morning from a candidate for a local school board race. During the service, the pastor allowed the candidate to address the

congregation from the stage alongside the church's praise band. After talking about the importance of her faith and reasons for seeking the elected position, the pastor performed one of the most central and common of all duties of a Christian minister: he prayed for her.

Yet, this act of worship and Christian care did not escape the attention of the IRS either. In June of 2024—again *two years* after the supposedly offending deed—the IRS informed the church that it was investigating alleged violations of the so-called Johnson Amendment. *See* Exhibit B. As with Grace Church St. Louis, the IRS's letter to New Way posed improper and invasive questions, such as:

- [H]ow many people were in attendance and in what capacity were they there (e.g., church congregant)?

- What was the purpose of allowing Jill Woolbright to speak at an official church function of New Way Christian Fellowship Inc.?

And, true to form, the IRS did not miss a chance to invite the church to incriminate itself, asking such questions as:

- Have you participated in any political campaign intervention activities in 2022 that you have not mentioned in response to the above questions?

- In 2022, were you aware that by violating the prohibition on political activities outlined in IRC Section 501(c)(3) (without making a correction), that your tax-exempt status could be revoked or that you could be subject to excise taxes?

With the advantage of the advice of counsel, New Way Church declined the invitation to answer any of the IRS's questions, asserted the IRS had no authority to inspect the church in this manner, and invited the IRS to dismiss its investigation. It did, but the process left the pastor and his congregants shaken, annoyed, and wondering how the promises of the First Amendment could

so easily be laid aside by the Johnson Amendment.

## II.    The Johnson Amendment Upends Church Autonomy

   *a.   The IRS merely recognizes what is already true: churches are tax exempt.*

Many in the general population incorrectly believe that the IRS controls the exempt status of the nation's houses of worship.  The common understanding is that when a church, synagogue, or mosque applies for 501(c)(3) status, the IRS weighs the merit of the application and grants or denies the exemption accordingly.  While the IRS does evaluate the qualifications for 501(c)(3) tax-exempt status, it is *false* to say that the IRS *grants* a house of worship tax exemption.

In fact, according to the IRS's own publication, *Tax Guide for Churches & Religious Organizations* (Publication 1828 (Rev. 8-2015)), churches "are automatically considered tax exempt and are not required to apply for and obtain recognition of tax-exempt status from the IRS."  I.R.S. Pub. 1828 at 2 (Rev. 8-2015), https://www.irs.gov/pub/irs-pdf/p1828.pdf; *see also* 26 U.S.C. §508(c)(1)(A).  Nonetheless, many churches elect to seek recognition as a 501(c)(3) tax exempt organization to assure leadership, membership, and contributors that the church qualifies for tax exemption and other related tax benefits.

Thus, churches may claim tax-exempt status through two avenues: (1) by obtaining an advance tax-exemption ruling pursuant to IRC § 501(c)(3), which requires filing of an Exemption Application (IRS Form 1023), or (2) by simply holding itself out as a church and claiming tax-exempt status pursuant to IRC § 508.  Importantly, the IRS considers a church tax exempt *during* the 501(c)(3) application period. Those so recognized by the IRS are exempt from federal income taxes and eligible to receive tax-deductible contributions, among other advantages.  26 U.S.C. §§ 501(a), 170(c)(2).

Section 501(c)(3) recognizes the tax-exempt status of entities "organized and operated exclusively for religious [or] charitable" purposes, provided that the organization "does not

participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office." 26 U.S.C. § 501(c)(3); 26 C.F.R § 1.501(c)(3)-1(c)(3)(iii) ("candidate for public office" applies at the national, State, and local level). The proviso against participating or intervening in political campaigns is commonly known as the "Johnson Amendment."

