## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### Tyler Division

| | | |
|---|---|---|
| NATONAL RELIGIOUS BROADCASTERS, *et al.*, | § § § | |
| Plaintiffs; | § § | |
| v. | § § | Case No. 6:24-cv-311-JCB |
| BILLY LONG, in his official capacity as COMMISSIONER OF THE INTERNAL REVENUE SERVICE, *et al.*, | § § § § | |
| Defendants. | § § § | |

---

## BRIEF OF *AMICUS CURIAE* LIBERTY COUNSEL IN SUPPORT OF JOINT MOTION FOR ENTRY OF CONSENT JUDGMENT

---

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ ii

INTEREST OF AMICUS CURIAE ............................................................... 1

STATEMENT OF ISSUES ............................................................................. 2

SUMMARY OF ARGUMENT ....................................................................... 3

I.   The Johnson Amendment's purpose was to silence churches and other nonprofit religious organizations. ...................................................... 5

II.  The Johnson Amendment is vague and overbroad and thereby leads to selective enforcement and the chilling of otherwise permissible speech. .......... 8

III. The Proposed Consent Decree will protect the First Amendment and statutory rights of religious organizations, including churches. ....................................... 12

    A.   The Johnson Amendment regulates core political speech. ........................ 12

    B.   The Johnson Amendment amounts to an unconstitutional infringement and condition on the right to free speech .................................................. 16

    C.   The Johnson Amendment violates the Religious Freedom Restoration Act. .................................................................................................... 21

        1.   The Johnson Amendment constitutes a substantial burden on church's religious exercise. ................................................................ 22

        2.   The Amendment fails strict scrutiny. ................................................ 24

IV.  The Proposed Consent Decree will prevent unconstitutional entanglement of government and religion .................................................................. 25

CONCLUSION .......................................................................................... 29

# TABLE OF AUTHORITIES

**Cases**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013)............... 19

*Branch Ministries v. Rossotti*, 211 F.3d 137 (D.C. Cir. 2000) ..................................... 10

*Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182 (1999)............................ 4, 12, 16

*Buckley v. Valeo*, 424 U.S. 1 (1976)........................................................................ 4, 29

*Burson v. Freeman*, 504 U.S. 191 (1992) ...................................................................... 21

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) ........................................... 14

*Capitol Square Review and Advisory Bd. v. Pinette*, 515 U.S. 753 (1995) ............... 14

*Catholic Answers, Inc. v. United States*, No. 09-CV-670 (Oct. 14, 2009)................. 11

*Citizens United v. Federal Election Comm'n*, 558 U.S. 310 (2010).......... 13, 15, 16, 25

*City of Boerne v. Flores*, 521 US. 507 (1997)................................................................ 21

*Corp. of Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327 (1987) ...................................................................................... 14

*Def. Distributed v. U.S. Dep't of Def.*, 838 F.3d 451 (5th Cir. 2016) ......................... 25

*Emp't Div., Dept. of Human Res. of Or. v. Smith*, 494 U.S. 872 (1990).................... 22

*Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214 (1989)................................ 12

*FCC v. League of Women Voters of Cal.*, 468 U.S. 364 (1984)................................... 19

*Fed. Election Comm'n v. Wisconsin Right To Life, Inc.*, 551 U.S. 449 (2007) .......... 12

*Gonzales v. O'Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006) . 21

*Henderson v. Kennedy*, 265 F.3d 1072 (D.C. Cir. 2001) ............................................ 24

*Hernandez v. Comm'r*, 490 U.S. 680 (1989) ............................................................... 22

*Holt v. Hobbs*, 574 U.S. 356 (2015) .............................................................................. 22

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012) ........................................................................................................................ 26, 28

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94 (1952) ................................................................................................................... 26

*Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022)............................................... 14

*Koontz v. St. Johns River Water Management Dist.*, 570 U.S. 595 (2013) ............... 16

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995)......................................... 13

*Meyer v. Grant*, 486 U.S. 414 (1988) ........................................................................... 29

*N.L.R.B. v. Catholic Bishop of Chi.*, 440 U.S. 490 (1979) ......................................... 27

*NAACP v. Button*, 371 U.S. 415 (1963)................................................................... 4, 12

*Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058 (9th Cir. 2008)........................... 23

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732 (2020)................. 5, 27

*Perry v. Sindermann*, 408 U.S. 593 (1972) ................................................................. 21

*Regan v. Taxation with Representation of Wash.*, 461 U.S. 540 (1983)............... 17, 18

*Sanders Cnty. Republican Cent. Comm. v. Bullock*, 698 F.3d 745 (9th Cir. 2012) ... 13

*Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696 (1976) ........................... 26

*Sherbert v. Verner*, 374 U.S. 398 (1963) .............................................................. 16, 20

*Shurtleff v. City of Boston*, 596 U.S. 243 (2022) ...................................................... 1

*Smith v. U.S. Dep't of Treasury*, 761 F. Supp. 3d 952 (E.D. Tex. 2025) .................... 25

*Speiser v. Randall*, 357 U.S. 513 (1958) .................................................................. 16

*Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707 (1981) ........................ 22

*Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017) ........ 19, 20

*Watson v. Jones*, 80 U.S. 679 (1872) ................................................................... 25, 26

*Whole Woman's Health v. Smith*, 896 F.3d 362 (5th Cir. 2018) ........................... 28, 29

## Statutes

26 U.S.C. § 501(c)(3) ....................................................................................... passim

26 U.S.C. § 508 .................................................................................................... 6

42 U.S.C. § 2000bb ........................................................................................... 4, 21

I.R.C. § 4955 ........................................................................................................ 8

Revenue Act of 1987, Pub. L. No. 100-203, 101 Stat. 1330 (1987) ............................ 7

## Other Authorities

100 Cong. Rec. 9,604 (1954) .................................................................................. 7

C. Eric Lincoln & Lawrence H. Mamiya, *The Black Church in the African American Experience* (1990) ........................................................................................ 28

Darryl Fears, *IRS Ends 2-Year Probe of NAACP's Tax Status*, Wash. Post (Sept. 1, 2006) ........................................................................................................... 11