> b. *The history of the Johnson Amendment and its chilling of constitutionally protected rights.*

Then-Texas Senator Lyndon B. Johnson introduced the 31-words that prohibit participation in political campaigns in 1954. The alleged motivation for the language came after two wealthy Texans used tax-exempt organizations to support Johnson's opponent in the primary election. Johnson won by a significant margin, but he was reportedly furious at the political opposition and took retribution in the form of amending the Internal Revenue Code. History records Johnson as the proponent of the language, but he offered no explanatory note with his amendment, nor is there even a record of who voted for or against it. The Johnson Amendment passed the U.S. Senate on a voice vote on July 12, 1954.

According to official IRS guidance, what constitutes prohibited political activity by a charitable nonprofit depends "on the facts and circumstances." I.R.S. Pub. 1828 at 7. Examples of prohibited activity include conducting voter education activities in such a way that favors one candidate over another; inviting one candidate to speak, but purposefully not inviting other candidates; and providing goods, services, or facilities to some, but not all, candidates in a campaign.

Nonetheless, the IRS does not consider voter education activities "conducted in a non-partisan manner" to constitute political activity. Thus, a church may publish voter education guides, host voter registration drives, and even host nonpartisan candidate forums at the church

without running afoul of the Johnson Amendment.  Whether a church steps over the thin line between partisan and non-partisan education is left to the broad discretion of the IRS, however, with little to no guidance for the average pastor, parishioner, or lay leader.

The wide-ranging language of the Johnson Amendment, and its potential application by the IRS, has led many religious leaders to avoid political topics entirely.  Many political leaders have proposed alternatives to the Johnson Amendment and others have attempted to repeal it without success.  In 2017, President Donald Trump signed an executive order directing the Department of the Treasury not to "take any adverse action against any individual, house of worship, or other religious organization on the basis that such individual or organization speaks or has spoken about moral or political issues from a religious perspective."  E.O. 13798, "Promoting Free Speech And Religious Liberty," 82 FR 21675 (May 4, 2017).  However, that order ended with his presidency—as demonstrated by the experiences of Grace Church St. Louis and New Way Church.

And, absent the repeal of the Johnson Amendment by Congress, and without this Court's entry of the proposed Consent Judgement, future administrations will flip the impact of the Johnson Amendment on or off depending upon their political preferences—all the while chilling and unchilling the guarantees of free speech, free exercise, and church autonomy.

**III.    The IRS Shields the Johnson Amendment from Challenge While Chilling Constitutionally Protected Speech.**

*a.    The futility of enforcing the Johnson Amendment.*

The Supreme Court of the United States has never addressed the Johnson Amendment's application to churches, and only a few federal courts have done so.  Indeed, it took 46 years after the adoption of the Johnson Amendment for a federal appellate court to uphold the IRS's revocation of a church's tax-exempt status. *See Branch Ministries v. Rossotti*, 211 F.3d 137 (D.C.

Cir. 2000).   No church's recognized tax exemption has been revoked under the Johnson Amendment since that case.

Branch Ministries operated Pierce Creek Church in New York. Ahead of the 1992 presidential election, Branch Ministries placed a full-page advertisement in the *USA Today* and *Washington Times* urging Christians not to vote for then-presidential candidate Bill Clinton due to his stance on certain moral issues.   The IRS examined the church as a result and, in 1995, revoked its tax exemption.   The church filed suit, but on appeal the U.S. Court of Appeals for the D.C. Circuit upheld the IRS's adverse action over arguments that it violated the First Amendment, the Religious Freedom Restoration Act ("RFRA"), and the Equal Protection Clause's prohibition on selective prosecution.   The court noted that, should the church wish to engage in political activity, it could form a related 501(c)(4) organization, which in turn could form a Political Action Committee ("PAC") that "would be free to participate in political campaigns." *Id.* at 143.

Interestingly, although the court upheld the IRS's revocation decision, it noted that "the impact of the revocation is likely to be more symbolic than substantial." *Id.* at 142.  After all, the revocation does not "necessarily make the Church liable for payment of taxes," as it "does not convert bona fide donations into income taxable to the Church." *Id.* at 143.  Moreover, while no provision of law requires a church to file for tax-exempt status to have that status, the court noted that "we know of no authority, and counsel provided none, to prevent the Church from reapplying for" 501(c)(3) status "provided, of course, that it renounces future involvement in political campaigns." *Id.* at 143.  In other words, the investigation of Branch Ministries and revocation of its tax-exempt status was an exercise in futility.