I.R.S., Pub. No. 1828, *Tax Guide for Churches and Religious Organizations* (rev. Aug. 2015) ................................................................................................ 6, 8

Letter from Marsha A. Ramirez, Dir., EO Examinations, Internal Revenue Serv., to NAACP (Aug. 9, 2006) .............................................................................. 11

*Lobbying and Political Activities of Tax-Exempt Organizations: Hearings Before the Subcomm. on Oversight of the H. Comm. on Ways & Means,* 100th Cong. 426 (1987) (statement of United States Catholic Conference) ...................................... 9

Michael Janofsky, *Citing July Speech, I.R.S. Decides to Review N.A.A.C.P.*, N.Y. Times (Oct. 29, 2004) ................................................................................. 11

## Rules

Rev. Rul. 2007-41, 2007-25 I.R.B. 1421 (June 18, 2007) ...................................... 9, 24

## Regulations

Treas. Reg. 1.501 ............................................................................................. 8, 18

## INTEREST OF AMICUS CURIAE

Liberty Counsel is a national civil liberties organization that provides education and legal defense on issues relating to religious liberty, the sanctity of human life, and the family. Since 1989, Liberty Counsel has defended the free speech and free exercise rights of churches and religious organizations. Its attorneys have testified before Congress on matters relating to government infringement on First Amendment rights and have argued multiple times before the United States Supreme Court, every federal Circuit Court of Appeals, and multiple State Supreme Courts.

Liberty Counsel believes the Johnson Amendment violates the First Amendment rights of religious organizations and churches, as well as their rights under the federal Religious Freedom Restoration Act. Liberty Counsel attorneys have written extensively on the Johnson Amendment, have instructed tens of thousands of pastors, clergy, church, and nonprofit leaders, and have considerable experience in First Amendment law.

In 2022, Liberty Counsel achieved a unanimous United States Supreme Court victory against the City of Boston in connection with its discrimination of religious speech. *See Shurtleff v. City of Boston*, 596 U.S. 243 (2022). Most recently, Liberty Counsel has urged Congress to pass the Free Speech Fairness Act, which would amend the tax code to protect the free speech rights of religious entities and churches.

From 2011 to 2013, Liberty Counsel's Mathew Staver served on a congressional task force organized by the Evangelical Council for Financial Accountability at the request of Senator Chuck Grassley (R-Iowa) to evaluate the constitutionality of the

1

Johnson Amendment. The Commission on Accountability and Policy for Religious Organizations recommended the repeal of the Johnson Amendment. The commission was comprised of nationally recognized clergy, nonprofit experts, legal experts, and CPA experts. The commission issued a 91-page report, which is attached as **Exhibit A** and incorporated herein.

Staver is one of the leading Christian legal theorists and experts in the country. In addition to serving as the founder and chairman of Liberty Counsel, Staver was the dean and tenured professor of law at Liberty University School of Law from May 2006 through December 2014, taught constitutional law and legal history, and led the law school through all levels of ABA accreditation. He is also an AV-rated attorney by Martindale-Hubbell, has appeared in every federal circuit court of appeals in the country, and has argued several victorious cases at the Supreme Court, including *Shurtleff*. He has published many articles and book chapters on the Johnson Amendment. Staver is also Board Certified in Appellate Practice by the Florida Bar.

Liberty Counsel has a vital interest in ensuring that the First Amendment rights of churches and religious organizations are protected and supports the adoption of the Proposed Order and Final Judgment, ECF No. 35-1 ("Proposed Consent Decree").

## STATEMENT OF ISSUES

Per Local Rule CV-7(a)(1), this *amicus* brief argues that the Johnson Amendment violates the First Amendment because: (1) it is vague and overbroad and

2

thereby leads to selective enforcement and the chilling of otherwise permissible speech; (2) it interferes with the rights of religious organizations and churches; (3) it violates the Religious Freedom Restoration Act (RFRA); and (4) it fosters unconstitutional entanglement of government and religion.

## SUMMARY OF ARGUMENT

In 1954, Congress added a limitation on political campaign activity to section 501(c)(3) of the Internal Revenue Code (IRC), which was dubbed the "Johnson Amendment" ("the Amendment"). Then-Senator Lyndon B. Johnson introduced an amendment to the IRC because he sought to silence his political critics, who were comprised of religious organizations and churches. The Amendment threatens otherwise tax-exempt nonprofit organizations, including churches, with loss of their section 501(c)(3) status if they "participate in, or intervene in…. any political campaign on behalf of (or in opposition to) any candidate for public office." I.R.C. §501(c)(3). The Parties in this case entered into a Proposed Consent Decree, which would enjoin the Internal Revenue Service (IRS) from enforcing the Amendment against Plaintiffs' Churches. *See* ECF. No. 35-1. Liberty Counsel supports the Proposed Consent Decree because the Amendment is impracticably vague and overbroad and violates the First Amendment and RFRA.

*First*, the Amendment is vague and overbroad and thereby leads to inconsistent enforcement and the chilling of otherwise permissible speech. The vague guidance regarding the scope of the Amendment has caused many churches to steer away from discussing any political matters to avoid scrutiny from the IRS. The

3

unclear guidance also makes it difficult for the IRS to administer the Amendment. Over the years, the IRS has enforced the Amendment against some churches while turning a blind eye to blatant violations by secular groups like the NAACP. The inconsistent application of the Amendment has undermined the credibility of the law and fueled allegations of bias and religious viewpoint discrimination.

*Second*, the Amendment infringes upon the First Amendment rights of religious organizations and churches. "Our form of government is built on the premise that every citizen shall have the right to engage in political expression and association. This right was enshrined in the First Amendment of the Bill of Rights." *NAACP v. Button*, 371 U.S. 415, 431 (1963). On its face, the Amendment violates the First Amendment because it prevents the discussion of political candidates, which is core political speech where First Amendment protection is "at its zenith." *Buckley v. Am. Const. Law Found., Inc.*, 525 U.S. 182, 187 (1999). The Amendment is doubly egregious because it also violates the right of churchgoers to "make informed choices among candidates for office." *Buckley v. Valeo*, 424 U.S. 1, 14-15 (1976). For many churches, political speech is inextricably linked to a church's religious duty, doctrine, and faith, and have sincerely held religious beliefs that Scripture compels them to speak on cultural and political issues of the day.