The court noted that the only immediate consequence of revocation would be felt, if at all, by the Church's donors.   One benefit to churches of applying for 501(c)(3) status is that IRS

approval "provide[s] donors with advance assurance that their contributions will be deductible" from the donor's taxable income. *Id.* at 139. "Donors to a church that has not received an advance determination of its tax-exempt status may also deduct their contributions; but in the event of an audit, the [donor] will bear the burden of establishing that the church meets the requirements of section 501(c)(3)." *Id.* Thus, revocation of Branch Ministries' 501(c)(3) status removed "the advance assurance of deductibility in the event a donor should be audited," in which event the donor would bear the burden "to establish that the Church meets the requirements of 501(c)(3)." *Id.* at 142–43.

In sum, then, even after the IRS revoked Branch Ministries' tax exemption—and a court upheld that revocation—Branch Ministries remained tax exempt, although its donors might have borne an additional burden of proof in any audit. Why? Because the IRS does not *grant* tax exemption to churches, it merely *recognizes* what is already true: houses of worship are tax-exempt entities.

Other cases have examined application of § 501(c)(3)'s conditions, including both its clause prohibiting substantial efforts to "influence" legislation and the Johnson Amendment. Almost 30 years before *Branch Ministries*, a federal appellate court upheld revocation of the tax exemption of a religious radio ministry rather than a church. That exemption rested on the ministry's extensive efforts to influence legislation to restore prayer in public schools. *See Christian Echoes Nat'l Ministry, Inc. v. United States*, 470 F.2d 849 (10th Cir. 1972). In 1988, the Bar of New York City lost its tax exemption to the Johnson Amendment for publishing nonpartisan ratings of candidates for elective judgeships. *See Ass'n of the Bar of N.Y. v. Comm'r*, 858 F.2d 876 (2d Cir. 1988). And in *Regan v. Taxation with Representation*, 461 U.S. 540, 551 (1983), the U.S. Supreme Court upheld the IRS's denial of an organization's application for

nonprofit recognition under the clause that prohibits a 501(c)(3) organization from devoting "a substantial part of [its] activities" to "attempting[] to influence legislation." 26 U.S.C. § 501(c)(3). Yet, that case did not involve a church or religious organization.

      *b. The onerous process of a church tax inquiry under the Johnson Amendment.*

Congress imposed special procedures on how and when the IRS may conduct civil tax inquiries and examinations of churches. The IRS may begin a church tax inquiry only if an appropriate high-level Treasury official reasonably believes, based on facts and circumstances recorded in writing, that the church may not qualify for an exemption. While the IRS is required to obtain the approval of a high-level Treasury official prior to launching a church tax inquiry and says as much in inquiries under the Johnson Amendment, the identity of that person is not included, nor has the IRS provided that information in response to such public records requests submitted by the undersigned. In fact, the undersigned counsel has sought copies of all such inquiries launched under the Johnson Amendment only to be told that such are not subject to disclosure under public records laws.

In any event, Federal law provides a 90-day period for the church to respond in writing to address the IRS's concerns. If this response does not sufficiently alleviate the IRS's concerns, the IRS may issue a second notice, generally within 90 days, informing the church of a need to examine its books and records. After issuing the second notice, but before starting any examination of church records, the church may request a conference with the IRS to discuss and attempt to resolve concerns about the examination. Reference by the IRS to "church records" contemplates "all corporate and financial records regularly kept by a church, including corporate minute books and lists of members and contributors." 26 U.S.C. § 7611(h)(4)(A). The IRS must complete its examination within 2 years of launch, *id.* § 7611(c)(1), and it may examine church conduct only from the prior 3 years to determine tax-exempt eligibility, *id.* § 7611(d)(2)(A).