*Third*, the Amendment violates the Religious Freedom Restoration Act of 1993, 42 U.S.C. §§ 2000bb–2000bb-4, because it constitutes a substantial burden on the free exercise of religion. For many churches, instructing their congregants on important political issues and campaigns is an integral part of their mission. The Amendment

prohibits the discussion of political campaign activities in all official channels of a section 501(c)(3) entity, which has a chilling and deterring effect on the exercise of First Amendment rights.

*Fourth*, the church autonomy doctrine counsels in favor of this Court adopting the Proposed Consent Decree. The focal point of this doctrine is that the government should not interfere with a church's religious doctrine or practice. The church autonomy doctrine embodies the Founding Fathers determination to form a government that protected religious freedom, unlike the 16th-century British government they fought against, which sought to "control the exercise of religion." *See Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 754 (2020). The Amendment undermines the church autonomy doctrine, and returns freedom once held by religious institutions, to the government. Specifically, it authorizes the IRS to interfere with and control matters of a church's faith and doctrine, including a church's religious convictions concerning communications on core political speech.

Accordingly, Liberty Counsel urges this Court to adopt the Proposed Consent Decree to protect the constitutional and statutory rights of religious organizations and churches.

## ARGUMENT

## I.    The Johnson Amendment's purpose was to silence churches and other nonprofit religious organizations.

A nonprofit organization that elects 501(c)(3) status under the IRC is afforded (1) federal tax-exempt status and (2) tax deductibility on behalf of the donors who contribute to the organization. One of the main advantages of a 501(c)(3) is that the

donors can claim a federal tax deduction on their contributions. Churches organized exclusively for religious or charitable purposes are automatically exempt from federal taxes. See I.R.S., Pub. No. 1828, *Tax Guide for Churches and Religious Organizations* at 2 (rev. Aug. 2015), https://www.irs.gov/pub/irs-pdf/p1828.pdf; *see also* 26 U.S.C. § 508(c)(1)(A). Churches that meet the criteria are tax exempt as 501(c)(3) organizations even without filing a Form 1023 application for exemption. Churches are therefore exempt from the application process and do not need a letter ruling from the IRS to be treated as a 501(c)(3) tax-exempt organization. Some churches elect to seek and IRS letter ruling as a 501(c)(3) organization but that election should not come at the unconstitutional cost of political silence.

In 1934, Congress added a provision to the IRC stipulating that "no substantial part" of such an organization's activities could consist of "carrying on propaganda, or otherwise attempting, to influence legislation." I.R.C. § 501(c)(3). This restriction is referred to as the "lobbying limitation." A 501(c)(3) organization may lose its tax-exempt status if its legislative activities exceed more than a substantial part of its total activities. No church has ever lost its tax-exempt status for engaging in too much lobbying.

In 1954, as a result of a floor amendment by then-Senator Lyndon B. Johnson, Congress added a limitation on participation in partisan politics to section 501(c)(3) of the IRC. The limitation was named the "Johnson Amendment" and passed with minimal discussion or debate. The following exchange sums up the extent of the Senate floor discussion on the Johnson Amendment:

The Presiding Officer: The Senator from Texas [Mr. Johnson] has been recognized.

Mr. Johnson of Texas: Mr. President, I have an amendment at the desk, which I would like to have stated.

The Presiding Officer: The Secretary will state the amendment.

The Chief Clerk: On page 117 of the House Bill, in section 501(c)(3), it is proposed to strike out "individuals, and" and insert "individual," and strike out "influence legislation." and insert "influence legislation, and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office."

Mr. Johnson of Texas: Mr. President, this amendment seeks to extend the provisions of section 501 of the House bill, denying tax-exempt status to not only those people who influence legislation but also to those who intervene in any political campaign on behalf of any candidate for any public office. I have discussed the matter with the chairman of the committee, the minority ranking member of the committee, and several other members of the committee, and I understand that the amendment is acceptable to them. I hope the chairman will take it to conference, and that it will be included in the final bill which Congress passes.

(Ex. A. at pp. 13-14 [citing 100 Cong. Rec. 9,604 (1954)].)

The passage of the Revenue Act of 1954 added language to the IRC that disqualified organizations registered under section 501(c)(3) from exemption if they "participate in, or intervene in (including the publishing or distribution of statements), any political campaign on behalf of any candidate for public office." In 1987, Congress amended section 501(c)(3) to clarify that the prohibition on campaign activity included activities "in opposition to," any candidate for public office. Revenue Act of 1987, Pub. L. No. 100-203, 101 Stat. 1330 (1987).

Under section 4955, an amount paid or incurred by a section 501(c)(3) organization to participate in, or intervene in, a political campaign for public office is

considered a "political expenditure." I.R.C. § 4955(d)(1). Section 4955(a) imposes an initial tax on each political expenditure equal to 10% of the amount of the expenditure. If the expenditure is not promptly corrected, section 6852 authorizes the IRS to immediately determine the amount of income tax due.

The Johnson Amendment was created because then-Senator Johnson sought to silence his critics. In 1948, Senator Johnson was locked in a heated battle in the Texas Democratic primary for United States Senate. Johnson was opposed by numerous churches and barely won the Senate seat. Two wealthy Texans also used tax-exempt organizations to support Johnson's opponent in the primary election. The Amendment was political vengeance and has been used to silence churches and other nonprofit religious organizations, and it has been wreaking havoc ever since.

## II.    The Johnson Amendment is vague and overbroad and thereby leads to selective enforcement and the chilling of otherwise permissible speech.

Under section 501(c)(3) of the IRC, campaign political activity includes the publication or distribution of written or printed statements or the making of oral statements on behalf of, or in opposition to, a candidate for public office. Treas. Reg. 1.501(c)(3)-1(c)(3) (iii). A 501(c)(3) organization is at risk of engaging in prohibited political activity if it discusses any message favoring or opposing a candidate. A statement can identify a candidate, not only by stating the candidate's name, but also by showing a picture of the candidate, referring to political party affiliations, or other issues of a candidate's platform or biography. The IRS determines whether a 501(c)(3) organization engages in prohibited political activity on the "facts and circumstances" of each case. I.R.S. Pub. 1828 at 7.