At any point during the inquiry, if the church's responses satisfy the IRS's concerns, the IRS will close the matter without examining the church's records.  Additionally, after this type of inquiry, the IRS generally cannot conduct a subsequent examination of the church for a 5-year period unless the previous examination resulted in a revocation of tax-exempt status, a notice of deficiency of assessment, or a request for significant change in church operations, such as significant change in accounting practices.  *Id.* § 7611(f)(1); *see also* IRS, *Church Audit Process* (last updated Dec. 4, 2023), https://www.irs.gov/charities-non-profits/churches-religious-organizations/church-audit-process.

   c. *The potential penalties available to the IRS to exert upon houses of worship it determines have violated the Johnson Amendment.*

In addition to dragging a church or house of worship through two-year long investigation and the general chill the Johnson Amendment imposes upon constitutional guarantees, the IRS has more tangible means of punishment for entities it determines violate the Johnson Amendment. Such penalties include:

1. Revoking the entity's 501(c)(3) status, *see Branch Ministries*, 211 F.3d 137;

2. In cases involving political expenditures by the entity, recovering a 10% tax on all such expenditures, *see* 26 U.S.C. § 4955; and

3. In cases of "flagrant violation[s] of the prohibition against making political expenditures," immediately assessing all taxes due, *id.* § 6852, for the 6 most recent taxable years, *id.* § 7611(d)(2)(A)(ii), and seeking injunctive relief in federal court, *id.* § 7409.

On the less severe end, the IRS may issue a written advisory noting that the church engaged in campaign activity but declining to impose a penalty because of mitigating factors.  For example, in 2004 and 2006, during the IRS's short-lived Political Activity Compliance Initiative, it declined to withdraw exemptions from churches that deliberately violated the Johnson Amendment, opting

instead to issue written advisories.  Those violations included "distribution of church bulletins and inserts supporting or opposing candidates, church officials supporting or opposing candidates during services or church functions, candidates being allowed to use church facilities, and distribution of biased voter guides and candidate ratings."  *Churches and Campaign Activity: Analysis Under Tax and Campaign Finance Laws* 7–8, Congressional Research Service (Oct. 9, 2012), *available at* https://www.everycrsreport.com/files/20121009_RL34447_22d86a9c9b98ada b4e9846c34dccff3dc741b652.pdf.    In those cases, mitigating factors included whether the churches' violations only occurred once, whether they were done in good faith reliance on the advice of counsel, whether the church corrected the conduct, and whether the church took steps to prevent future violations.  *Id.*

Despite many alleged violations, only two churches have ever lost their tax-exempt status during the Johnson Amendment's existence and only two others have been required to pay excise taxes.  *See id.* (citing *Review of Internal Revenue Code Section 501(c)(3) Requirements for Religious Organizations: Hearing on H.R. 2357 Before the Subcomm. on Oversight of the H. Comm. on Ways & Means*, 107th Cong. 80 (2002) (statement of Rep. Karen L. Thurman, Member, Subcomm. on Oversight)).

> d.  *The doctrine of Taxpayer Standing insulates the Johnson Amendment from challenge until it's too late while inviting the political targeting of constitutional rights.*

Complaints concerning the Johnson Amendment may echo in the sanctuaries of the nation's churches or find debate in the halls of Congress, but rarely gain a hearing in the nation's Article III courts.  The reason for this is simple: taxpayer standing.  The clear holding of the U.S. Supreme Court—for over 100 years—is that complaints of a general nature cannot support a taxpayer's legal action against a statute's validity.  *See Commonwealth of Massachusetts v. Mellon*, 262 U.S. 447 (1923) (denying judicial review of federal statutes based upon general complaints by

taxpayers). The court admitted "no power per se to review and annul acts of Congress on the ground that they are unconstitutional." *Id.* at 488. Rather, such complaints may be heard by Article III courts "only when the justification for some direct injury suffered or threatened." *Id.* Thus, to invoke the court's jurisdiction, a taxpayer "must be able to show, not only that the statute is invalid, but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally." *Id.*

Even if *Flast v. Cohen* may extend access to the Federal courts in cases invoking the First Amendment's Free Exercise Clause, even there a party must have standing to challenge a statute that specifically works to his immediate injury "and not on the issues he wishes to have adjudicated." *Flast v. Cohen*, 392 U.S. 83, 99 (1968). Article III courts require a redressable injury and are not in the business of issuing advisory opinions. And, for an issue like the Johnson Amendment, though a great many retain political disagreement with its continuation, even if "a party may have standing in a particular case . . . the federal court may nevertheless decline to pass on the merits of the case because, for example, it presents a political question." *Id.* at 100.