In June 2007, the IRS issued guidance to help clarify the scope of the law. The IRS listed factors such as "[w]hether the statement is delivered close in time to the election" and "[w]hether the statement expresses approval or disapproval for one or more candidates' positions and/or actions." Rev. Rul. 2007-41, 2007-25 I.R.B. (June 18, 2007). The statement need not even reference a candidate by name. The guidance does not clarify how close is "too close" to an election and what a faith leader can preach without indirectly expressing "approval or disapproval" of a candidate. The overbroad and vague language of the Amendment has not only chilled the speech of many religious organizations and churches but has frozen their speech and caused them to avoid political topics entirely. As explained by the U.S. Conference of Catholic Bishops:

> [E]very sermon on a controversial issue in which the candidates are on opposite sides, and every report in the religious press on the views of candidates running for office raises a potential question of the appropriate application of the political campaign activity restriction. The current broad IRS interpretation of the restriction has a substantial chilling effect on the role of churches and religious organizations in discussing not only particular candidates' views on issues of importance to members of the faith, but also in discussing the issues themselves.

(Ex. A at p. 17 [quoting *Lobbying and Political Activities of Tax-Exempt Organizations: Hearings Before the Subcomm. on Oversight of the H. Comm. on Ways & Means,* 100th Cong. 426 (1987) (statement of United States Catholic Conference)].)

The lack of clarity by the IRS has also led to selective enforcement. One case involved Branch Ministries, which operated a church at Pierce Creek in Binghamton, New York. On October 30, 1992, four days before the presidential election, Branch Ministries placed a full-page advertisement in *USA Today* and the *Washington Times*

opposing then-Governor Bill Clinton for the office of President, warning people that Clinton espoused extreme views regarding abortion and homosexuality. On November 20, 1992, the IRS notified the church that it intended to conduct a tax inquiry, and after two meetings that were deemed "unproductive," the IRS revoked the church's tax-exempt status *letter ruling. Branch Ministries v. Rossotti*, 211 F.3d 137, 140 (D.C. Cir. 2000). However, the D.C. Circuit Court pointed out that under the IRC, churches are the only institutions not required to apply for tax-exempt status *letter ruling*, and that churches, by their very nature, are tax-exempt. *Id.* at 139. The church lost its tax-exempt *letter ruling* from the IRS, the court said, was more symbolic than substantive, because the loss of the *letter ruling* did not affect the church's tax-exempt status. *Id.*

The IRS was granted summary judgment in favor of upholding the revocation of the church's IRS *letter ruling* even though there was significant evidence of selective enforcement. 211 F.3d at 140-41, 144-45. Counsel for Branch Ministries introduced "several hundred pages of newspaper excerpts" citing examples of campaign intervention by other churches and pastors. *Id.* at 144. Among the examples included "reports of explicit endorsements of Democratic candidates by clergymen as well as many instances in which favored candidates have been invited to address congregations from the pulpit." *Id.* Despite the other churches' involvement in political campaigns, Branch Ministries was "the only one to have ever had its tax-exempt status revoked for engaging in political activity." *Id.*

10

In 2004, Catholic Answers, a 501(c)(3) public charity, posted two e-letters questioning whether presidential candidate John Kerry, also a Catholic, should present himself for Holy Communion because of his support for abortion. *Catholic Answers, Inc. v. United States*, 2009 WL 3320498, 1–2 (S.D. Cal. Oct. 14, 2009). The organization also created a voter guide entitled "Voter's Guide for Serious Catholics." *Id*. at 2 & n.2. The IRS opened an investigation into the voter guide but found that it did not constitute political intervention. *Id.* at 2. The IRS also reversed its assessment of excise taxes because the alleged political activity "was not willful and flagrant." *Id.* at 3-4.

The IRS has refused to punish non-religious organizations engaged in blatant political activity. For instance, in 2004, at its convention in Philadelphia, then-chairman of the NAACP, Julian Bond, made several comments in opposition of President George W. Bush and Vice President Dick Cheney in violation of the prohibition on political campaign activity. (Ex. A. at p. 24 [citing Michael Janofsky, *Citing July Speech, I.R.S. Decides to Review N.A.A.C.P.*, N.Y. Times (Oct. 29, 2004)].) Despite clear violations of the Johnson Amendment, on August 31, 2006, the IRS stated in a letter that it was closing its investigation and that it would continue to recognize the NAACP as a 501(c)(3) organization. (*Id*. at p. 26 [citing Darryl Fears, *IRS Ends 2-Year Probe of NAACP's Tax Status*, Wash. Post (Sept. 1, 2006); Letter from Marsha A. Ramirez, Dir., EO Examinations, Internal Revenue Serv., to NAACP (Aug. 9, 2006)].)

As history demonstrates, the Amendment is simply unworkable in its current form. Churches have faced an unconstitutional chill on their speech to avoid violating an unconstitutional law compelling their silence. Compounding the problem is the fact that IRS agents are given broad discretion to enforce the IRC when they know little about the First Amendment. The IRS has selectively chosen to punish churches who support Christian conservative candidates while refusing to punish left-leaning organizations like the NAACP. Requiring religious organizations to comply with a law when secular nonprofit organizations violate the law with impunity is not only unreasonable and unfair—it is unconstitutional. A more viewpoint discriminatory regime is difficult to imagine.

III.   **The Proposed Consent Decree will protect the First Amendment and statutory rights of religious organizations, including churches.**

A.   **The Johnson Amendment regulates core political speech.**

The Supreme Court has long protected the right to "vigorous advocacy" involving important political issues. *See, e.g.*, *NAACP*, 371 U.S. at 429 (citing cases). The First Amendment "has its fullest and most urgent application to speech uttered during a campaign for political office." *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989) (cleaned up); *see also Buckley*, 424 U.S. at 48 ("Advocacy of the election or defeat of candidates for federal office is no less entitled to protection under the First Amendment than the discussion of political policy generally or advocacy of the passage or defeat of legislation.") "[T]he First Amendment requires us to err on the side of protecting political speech rather than suppressing it." *Fed. Election Comm'n v. Wisconsin Right To Life, Inc.*, 551 U.S. 449, 457 (2007).