Absent Congressional repeal, faith leaders threatened by the Johnson Amendment have little recourse but to wait and see whether the IRS will enforce the Johnson Amendment against them. But, even if it were to open an investigation against a house of worship accused of violating the Johnson Amendment, the IRS determines its own future. It can either fully enforce the Johnson Amendment sufficient to give injury to a litigant and, thus, standing to challenge the law in court, or it can unilaterally end any such investigation and deprive a house of worship of an injury sufficient to afford standing. Neither removes the threat of enforcement against pastors, priests,

and parishioners who must guess whether their sermon, prayer, or educational activity violates the Johnson Amendment.

Thus, the fox guards the henhouse. One Executive may direct his IRS to suspend enforcement of the Johnson Amendment, while another may direct the IRS to enforce it aggressively. *See Fonticiella v. Comm'r of Internal Revenue*, 117 T.C.M. (CCH) 1377 (T.C. 2019) ("The President retains full oversight of the [IRS] Commissioner," who exercises "delegated authority" in his supervision of the IRS as a bureau of the Department of the Treasury). What results not only chills constitutionally protected activity, but also invites abuse. Thus, while New Way's prayer for a local school board member and Grace Church's provision of educational information warrants an investigation by the IRS (which, at the time of the investigation, was controlled by President Joe Biden), we are aware of no such investigation when President Biden stumped for re-election in a Philadelphia church.[2] Nor did the IRS announce its enforcement of the Johnson Amendment following a campaign event by Vice President Kamala Harris mere days before Election Day 2024.[3] Too be sure, both churches should have had the right to host President Biden or Vice President Harris in the very manner in which they did. The point nonetheless remains: the Johnson Amendment remains a threat to core constitutional rights, deployed (or not) at a time and choosing determined by a Presidential administration's political motivation, but otherwise shielded from judicial review by the doctrine of taxpayer standing.

Until Congress deletes the Johnson Amendment from the Internal Revenue Code, which it should do at the earliest opportunity, it falls to the Executive and his delegated authority to

---

[2] Carmen Russel-Sluchansky, *Biden joins sermon at Church of God in Christ during 6th campaign visit to Philadelphia*, WHYY (July 7, 2024, 7:04 PM), https://whyy.org/articles/biden-pennsylvania-mount-airy-church-visit/.

[3] Alexandra Simon and Dan Snyder, *Harris tells Philadelphia church election will 'decide the fate of our nation for generations to come,'* CBS News (Oct. 28, 2024, 4:48 AM), https://www.cbsnews.com/philadelphia/news/kamala-harris-philadelphia-campaign-rally/.

administer the IRS, including the Johnson Amendment.  If that be so, then it is entirely within the Executive's prerogative to direct the IRS to agree to the consent decree now before this Court and urge the Court to bind its enforcement power in the manner described therein.  We agree and urge the Court to grant the Joint Motion.

IV.    **The Johnson Amendment Violates the Guarantees of Free Speech and Religious Liberty in Multiple Ways.**

    *a.  The doctrine of Church Autonomy undermines the Johnson Amendment's power.*

The First Amendment's Religion Clauses protect the "power" of "religious organizations" to "decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 186 (2012).  Pastors' approach to politics and voting are necessarily informed by Biblical teachings and the church's doctrine.  Despite what the Johnson Amendment threatens, the government cannot control what a pastor speaks from the pulpit, nor what churches consider to be part and parcel a matter of religious duty—even where they consider engaging in speech regarding political campaigns part of that duty.  To monitor and control religious speech by a church presupposes the ability of the government to regulate the church and, worse, dictate what is or is not a matter of religion.  *See also Watson v. Jones*, 80 U.S. (13 Wall.) 697, 733 (1871); *Jones v. Wolf*, 443 U.S. 595, 602 (1979); *see also Branch Ministries*, 211 F.3d at 142 (recognizing that First Amendment challenge to the Johnson Amendment might have succeeded if the church had maintained that "a withdrawal from electoral politics would violate its beliefs").