Core political speech is where First Amendment protection is "at its zenith." *Buckley*, 525 U.S. at 187 (cleaned up). "[P]olitical speech – including the endorsement of candidates for office – is at the core of speech protected by the First Amendment." *Sanders Cnty. Republican Cent. Comm. v. Bullock*, 698 F.3d 741, 745 (9th Cir. 2012). A law that burdens core political speech will only clear the constitutional bar if it "is narrowly tailored to serve an overriding state interest." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995).

In *Citizens United v. Federal Election Commission*, the Supreme Court affirmed that associations, including nonprofit organizations, are entitled to First Amendment protection in the expression of core political speech. 558 U.S. 310 (2010). Citizens United, a nonprofit corporation, challenged a law that banned corporations from making "electioneering communications," which the law defined as including communications about specific candidates for office. *Id.* at 320-21. The Supreme Court held that the Constitution did not authorize the prohibition of corporate political speech, including funding federal elections, and clarified that "political speech of corporations or other associations should [not] be treated differently under the First Amendment simply because such associations are not a natural person." *Id.* at 343 (cleaned up). The same is true of churches, yet the Amendment treats them differently on the basis of their status as a religious, nonprofit entity.

Following *Citizens United*, the Supreme Court has continued to acknowledge the First Amendment rights of corporations. In *Burwell v. Hobby Lobby Stores*, 573 U.S. 682, 706-08 (2014), the Supreme Court explained that extending statutory and

13

constitutional rights to corporations protects the rights of people associated with those corporations (including owners, employees, and officers). Although *Burwell* was decided under RFRA, not the First Amendment, it further demonstrates the Supreme Court's commitment to protecting the free exercise and speech rights of corporations.

Indeed, the government should provide heightened protection against infringements on the religious speech of nonprofit organizations. As the Supreme Court has astutely observed, "[t]he risk of chilling religious organizations is most likely to arise with respect to nonprofit activities." *Corp. of Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 344 (1987). Unlike for-profit corporations, nonprofit organizations are organized to provide specific community services, not simply to engage in commerce, and "[c]hurches often regard the provision of such services as a means of fulfilling religious duty and of providing an example of the way of life a church seeks to foster." *Id.* at 344-45. Because of churches' rich history in American society, the Free Speech and Free Exercises Clauses of the First Amendment "work in tandem" to provide "overlapping protection for expressive religious activities," providing double protection for religious speech. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 523 (2022). "[I]n Anglo-American history, government suppression of speech has so commonly been directed *precisely* at religious speech that a free speech clause without religion would be Hamlet without the prince." *Capitol Square Review and Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995) (cleaned up).

Plaintiffs, which are comprised of churches and nonprofit Christian organizations, are organized under IRC §501(c)(3) and seek to discuss political candidates with their congregations and ministries. Like many churches today, Plaintiffs believe it is a religious duty to speak about abhorrent political practices and campaign messages that violate Scripture and lead their congregants astray. Their congregants seek spiritual guidance from ministry leadership, including spiritual guidance on who and what to vote for. The Amendment prohibits churches from speaking about any political candidate, thereby preventing their congregations from making informed decisions about candidates running for office from a Biblical perspective. The Amendment cannot be reconciled with *Citizens United*, where the Supreme Court held that the "Government may not suppress political speech on the basis of the speaker's corporate identity." 558 U.S. at 365.

The Amendment violates the First Amendment because "[n]o sufficient interest justifies limits on the political speech of nonprofit or for-profit corporations." *Citizens United*, 558 U.S. at 365. The Amendment was passed because then-Senator Lyndon B. Johnson sought to silence his political critics. Thus, similar to the federal election law that banned corporate speech in *Citizens United*, the Amendment had the "purpose and effect…to silence entities whose voices the government deems to be suspect." *Id.* at 339.

Not only does the Amendment contravene the free speech rights of churches and religious organizations, it violates the principles of our republican form of government. "In a republic where the people are sovereign, the ability of citizenry to

15

make informed choices among candidates for office is essential." *Buckley*, 424 U.S. at 14-15. For these reasons, this Court should adopt the Proposed Consent Decree to ensure that churches have the right to speak on core political issues, and their congregations have the "right of citizens to inquire, to hear, and to use information to reach consensus," which is a "precondition to enlightened self-government and a necessary means to protect it." *Citizens United*, 558 U.S. at 339.

**B.    The Johnson Amendment amounts to an unconstitutional infringement and condition on the right to free speech.**

The Supreme Court has long held that the government cannot condition an organization's receipt of a government benefit on the surrender of its constitutional rights. *See, e.g.*, *Speiser v. Randall*, 357 U.S. 513 (1958); *Koontz v. St. Johns River Water Management Dist.*, 570 U.S. 595, 604 (2013) (noting that the unconstitutional conditions doctrine "vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up"). In *Speiser*, the Supreme Court struck down a property tax exemption that required owners to sign declarations swearing they would never "advocate the overthrow of the Government of the United States...by force or violence." 357 U.S. at 515, 528-29. The Court held that to "deny an exemption to claimants who engage in certain forms of speech is in effect to penalize them for such speech." *Id.* at 518. Five years later, in *Sherbert v. Verner*, the Court held that it was unlawful to deny a Seventh Day Adventist woman state unemployment assistance because she was unwilling to work on the Sabbath. 374 U.S. 398, 406 (1963).

16

The defense claims *Speiser* and its progeny are not applicable here and rely primarily on the Supreme Court's decision in *Regan v. Taxation with Representation of Washington*, 461 U.S. 540 (1983) to support its position. The thrust of Defendant's position is that the Johnson Amendment does not violate the First Amendment because the government does not have a duty to subsidize Plaintiffs' speech. *See* ECF No. 13. *Regan* is distinguishable because it involved a restriction on lobbying, not a complete ban on core political speech, and therefore does not control this case.