    *b.  The Free Exercise Clause of the First Amendment to the U.S. Constitution protects against the Johnson Amendment's threats.*

While the Johnson Amendment may appear to regulate all nonprofits neutrally, religious nonprofits (especially churches and their auxiliaries) are different and given special solicitude under the First Amendment and federal law.  Indeed, the Constitution places religious freedom in

a "preferred position." *Murdock v. Com. of Pennsylvania*, 319 U.S. 105, 115 (1943). And religious

speech is "doubly protect[ed]." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 523 (2022).

Moreover, the Religious Freedom Restoration Act ("RFRA"), 42 U.S. C. § 2000bb, *et seq*,

requires laws restricting the free exercise of religion—like the Johnson Amendment—to be

narrowly tailored to further a compelling interest. Thus, even if the IRS might enforce the Johnson

Amendment against secular nonprofits, any such enforcement against religious nonprofits, like

churches, unconstitutionally burdens the free exercise of religion. More specifically still, churches

are given even greater protection than traditional nonprofit organizations or even *religious*

nonprofit organizations. Thus, even if the IRS may enforce the Johnson Amendment against

secular nonprofits and require certain religious nonprofits to form a separate, but related, 501(c)(4)

organization for purposes of political/legislative involvement, enforcement against churches—

who, according to the IRS, are "automatically considered tax exempt" where others are not—

presents even greater unconstitutional burdens upon the free exercise of religion.

    *c.  The Johnson Amendment violates the Free Speech Clause of the First Amendment to the U.S. Constitution.*

The First Amendment insists upon more speech rather than less in order "to assure the

unfettered interchange of ideas for [the] bringing about of political and social changes desired by

the people." *FCC v. League of Women Voters*, 468 U.S. 364, 403 (1984) (Rehnquist, J., dissenting).

In the context of political dialogue, that means that the "First Amendment protects speech and

speaker, and the ideas that flow from each." *Citizens United v. Federal Election Comm'n*, 558

U.S. 310, 341 (2010).

While *Citizens United* expanded the free speech rights available to corporations, the

Supreme Court's jurisprudence has not yet addressed whether political speech restrictions on tax-

exempt churches are effectively more restrictive than those on non-religious, non-tax-exempt

entities.  But, given the Supreme Court's recent insistence that the Free Speech and Free Exercise Clauses of the First Amendment "work in tandem" to provide "overlapping protection for expressive religious activities" thus "doubly protect[ing] religious speech," it seems likely that churches, if anyone, should be afforded greater protections against intrusion upon religious speech. *Kennedy*, 597 U.S. at 523–24; *see also Shurtleff v. City of Bos., Massachusetts*, 596 U.S. 243, 252 (2022) (In determining whether government intends "to regulate private expression," key factors include "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression.").

For the IRS to insist that a church form a separate organization—a 501(c)(4) or 527 Political Action Committee—to engage in religious speech that touches upon matters political unconstitutionally burdens that right.  Indeed, such speech is not speech by the church, but by a different entity entirely.  If there is "[n]o sufficient governmental interest [justifying] limits on the political speech of nonprofit or for-profit corporations" regarding corporate expenditures for express political advocacy, surely the tax code cannot be used to regulate a church's constitutional rights.  *Citizens United* 558 U.S. at 365.