In *Regan*, Taxation with Representation of Washington ("TWR") was a nonprofit organization organized to promote a particular view of tax policy under sections 501(c)(3) and (c)(4) of the IRC. 461 U.S. at 542-43. TWR sought to engage in unlimited lobbying while retaining both its exempt status and its ability to receive and expand tax-deductible contributions for such activities. *Id.* at 542. When it applied for tax-exempt status, the IRS denied its exemption on the grounds that a substantial part of its activities would consist of attempting to influence legislation. *Id.* at 542. TWR argued that this limitation on lobbying was an unconstitutional infringement of its First Amendment rights, but the Supreme Court disagreed, holding that Congress was not required to subsidize lobbying. *Id.* at 545.

Justice Blackmun's agreed that the limitation on lobbying did not violate TWR's First Amendment rights but based that conclusion on an assumption—not present in the instant matter—about the IRS's administration of the restriction. 461 U.S. at 552 (Blackmun, J., concurring). Justice Blackmun concluded that the existence of 501(c)(4) organization cured the constitutional defect. *Id.* He concluded,

however, that the restriction on lobbying, standing alone, would deny substantial benefits to an organization exercising its constitutional rights because it would "deprive[] an otherwise eligible organization of its tax-exempt status and its eligibility to receive tax-deductible contributions for all its activities." *Id*.

*Regan* is distinguishable because the Amendment has no cure, but involves a total *prohibition* on core political speech—not a mere *limitation* on lobbying. A social welfare organization, exempt under section 501(c)(4), faces no limitation on the amount of lobbying it can do, so long as the lobbying relates to a social welfare purpose. Social welfare organizations cannot engage in unlimited speech regarding the endorsement of candidates. The Treasury regulations expressly provide that the "promotion of social welfare does not include direct or indirect participation or intervention in political campaigns on behalf of or in opposition to any candidate for public office." Treas. Reg. § 1.501(c)(4)-1(a)(2)(ii) (as amended in 1990). Thus, the dual-entity structure does not protect the Amendment to the same degree as the limitations on lobbying because a social welfare organization does not provide an absolute channel for the expression of political campaign activity.

Since *Regan*, the Supreme Court has continued to apply the unconstitutional conditions doctrine to both direct and indirect coercions on free speech and free exercise of religion, demonstrating the *Regan* decision was limited to its particular facts. One year after *Regan* was decided, the Supreme Court, in *FCC v. League of Women Voters of California*, held that a federal law authorizing a ban on noncommercial television and radio stations violated the First Amendment because

18

it conditioned their right to receive federal grants on whether they "engag[ed] in editorializing." 468 U.S. 364, 366, 402 (1984). Just as churches under the Amendment here, the stations were subject to a complete ban because they were unable to practically "segregate [their] activities according to their source of funding" and therefore had "no way of limiting the use of [their] federal funds to all noneditorializing activities." *Id.* at 400. The Supreme Court held that the federal law could pass constitutional muster if Congress allowed the stations to create affiliate organizations for editorializing. *Id.* at 400-01.

Subsequently, in *Agency for International Development v. Alliance for Open Society International, Inc.*, the Supreme Court addressed the constitutionality of a government grant that was intended to fight HIV and AIDS. 570 U.S. 205 (2013). Congress prohibited the use of money to promote the legalization of prostitution or human trafficking. *Id.* at 208. The Court held that conditioning the receipt of funds on whether the recipients "explicitly oppos[e] prostitution and sex trafficking" was unconstitutional because "freedom of speech prohibits the government from telling people what they must say." *Id.* at 210, 213.

In *Trinity Lutheran Church of Columbia, Inc. v. Comer*, the Supreme Court squarely confronted whether there was any meaningful distinction between direct or indirect limitations on First Amendment rights. 582 U.S. 449 (2017). The Court addressed a Missouri policy that provided grants to schools, nonprofit daycares, and other nonprofit organizations but disqualified religious organizations. The Missouri government argued that its policy did not "meaningfully burden the Church's free

19

exercise rights," but that it merely "declined to allocate to Trinity Lutheran a *subsidy* the State had no obligation to provide in the first place." *Id.* at 462-63 (emphasis added). Even though the challenged subsidy was an indirect imposition, the Court held that Missouri's policy was unconstitutional and emphasized that the Free Exercise Clause prohibits not just "outright prohibitions" on the exercise of religion but also "*indirect* coercion or penalties." *Id.* at 463 (internal quotation and citation omitted) (emphasis added).

Like *Trinity Lutheran*, the Amendment does not "criminalize the way" the Plaintiffs worship or tell them that they "cannot subscribe to a certain view of the Gospel." 582 U.S. at 463. Instead, the Amendment coerces Plaintiffs and all churches into surrendering their right to free speech by threatening to revoke their tax-exempt status and tax benefits. The vague nature of the law also chills the otherwise permissible expression of speech. As the Supreme Court held more than sixty years ago, "[i]t is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." *Sherbert*, 374 U.S. at 404 (internal citations omitted).

Although *Trinity Lutheran* was decided solely under the Free Exercise Clause, the unconstitutional conditions doctrine applies equally to both the free exercise of religion and speech. The doctrine reflects the Supreme Court's repeated pronouncement that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests." *Perry v. Sindermann*, 408 U.S.

593, 597 (1972). Thus, this Court should adopt the Proposed Consent Decree because the Johnson Amendment violates the unconstitutional conditions doctrine.

### C.    The Johnson Amendment violates the Religious Freedom Restoration Act.

RFRA, as enacted, "[p]rohibits any agency, department, or official of the United States or any state…from substantially burdening a person's exercise of religion even if that burden results from a rule of generally applicability…." 2 U.S.C. § 2000bb-1. The only exception to burdening religious exercise is if the government demonstrates that its burden is both in furtherance of a compelling government interest and is the least restrictive means of doing so. *Id*. § 2000bb-1(b). "RFRA requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law to the person—the particular claimant whose sincere exercise of religion is being substantially burdened." *Gonzales v. O'Centro Espirita Beneficiente Uniao do Vegetal*, 546 U.S. 418, 430 (2006)). RFRA adopted "the most demanding test known to constitutional law," *City of Boerne v. Flores*, 521 US. 507, 534 (1997), which is rarely passed. *Burson v. Freeman*, 504 U.S. 191, 200 (1992) ("[W]e readily acknowledge that a law rarely survives such scrutiny . . . .").