A Free Speech challenge could also argue that the threat of disclosing lists of church members and church donor information pursuant to IRC § 7611(h)(4)(A) chills the church's speech and is unconstitutional under a heightened level of scrutiny.  *See Am. for Prosperity Foundation v. Bonta*, 594 U.S. 595, 612–19 (2021); *NAACP v. State of Ala.*, 357 U.S. 449, 461, (1958) ("In the domain of these indispensable liberties, whether of speech, press, or association, the decisions of this Court recognize that abridgement of such rights, even though unintended, may inevitably follow from varied forms of governmental action.").

d. *Enforcement of the Johnson Amendment against houses of worship constitutes unlawful viewpoint discrimination.*

Since tax exemptions cannot be considered government speech, a church does not relinquish its fundamental rights of speech and religion. They are thus free to speak for themselves upon topics of their choosing, expressing viewpoints of their own.  Government cannot insist that a religious organization express, or prevent from expressing, a particular viewpoint.  *See Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995) ("The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.").

e. *Giving the IRS nearly unfettered discretion to enforce the Johnson Amendment invites inequitable, politically-motivated application of the law.*

The Internal Revenue Code, and specifically the Johnson Amendment, gives significant, nearly unfettered discretion to the IRS to determine what constitutes participation or intervention in a political campaign or any candidate for public office.  Such discretion can easily be abused, especially regarding religious speech from the pulpit. *See Fulton v. City of Phila.*, 141 S. Ct. 1868, 1877 (2021) ("A law is not generally applicable if it invite[s] the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions.") (internal quotations removed).  That is especially likely given that the IRS allows other secular organizations—even nonprofit organizations—to engage in the very speech it prohibits of churches.  Thus, a law "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way" will also lack the requisite neutrality demanded by the First Amendment.  *Id.*

*f. Since 1954, the Johnson Amendment has bread unlawful hostility toward religion by the government and fomented it within the American culture.*

Government must always be respectful toward religious exercise. Yet, government officials have often demonstrated hostility toward religion in the enforcement of its laws. For instance, in *Masterpiece Cakeshop*, the State of Colorado held baker Jack Phillips, in derision for his religious beliefs. As the Supreme Court noted, "[t]he Free Exercise Clause bars even 'subtle departures from neutrality' on matters of religion." *Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 584 U.S. 617 (2018) (quoting *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 534 (1993)). To further drive the point, the Court later concluded that "[g]overnment fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 141 S.Ct. at 1877. The past behavior of IRS agents like Lois Lerner, former Director of Exempt Organization for the IRS, suggest that the inquiry against houses of worship in enforcing the Johnson Amendment could be motivated by more than mere enforcement. Indeed, further investigation may reveal open hostility to the religious beliefs of America's houses of worship in violation of the Constitution.

In May of 2021, the IRS denied tax exempt status to Christians Engaged, a Christian nonprofit formed to educate and empower everyday Americans to pray for its elected officials, vote, and be civically engaged. Bizarrely, in its determination letter, the IRS would not even use the phrase, "Word of God," a common reference to the Christian Bible. *See* Exhibit C. Rather, it substituted the letter "M" throughout its letter denying Christians Engaged tax exemption. The IRS denied their application after it determined the Christian organization's "educational activities were not neutral" because the topics typically on which Christians Engaged educated were "associated with political party platforms" and often "affiliated with distinct candidates." *Id.*

More bluntly, the IRS claimed it was required to deny their application because, Christians Engaged "instruct[ed] individuals on how Christians should use the Bible and vote the Bible." *Id.*

Such a negative determination letter reflects not only the ignorance of IRS agents tasked with following its own rules related to religious organizations and houses of worship, but also reveals and encourages a hostility toward religion that the Supreme Court has rightly labeled as "odious to the Constitution . . . and cannot stand." *Trinity Lutheran Church of Columbia v. Comer*, 582 U.S. 449, 467 (2017).

>   g.  *America's history and tradition counsels against the continuation of the Johnson Amendment's application against houses of worship.*

After abandoning its *Lemon* test, the Supreme Court has increasingly emphasized history, historical practices, and original meaning in the First Amendment context. *See, e.g.*, *Kennedy*, 597 U.S. at 535; *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 50–52 (2019); *Shurtleff v. City of Boston*, 596 U.S. 243, 287 (2022) (Gorsuch, J., concurring) (endorsing historical understanding of the First Amendment's original meaning); *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014).