Indeed, RFRA "operates as a kind of super statute, displacing the normal operation of other federal laws…." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 682 (2020). "RFRA is unusual in that it amends the entire United States Code," *Rweyemamu v. Cote*, 520 F.3d 198, 202 (2d Cir. 2008), because "[a]t bottom, the import of RFRA is that, whatever other statutes may (or may not) say, 'the Federal Government may

not, *as a statutory matter*, substantially burden a person's exercise of religion.'" *Id.* (quoting *Gonzales*, 546 U.S. at 424) (emphasis in original).

In determining whether a belief is sincerely held, the Supreme Court has made clear that the protections under the Free Exercise Clause, which are more limited than under RFRA, are "not limited to beliefs which are shared by all of the members of a religious sect." *Holt v. Hobbs*, 574 U.S. 356, 362 (2015). Courts cannot sit in judgment of whether a person's "religious beliefs are mistaken or insubstantial." *Hobby Lobby*, 573 U.S. at 725. Nor are courts to determine "'the plausibility of a religious claim.'" *Id.* at 724 (quoting *Emp't Div., Dept. of Human Res. of Or. v. Smith*, 494 U.S. 872, 887 (1990)). Rather, the "narrow function" of a court "is to determine whether the line drawn [between conduct that is and is not permitted under one's religion] reflects an honest conviction." *Id.* (quoting *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 716 (1981) (cleaned up)). "It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989).

1. **The Johnson Amendment constitutes a substantial burden on church's religious exercise.**

To determine whether the Johnson Amendment imposes a substantial burden on Plaintiffs' sincere religious beliefs, "the question that RFRA presents [is] whether the [Amendment] imposes a substantial burden on the ability of the objecting parties to conduct business in accordance with their religious beliefs." *Hobby Lobby*, 573 U.S. at 724. Importantly, that test requires a narrow and focused inquiry to the person of

22

the churches, *Gonzales*, 546 U.S. at 430, and the religious beliefs they hold. Notably, the substantial burden inquiry does not address the "very different question that the federal courts have no business addressing (whether the religious belief asserted in a RFRA case is reasonable)." *Id.* Denying a church the ability to follow its religious beliefs and to espouse those beliefs to its congregants is a substantial burden. *See, e.g., Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1069-70 (9th Cir. 2008) (en banc) (A substantial burden is imposed "when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit (*Sherbert*) or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions (*Yoder*).") The Amendment forces churches to choose between silence and the exercise of their religious beliefs, and conditions its tax-exempt status on that choice. RFRA prohibits such an unconscionable Hobson's choice.

For churches, the Amendment plainly imposes a substantial burden. Many faith traditions, including Plaintiffs, view teaching and preaching about political issues to be an important function of churches and religious leaders, and silencing churches from instructing their congregants on how cultural and political issues intersect with Scripture burdens their religious exercise. Scripture compels many churches, including Plaintiffs, that silence in the face of evil is evil itself, and that they are to open their mouths and teach their congregations what Scripture compels in the cultural and political arena. *Ecclesiastes* 3:7. Indeed, churches have sincerely held religious beliefs that the Lord keeps watch over their instruction and will not hold them blameless for silence in the face of evil. *Proverbs* 24:12 ("If you say, 'behold,

we did not know this,' does not he who weighs the heart perceive it? Does not he who keeps watch over your soul know it, and will he not repay man according to his work."). Eternal judgment for the Amendment's compelled silence is the archetype substantial burden.

The prohibition on political campaign activity prevents churches from communicating through any official channel. Rev. Rul. 2007-41, 2007-25 I.R.B. 1421, 1422. And churches cannot form a 501(c)(4) to discuss political campaign activity, so the alternative channel argument cannot be used here. *Cf. Henderson v. Kennedy*, 265 F.3d 1072, 1074 (D.C. Cir. 2001) (rejecting a RFRA challenge to regulations barring the sale of t-shirts on the National Mall in part because the claimants had a multitude of other means of communicating their religious methods, including selling t-shirts at a different location). Thus, contrary to *Regan*, discussed *supra*, there is no escape hatch for churches to hedge their religious beliefs and compliance with the Amendment. Thus, without any other option that the Court found relevant in *Regan*, churches are left with no choice except silence or surrender of their tax-exempt recognition. There could be no more substantial burden. The Amendment violatesd RFRA because it operates to chill, inhibit, and deter—*i.e.*, substantially burden—"the exercise of First Amendment freedoms." *Sherbert*, 374 U.S. at 405

### 2.    The Amendment fails strict scrutiny.

The Amendment also fails strict scrutiny. RFRA requires application of the compelling interest test "to the person," and "requires [the Court] to look beyond broadly formulated interests." *Hobby Lobby*, 573 U.S. at 726. As the Supreme Court affirmed in *Citizens United*, "[n]o sufficient government interest justifies limits on

the political speech of nonprofit or for-profit corporations." 558 U.S. at 365. The reason for that is simple: the Government has no interest whatsoever in enforcing unconstitutional silencing of religious expression. *Def. Distributed v. U.S. Dep't of Def.*, 838 F.3d 451, 458 (5th Cir. 2016). In fact, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* Put simply, the government has no interest, much less a compelling one, in enforcing unconstitutional restrictions on speech. *Smith v. U.S. Dep't of Treasury*, 761 F. Supp. 3d 952, 973 (E.D. Tex. 2025) (the government has no interest in "the enforcement of unconstitutional laws and unlawful rules"). And, because the government has no compelling interest in violating churches' First Amendment rights, the Amendment fails strict scrutiny under the compelling interest prong. Thus, this Court should adopt the Proposed Consent Decree because for many religious organizations, the Amendment unequivocally burdens their free exercise of religion.