American pastors have historically spoken on political issues and candidates. *See generally* Shawn A. Voyles, Comment, *Choosing Between Tax-Exempt Status and Freedom of Religion: The Dilemma Facing Politically-Active Churches*, 9 Regent U. L. Rev. 219, 226–30 (1997). Even before the Revolution, "patriotic clergymen told their congregations that failure to oppose British tyranny would be an offense in the sight of Heaven." Patricia U. Bonomi, *Under The Cope Of Heaven: Religion, Society, And Politics In Colonial America* 216 (updated ed. 2003). A few years later, in the late 1700s and early 1800s, Virginia Baptists, under John Leland's leadership, endorsed James Madison's campaign for the Virginia Ratifying Convention and U.S. House of Representatives—thus playing a crucial factor in passing the First Amendment—and Thomas Jefferson's campaign for President. *See* Reece Barker, *A Memorial and Remonstrance Against*

*Taxation of Churches*, 47 B.Y.U. L. Rev. 1001, 1031 (2022).  Churches played a key role on both sides of the presidential election of 1800; while the Virginia Baptists supported Jefferson, on the other side, Dutch Reformed minister, Rev. William Linn, attacked Jefferson's candidacy through print, charging Jefferson as a deist who never observes the Lord's Day.  *See* Voyles, *supra*, at 227.

The Johnson Amendment further departs from the long historical tradition in the United States of granting tax-exemptions to churches.  Prior to the American Revolution, most colonies provided tax relief to churches, and Congress introduced its first tax exemption for churches in 1802.  *See* Vaughn E. James, *The African-American Church, Political Activity and Tax Exemption*, 37 Seton Hall L. Rev 371, 376 (2007).  As the Supreme Court has long acknowledged, "[f]ew concepts are more deeply embedded in the fabric of our national life, beginning with pre-Revolutionary colonial times, than for the government to exercise at the very least this kind of benevolent neutrality toward churches and religious exercise . . . ."  *Walz v. Tax Comm'n of New York*, 397 U.S. 664, 676 (1970).  The Supreme Court has not considered church tax exemptions from an originalist perspective, but such historical arguments improve the chances that the Court would invalidate the Johnson Amendment if ever presented with such a case.

    *h.  The government cannot place unconstitutional conditions to compel a house of worship to comply with the Johnson Amendment.*

Through enforcement of the Johnson Amendment, the government cannot compel a church to forgo its constitutional rights to receive the same tax exemption all other similarly situated organizations receive.  Indeed, "if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited . . . Such interference with constitutional rights is impermissible."  *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

## CONCLUSION

For all the reasons stated herein, the Court should GRANT the Joint Motion for Entry of

Consent Judgement, ECF No. 35.

Dated: August 5, 2025                 Respectfully Submitted,


                                      /s/ Jeremiah G. Dys

                                      Jeffrey C. Mateer
                                      TX Bar No. 13185320
                                      jmateer@firstliberty.org
                                      Hiram S. Sasser III
                                      TX Bar No. 24039157
                                      hsasser@firstliberty.org
                                      David J. Hacker
                                      TX Bar No. 24103323
                                      dhacker@firstliberty.org
                                      Jeremiah G. Dys
                                      TX Bar No. 24096415
                                      jdys@firstliberty.org
                                      Ryan N. Gardner
                                      TX Bar No. 24101790
                                      rgardner@firstliberty.org

                                      FIRST LIBERTY INSTITUTE
                                      2001 W. Plano Pkwy, Ste. 1600
                                      Plano, TX 75075
                                      972-941-4444

## CERTIFICATE OF SERVICE

I hereby certify that on August 5, 2025, I electronically filed this motion with the Clerk of the Court for the United States District for the Eastern District of Texas by using the CM/ECF system. Counsel in this case are registered CM/ECF users and service will be accomplished using the CM/ECF system.

<u>/s/ Jeremiah G. Dys</u>