## IV.    The Proposed Consent Decree will prevent unconstitutional entanglement of government and religion.

The Johnson Amendment violates the principles that animate the church autonomy doctrine, which was first formally recognized by the Supreme Court in *Watson v. Jones*, 80 U.S. 679 (1872). *Watson* was a landmark case that established important principles regarding church autonomy and the limits of government involvement in the affairs of church governance, faith, and doctrine. *Watson* involved a property dispute between two factions of a Presbyterian church in Louisville, Kentucky. *Id.* at 679-81. The Court held that in adjudicating church property disputes, courts cannot rule on the truth or falsity of a religious teaching, and in the

25

absence of an internal authority structure to resolve the dispute, courts should defer to the wishes of the majority of the congregation. *Id.* at 722-25. The opinion "radiates a spirit of freedom for religious organizations, and independence from secular control or manipulation – in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952) (cleaned up).

Over a century later, the Supreme Court unanimously affirmed the church autonomy doctrine – demonstrating the doctrine's enduring role in our republic. In *Serbian Eastern Orthodox Diocese v. Milivojevich*, the Court declared that the First Amendment permits religious organizations "to establish their own rules and regulations for internal discipline and government." 426 U.S. 696, 713 (1976). The Court further held that government authorities must defer to decisions by such bodies "on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law," and these same authorities cannot interfere in matters of "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standards of morals required of them." *Id.* at 714, 724.

In *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, the Supreme Court affirmed that the church autonomy doctrine formed the basis for the ministerial exception under the First Amendment, which provides immunity in the context of employment disputes. 565 U.S. 171 (2012). The core issue in *Hosanna-Tabor* was whether the church could choose its spiritual leaders without government

26

interference. In another unanimous decision, the Court held that the authority to hire, promote, and discharge a spiritual leader was a religious function reserved to the church alone. *Id.* at 194-95.

In *Our Lady of Guadalupe School v. Morrissey-Berru*, the Supreme Court affirmed *Hosanna-Tabor* and expounded on its holding: "The constitutional foundation for our holding was the general principle of church autonomy to which we have already referred: independence in matters of faith and doctrine and in closely linked matters of internal government." 591 U.S. 732, 747 (2020). The Court explained that matters of faith and doctrine encompass "preaching, teaching, and counseling." *Id.*

The Johnson Amendment forbids churches from discussing political candidates and campaigns, and from instructing their congregants on whether certain candidates conform "to the standards of morals required of them." 426 U.S. at 724. To enforce the Amendment, the IRS is necessarily required to scrutinize the faith and doctrine of churches, including what the churches teach and who they invite to speak. The Supreme Court has clarified that even "the very process of inquiry" into a church's communications is unconstitutional because it strikes at the "independence of religious institutions" in both "matters of faith and doctrine" and "matters of church government." *N.L.R.B. v. Catholic Bishop of Chi.*, 440 U.S. 490, 502 (1979); *Our Lady of Guadalupe*, 591 U.S. at 746-47 (internal citation omitted).

Matters of church faith and doctrine are inextricably entwined with church communications regarding political matters, including the discussion of political

candidates. It is impossible for the IRS to investigate the political communications of religious organizations and churches without first interpreting religious doctrine – a task they are neither qualified nor lawfully permitted to perform under the First Amendment. Political discussions involving cultural and political issues of the day, including Scripture's teachings on the origin of life, human sexuality, and the like, encompass a church's doctrine and faith. For some churches, engagement in political communications is steeped in their history and culture, and compelled by their sincere religious convictions. For instance, "[p]olitics in black churches involves more than the exercise of power on behalf of a constituency; it also includes the community building and empowering activities in which many black churches, clergy, and lay members participate daily." (Ex. A. at p. 21 [quoting C. Eric Lincoln & Lawrence H. Mamiya, *The Black Church in the African American Experience* 199 (1990)].)

The Fifth Circuit's decision in *Whole Woman's Health v. Smith*, 896 F.3d 362 (5th Cir. 2018) is particularly instructive. On the eve of Holy Week for Christians, Whole Woman's Health, a pro-abortion group, served a subpoena on The Texas Conference of Catholic Bishops ("TCCB"), an unincorporated ecclesiastical association that furthers the ministry of the Roman Catholic Bishops and Archbishops in the State of Texas, seeking communications regarding TCCB's stance on abortion and anti-abortion related legislation. *Id.* at 364, 366. TCCB's religious duty encompassed instructing the Catholic Church on "various moral, theological, and social issues, including abortion policy." *Id.* at 364. Relying on *Hosanna-Tabor* and its progeny, the Fifth Circuit concluded the subpoena violated the church

28

autonomy doctrine because it "interfere[d] with TCCB's decision-making processes on matter of intense doctrinal concern." *Id.* at 372-74.

Similar to the subpoena in *Whole Woman's Health*, the Johnson Amendment interferes with Plaintiffs' "internal deliberations and internal decision-making," *id.* at 374 (citing *Hosanna-Tabor*, 565 U.S. at 199-200), concerning whether to remain silent in the face of evil or to instruct their congregants in matters of faith and doctrine. Like TCCB, many religious organizations, including Plaintiffs, have a religious duty to address their congregants and members on political issues and campaigns that directly impact their faith and doctrine. The Amendment specifically prohibits the discussion of candidates just as the subpoena in *Whole Woman's Health* involved the discussion of political and legislative matters regarding abortion. Both communications involve "core political speech" because they involve "interactive communications concerning political change." *Meyer v. Grant*, 486 U.S. 414, 422 (1988); *see also Buckley*, 424 U.S. at 48.

In sum, allowing Plaintiffs "to enter the public square, cannot be understated and reflects consistent prior case law." *Whole Woman's Health*, 896 F.3d at 374. This Court should adopt the Proposed Consent Decree to protect against unconstitutional entanglement of government and churches.

## CONCLUSION

For the foregoing reasons, Liberty Counsel respectfully requests that this Court adopt the Proposed Consent Decree.

Dated: August 11, 2025                    Respectfully submitted,

                                          /s/ Mathew D. Staver
                                          Mathew D. Staver
                                          LIBERTY COUNSEL
                                          P.O. Box 540774
                                          Orlando, FL 32854
                                          (407) 875-1776
                                          court@LC.org
                                          *Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on August 11, 2025, I electronically filed this motion with the Clerk of the Court for the United States District for the Eastern District of Texas by using the CM/ECF system. Counsel in this case are registered CM/ECF users and service will be accomplished using the CM/ECF system

/s/ Mathew D. Staver
*Counsel for Amicus Curiae*