## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | |
|---|---|
| **NATIONAL RELIGIOUS BROADCASTERS, SAND SPRINGS CHURCH, FIRST BAPTIST CHURCH WASKOM,** and **INTERCESSORS FOR AMERICA,** | |
| *Plaintiffs,* | |
| v. | Case No. 6:24-cv-00311 |
| **BILLY LONG,** in his official capacity as Commissioner of the Internal Revenue Service, and **THE INTERNAL REVENUE SERVICE,** | |
| *Defendants.* | |

## BRIEF OF CORNERSTONE CHAPEL AND FIRST BAPTIST CHURCH OF DALLAS, TEXAS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS

David Cortman
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville, GA 30043
(770)339-0774
dcortman@adflegal.org

Ryan Tucker
Mark A. Lippelmann*
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
rtucker@adflegal.org
mlippelmann@adflegal.org

*Attorneys for Amici Curiae*

**Application for* Pro Hac Vice *admission approved*

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................iii

INTEREST OF *AMICI CURIAE* .................................................................... 1

SUMMARY OF ARGUMENT ........................................................................... 2

ARGUMENT ...................................................................................................... 4

    I.    History and tradition support religious organizations' right to speak freely about political issues, leaders, and campaigns. ................ 4

    II.   History and tradition support exempting religious organizations from taxes without political conditions. .................................................. 9

    III.  Congress enacted the "Johnson Amendment." ..................................... 11

    IV.  The Johnson Amendment is not a refusal to subsidize political activity; it is an unconstitutional condition on a government benefit. ................................................................................................. 14

          A.    The § 501(c)(3) tax exemption is not a subsidy. ........................ 14

          B.    The Johnson Amendment puts religious organizations to an unconstitutional choice between a government benefit for which they would otherwise qualify and their religious exercise and protected speech. .................................................. 20

CONCLUSION.................................................................................................. 24

CERTIFICATE OF SERVICE ......................................................................... 26

# TABLE OF AUTHORITIES

**Cases**

*Arizona Christian School Tuition Organization v. Winn,*

    563 U.S. 125 (2011)................................................................. 17

*Board of County Commissioners, Wabaunsee County, Kansas v. Umbehr,*

    518 U.S. 668 (1996)................................................................. 23

*Bob Jones University v. United States,*

    461 U.S. 574 (1983)................................................................. 11

*Buettner-Hartsoe v. Baltimore Lutheran High Sch. Association,*

    96 F.4th 707 (4th Cir. 2024)................................................. 18

*Camps Newfound/Owatonna, Inc. v. Town of Harrison, Maine.,*

    520 U.S. 564 (1997)........................................................... 17, 18

*Carson v. Makin,*

    142 S. Ct. 1987 (2022)........................................................... 20

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*

    508 U.S. 520 (1993)................................................................. 21

*Citizens United v. Federal Election Commission,*

    558 U.S. 310 (2010)................................................................. 23

*Espinoza v. Montana Department of Revenue,*

    591 U.S. 464 (2020)................................................................. 20

*Gaylor v. Mnuchin,*

    919 F.3d 420 (7th Cir. 2019) ............................................... 18

*Groff v. DeJoy,*

    600 U.S. 447 (2023) ............................................................................................ 11

*Johnson v. Economic Development Corp.,*

    241 F.3d 501 (6th Cir. 2001) ........................................................................... 18

*Lemon v. Kurtzman,*

    403 U.S. 602 (1971).......................................................................................... 11

*McDaniel v. Paty,*

    435 U.S. 618 (1978).......................................................................................... 22

*Regan v. Taxation with Representation of Washington,*

    461 U.S. 540 (1983)................................................................................... 18, 20

*Speiser v. Randall,*

    357 U.S. 513 (1958).......................................................................................... 24

*Steele v. Industrial Development Board Of Metropolitan Government Nashville,*

    301 F.3d 401 (6th Cir. 2002) ........................................................................... 18

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*

    582 U.S. 449 (2017)................................................................ 14, 20, 21, 22, 23

*Walz v. Tax Commission of City of New York,*

    397 U.S. 664 (1970)........................................................... 10, 11, 15, 17, 19

## Statutes

26 U.S.C. § 170................................................................................................... 14

26 U.S.C. § 501................................................................................................. 3, 12

## Other Authorities

iv

100 Cong. Rec. 9,604 (1954) ........................................................................... 12

Alice G. McAfee, *The All-Woman Texas Supreme Court: The History Behind A Brief*
   *Moment on the Bench*,
   39 St. Mary's L.J. 467 (2008) ................................................................... 9

Andrew C. Spiropoulos, *Just Not Who We Are: A Critique of Common Law*
   *Constitutionalism*,
   54 Vill. L. Rev. 181 (2009) ....................................................................... 7

Boris I. Bittker, *Churches, Taxes and the Constitution*,
   78 Yale L.J. 1285 (1969) ......................................................................... 16

Carli N. Conklin, *The Origins of the Pursuit of Happiness*,
   7 Wash. U. Jurisprudence Rev. 195 (2015) ............................................. 6

Chris Kemmitt, *Rfra, Churches and the Irs: Reconsidering the Legal Boundaries of*
   *Church Activity in the Political Sphere*,
   43 Harv. J. on Legis. 145 (2006) ....................................................... 9, 10

Deirdre Dessingue Halloran & Kevin M. Kearney, *Federal Tax Code Restrictions on*
   *Church Political Activity*,
   38 Cath. Law. 105 (1998) ................................................................ 12, 13

Deirdre Dessingue, *Prohibition in Search of A Rationale: What the Tax Code*
   *Prohibits; Why; to What End?*,
   42 B.C. L. Rev. 903 (2001) .................................................................... 13

Douglas Laycock, *Continuity and Change in the Threat to Religious Liberty: The*
   *Reformation Era and the Late Twentieth Century*,
   80 Minn. L. Rev. 1047 (1996) ................................................................. 5

Edward A. Zelinsky, *Are Tax "Benefits" for Religious Institutions Constitutionally Dependent on Benefits for Secular Entities?*,

    42 B.C. L. Rev. 805 (2001) .................................................................... 18, 19

Erik W. Stanley, *Lbj, the Irs, and Churches: The Unconstitutionality of the Johnson Amendment in Light of Recent Supreme Court Precedent*,

    24 Regent U. L. Rev. 237 (2012)........................................................... 10, 18

Gabriel S. Sanchez, *Towards A Post-Historicist Punishments Clause Jurisprudence*,

    56 DePaul L. Rev. 1321 (2007) ....................................................................... 4

Harold J. Berman, *The Origins of Historical Jurisprudence: Coke, Selden, Hale*,

    103 Yale L.J. 1651 (1994) .............................................................................. 6

J. Michael Raley, *Martin Luther on the Legitimacy of Resisting the Emperor*,

    37 J.L. & Religion 96 (2022) ......................................................................... 5

James D. Davidson, *Why Churches Cannot Endorse or Oppose Political Candidates*,

    40 Rev. Religious Res. 16 (1998) ................................................................. 13

James L. Heft, S.M., *Religion and Politics: The Catholic Contribution*,

    32 U. Dayton L. Rev. 29 (2006) .................................................................... 5

Jeffrey Mikell Johnson, *The 501(c)(3) Campaign Prohibition As Applied to Churches: A Consideration of the Prohibition's Rationale, Constitutionality, and Possible Alternatives*,

    2 Liberty U.L. Rev. 557 (2008) .............................................................. 16, 18

John Witte, Jr. & Justin J. Latterell, *Between Martin Luther and Martin Luther King: James Pennington's Struggle for "Sacred Human Rights" Against Slavery*,

    31 Yale J.L. & Human. 205 (2020).............................................................. 8

John Witte, Jr., *The Essential Rights and Liberties of Religion in the American Constitutional Experiment*,

  71 Notre Dame L. Rev. 371 (1996) ........................................................................ 7

Johnny Rex Buckles, *The Penalty of Liberty: Liberal Suppression: Section 501(c)(3) and the Taxation of Speech. Philip Hamburger. Chicago: University of Chicago Press, 2018. 432 Pages. $55.00*,

  25 Tex. Rev. L. & Pol. 159 (2020) ................................................................ 16, 24

Kristin E. Kandt, *Historical Essay: In the Name of God; an American Story of Feminism, Racism, and Religious Intolerance: The Story of Alma Bridwell White.*,

  8 Am. U. J. Gender Soc. Pol'y & L. 753 (2000) ........................................................ 9

Mark A. Goldfeder & Michelle K. Terry, *To Repeal or Not Repeal: The Johnson Amendment*,

  48 U. Mem. L. Rev. 209 (2017) ........................................................................ 6

Mark A. Noll, *The Election Sermon: Situating Religion and the Constitution in the Eighteenth Century*,

  59 DePaul L. Rev. 1223 (2010) .................................................................... 7, 8

Mark W. Cordes, *Politics, Religion, and the First Amendment*,

  50 DePaul L. Rev. 111 (2000) ........................................................................ 7

Michael E. Smith, *Religious Activism: The Historical Record*,

  27 Wm. & Mary L. Rev. 1087 (1986) ............................................................... 7, 8

Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part i: Establishment of Religion*,

  44 Wm. & Mary L. Rev. 2105 (2003) ................................................................. 7

vii

Nora O'Callaghan, *Lessons from Pharaoh and the Hebrew Midwives: Conscientious Objection to State Mandates As A Free Exercise Right*,

39 Creighton L. Rev. 561 (2006)............................................................ 4, 5

Patrick L. O'Daniel, *More Honored in the Breach: A Historical Perspective of the Permeable Irs Prohibition on Campaigning by Churches*,

42 B.C. L. Rev. 733 (2001) .................................................................... 6, 12

Paul Weitzel, *Protecting Speech from the Heart: How Citizens United Strikes Down Political Speech Restrictions on Churches and Charities*,

16 Tex. Rev. L. & Pol. 155 (2011) ............................................................ 15

Philip A. Hamburger, *Natural Rights, Natural Law, and American Constitutions*,

102 Yale L.J. 907 (1993) ............................................................................ 7

Richard J. Ross, *The Commoning of the Common Law: The Renaissance Debate over Printing English Law, 1520-1640*,

146 U. Pa. L. Rev. 323 (1998) ................................................................... 6

*Subsidy*,

*Merriam-Webster Dictionary* (11th ed. 2022) .......................................... 15

The Honorable Michael A. Wolff, *Ted Mcmillian: The Happy Coincidence of Timing, Talent, and Persistence*,

43 St. Louis U. L.J. 1297 (1999).............................................................. 9

Theodore Parker, *Of Justice and the Conscience, in Ten Sermons of Religion*,

84–85 (Boston, Crosby, Nichols & Co. 1853) ........................................... 8

Vaughn E. James, *Reaping Where They Have Not Sowed: Have American Churches*

    *Failed to Satisfy the Requirements for the Religious Tax Exemption?,*

    43 Cath. Law. 29 (2004) ......................................................................... 10

Vaughn E. James, *The African-American Church, Political Activity, and Tax*

    *Exemption,*

    37 Seton Hall L. Rev. 371 (2007) .......................................................... 8, 9

W. Frank Steely, *Commentary on Presentation by Professor Frederick J. Blue on*

    *Chase and the Antislavery Movement,*

    21 N. Ky. L. Rev. 33 (1993) ...................................................................... 8

## INTEREST OF *AMICI CURIAE*[1]

Amici Cornerstone Chapel and First Baptist Church of Dallas, Texas ("First Baptist") are houses of worship that are committed to proclaiming the Word of God on all issues, including those that intersect with politics. Both churches are nonprofit organizations under § 501(c)(3) and thus must comply with the Johnson Amendment's prohibition against "participating in, or intervening in" political campaigns. And both churches have suffered constitutional and financial injuries due to prior enforcement of the Johnson Amendment simply because of their commitment to preaching and teaching the Christian faith.

Cornerstone Chapel suffered IRS enforcement after Pastor Gary Hamrick preached a biblically-based sermon contrasting major parties' positions on moral and social issues and encouraged the congregation to vote consistently with biblical principles. Pastor Hamrick's message did not endorse or oppose any candidate but challenged the congregation to consider Scripture's teachings when voting. Cornerstone also distributed a nonpartisan "Vote Your Values" guide, which neutrally presented each major party's stated positions on key issues. As a result, the IRS subjected Cornerstone to an invasive investigation and ultimately assessed an excise tax against the church for its religious speech.

First Baptist likewise endured an IRS investigation based on comments made by its pastor, Dr. Robert Jeffress, in a worship service. Although First Baptist

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amici curiae* and its counsel made any monetary contribution intended to fund the preparation or submission of this brief.

explicitly disclaimed any endorsement of political candidates, the IRS initiated a
tax inquiry and demanded extensive documents. The IRS's scrutiny followed a
worship service attended by then-Vice President Pence, where no political
opponents were mentioned and no candidate endorsements were issued. First
Baptist spent hundreds of thousands of dollars defending itself from this IRS
enforcement action.

Both Cornerstone and First Baptist have a strong interest in defending their
First Amendment rights to speak from the pulpit about moral and social issues
central to their faith without risking punitive IRS investigations. They each offer
unique, real-world experience and perspective illustrating the unconstitutional
chilling effect and practical harm of the Johnson Amendment's application to
houses of worship.

## SUMMARY OF ARGUMENT

For the first two centuries of our nation's history, America's churches enjoyed
the constitutional right to speak about political issues and candidates. They applied
Scripture to every aspect of life, including candidates, elections, and political issues.
They shepherded their communities on the important political issues of their day.
They were, as Dr. Martin Luther King Jr. once said, "the conscience of the state."
Churches were thus at the forefront of some of the most important social and
political changes in our nation's history.

But churches were stripped of that freedom in 1954 when Congress amended
the law that governs tax-exempt status for § 501(c)(3) organizations. That so-called

"Johnson Amendment" (introduced by then-Senator Lyndon B. Johnson) required that § 501(c)(3) organizations, which includes religious organizations, may not "participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office." 26 U.S.C. § 501(c)(3). Congress thereby unconstitutionally required religious organizations to give up their protected political speech and religious exercise to receive the otherwise available § 501(c)(3) tax exemption.

Other amici—including Campaign Legal Center, Public Citizen, and Common Cause—try to excuse this constitutional violation by asserting that the § 501(c)(3) tax exemption is a subsidy on which the government can place any requirements. *See* Br. of Amici Campaign Legal Ctr. et al., Dkt. 54 at 2–4, 7–9. But the tax exemption is not a subsidy. This country has *always* exempted religious organizations from taxes. So Congress did not give such organizations any new economic benefit in granting them the § 501(c)(3) tax exemption; it just continued this country's longstanding tradition of excluding them from the tax base. What's more, as the U.S. Supreme Court has noted, exemptions and subsidies differ in important respects. And governments exempt religious organizations not to aid them, but to avoid government hostility toward and entanglement with religion.

So the § 501(c)(3) tax exemption is not a subsidy. Rather, it is a government benefit for which the government cannot require otherwise eligible organizations to give up their free exercise and free speech rights. But that is what the Johnson Amendment does. It puts religious organizations like Plaintiffs, Cornerstone

3

Chapel, and First Baptist to an unconstitutional choice between a tax benefit and their constitutional rights. This Court should thus approve the parties' proposed consent decree and declare that the Johnson Amendment cannot infringe religious speech and exercise.

## ARGUMENT

### I. History and tradition support religious organizations' right to speak freely about political issues, leaders, and campaigns.

For centuries, churches and religious leaders have enjoyed the freedom to preach on biblical matters, and they did not surrender that freedom simply because the religious teaching relates to political affairs of the day. The Christian Bible's New Testament shows that Christianity has always engaged with political leaders and issues. The Bible, for example, contains letters from the Apostle Paul to early Christians that discussed topics such as paying taxes, Romans 13:6–7, obeying and respecting civil authorities, Romans 13:1–4; 1 Peter 2:13–17; Titus 3:9, and praying for political leaders, 1 Tim. 2:1–2. Other early Christian leaders also preached on politics. In the 300s and 400s, for example, John Chrysostom and Augustine of Hippo wrote and preached on politics, including by denouncing political leaders for abusing authority.[2]

---

[2] *See* Gabriel S. Sanchez, *Towards A Post-Historicist Punishments Clause Jurisprudence*, 56 DePaul L. Rev. 1321, 1346 n.132 (2007) (citing Augustine's sermon on the death penalty); Nora O'Callaghan, *Lessons from Pharaoh and the Hebrew Midwives: Conscientious Objection to State Mandates As A Free Exercise Right*, 39 Creighton L. Rev. 561, 583 (2006) ("St. Augustine counseled Christians to disobey human governmental powers that enjoined them to engage in immoral or blasphemous conduct, but rather 'by all means disregard the power [of the state] through fear of the Power' of God."); Paul Weithman, *Augustine's political*

4

Christian political sermons continued in Europe. Medieval church leaders like Pope Gregory the Great, Thomas Aquinas, Martin Luther, and the patron saint of politicians, Thomas More, wrote and preached on political issues.[3] And British sermons in the 16th and 17th centuries often addressed political topics, including

_philosophy_ (2006), https://www3.nd.edu/~pweithma/My%20Papers/Augustine's%20Political%20Thought.pdf; _Saint John Chyrsostom_, Franciscan Media, https://www.franciscanmedia.org/saint-of-the-day/saint-john-chrysostom/.

[3] _See_ J. Michael Raley, _Martin Luther on the Legitimacy of Resisting the Emperor_, 37 J.L. & Religion 96, 111, 114, 117 (2022) (describing sermons of Martin Luther on war and resisting superior authorities); Nora O'Callaghan, _supra_ note 2 at 584 ("According to St. Thomas Aquinas, people have a duty in conscience to obey just laws and even may have a duty to obey some unjust laws in certain circumstances."); _id._ at 583 ("St. Thomas More, the patron saint of lawyers and politicians, went to his death because he resisted a state mandate to commit the serious sin of lying under oath."); James L. Heft, S.M., _Religion and Politics: The Catholic Contribution A Public Lecture Given at the University of Dayton September 22nd 2006_, 32 U. Dayton L. Rev. 29, 33 (2006) ("[H]ere were, of course, classic confrontations between some bishops and political rulers (e.g. ... Gregory the Great versus Henry IV in the eleventh century ...)."); Douglas Laycock, _Continuity and Change in the Threat to Religious Liberty: The Reformation Era and the Late Twentieth Century_, 80 Minn. L. Rev. 1047, 1049–50 (1996) ("There followed more than three years of political maneuvering, during which time Luther issued a series of books, sermons, and public statements that escalated his quarrel with Rome ...."); _Excerpt #9 — Gregory the Great on the Ends of Political Power_, Into the Clarities, (Nov. 26, 2016), https://intotheclarities.com/2016/11/26/excerpt-9-gregory-the-great-on-the-ends-of-political-power/.

the development of English common law.[4] England's political sermons continued

through the Enlightenment Era and then extended to the American colonies.[5]

America's history is filled with political sermons.[6] During the colonial era,

American Christian religious leaders often preached on politics. In the 17th and

18th centuries, for example, New England colonies hosted official "election

---

[4] *See* Richard J. Ross, *The Commoning of the Common Law: The Renaissance Debate over Printing English Law, 1520-1640*, 146 U. Pa. L. Rev. 323, 349–50, 369 (1998) (noting that a "central them" in sermons by Protestant ministers was "a strong duty of obedience to the positive laws of the Christian polity" but also "criticism[s] of common law and lawyers"); *id.* at 409 ("Ministers seeking courtly preferment preached sermons 'to rail upon the fundamental laws of the kingdom.'"); Douglas Laycock, *supra* note 3 at 1057 (describing Thomas More's execution for disagreeing with Henry VIII); Harold J. Berman, *The Origins of Historical Jurisprudence: Coke, Selden, Hale*, 103 Yale L.J. 1651, 1689 (1994) (noting Bishop Richard Hooker's sermons on legal philosophy).

[5] *See, e.g.*, Carli N. Conklin, *The Origins of the Pursuit of Happiness*, 7 Wash. U. Jurisprudence Rev. 195, 212–13 (2015) (describing Anglican Bishop Joseph Butler's late-1700s political sermons). Indeed, Charles Dickens' *The Pickwick Papers* portrayed pastors supporting political candidates from the pulpit in the early 1800s. *See* Patrick L. O'Daniel, *More Honored in the Breach: A Historical Perspective of the Permeable Irs Prohibition on Campaigning by Churches*, 42 B.C. L. Rev. 733, 734–35 (2001) (describing how in *The Pickwick Papers* one pastor "warned that if the Blue candidate is elected, 'then we're going to war,'" another pastor asserted that "'[o]ur country is going to pay a dear price' if the Buff candidate for prime minister is elected," and another pastor explained, "I'm not telling you who to vote for. I'm telling you who you may not vote for").

[6] *See* Mark A. Goldfeder & Michelle K. Terry, *To Repeal or Not Repeal: The Johnson Amendment*, 48 U. Mem. L. Rev. 209, 212 (2017) ("Proponents of the Johnson Amendment who try to make arguments from tradition (that is, that the Johnson Amendment has been here for a while, and therefore it must be fine) must first acknowledge that it was once commonplace for pastors to preach about political issues and candidates.").

6

sermons."[7] And throughout the colonies, government bodies often called for special

sermons,[8] and ministers regularly preached about current political issues.[9]

As tensions between the American colonies and Great Britain escalated in

the 1770s, political sermons "intensified" and stoked the revolutionary spirit.[10]

"Sermons remained a central part of colonial life and their focus was increasingly

political in the years leading up to the founding."[11] Indeed, "[i]t is estimated that

about eighty percent of the published political pamphlets in the 1770s were reprints

of sermons."[12]

---

[7] Mark A. Noll, *The Election Sermon: Situating Religion and the Constitution in the Eighteenth Century*, 59 DePaul L. Rev. 1223, 1225 (2010); *see also* John Witte, Jr., *The Essential Rights and Liberties of Religion in the American Constitutional Experiment*, 71 Notre Dame L. Rev. 371, 380 (1996) (citing Political Sermons of the American Founding Era 1730-1805 (Ellis Sandoz, 1991)) ("Church officials ... each year offered 'election day sermons' on Christian political principles."); Philip A. Hamburger, *Natural Rights, Natural Law, and American Constitutions*, 102 Yale L.J. 907, 916 (1993) (describing "a type of publication somewhat neglected by historians of law: the eighteenth-century election sermons of Congregational New England").

[8] Mark A. Noll, *supra* note 7 at 1225–26.

[9] *Id.* at 1225–26, 1230; *see also* Jesse Crutchley, *Pastor as Political Leader: Lessons from the Wartime Sermons of Jonathan Edwards*, Providence (Feb. 3, 2023), https://providencemag.com/2023/02/pastor-as-political-leader-lessons-from-the-wartime-sermons-of-jonathan-edwards/.

[10] Mark A. Noll, *supra* note 7 at 1232; *see also* Andrew C. Spiropoulos, *Just Not Who We Are: A Critique of Common Law Constitutionalism*, 54 Vill. L. Rev. 181, 227 (2009) ("When one examines the sermons of the Revolutionary period, however, one finds sermon after sermon supporting Lockean principles of political obligation, including the right to revolution."); Michael E. Smith, *Religious Activism: The Historical Record*, 27 Wm. & Mary L. Rev. 1087, 1088 (1986) ("The clergy were deeply involved in the first great political question in our history as a nation, the propriety of the War for Independence against England.").

[11] Mark W. Cordes, *Politics, Religion, and the First Amendment*, 50 DePaul L. Rev. 111, 123 (2000).

[12] Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part i: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105, 2184 (2003).

Political sermons did not end with America's victory over England. In the late 18th century, sermons addressed the new U.S. Constitution[13] and preached in support of or in opposition to political candidates.[14] Sermons also continued to drive American political movements. Sermons supported and motivated the movement to abolish slavery.[15] As one commentator put it, "[t]he greatest force behind the antislavery movement in pre-Civil War America, as indeed behind most of the major reform movements of that era, was evangelical Protestantism."[16] In the early 1900s, sermons supported the women's suffrage movement and the Nineteenth

---

[13] Mark A. Noll, *supra* note 7 at 1238.

[14] *Id.* at 1244. Religious groups involvement in elections has continued throughout our Nation's history. *See* Michael E. Smith, *supra* note 9 at 1091–92 ("Major occasions for religious partisanship have included the presidential candidacies of Thomas Jefferson, Andrew Jackson, Grover Cleveland, William Jennings Bryan, Alfred E. Smith, and John F. Kennedy. Furthermore, from the founding of our nation, members of the clergy themselves occasionally have held important public offices." (citations omitted)).

[15] *See* John Witte, Jr. & Justin J. Latterell, *Between Martin Luther and Martin Luther King: James Pennington's Struggle for "Sacred Human Rights" Against Slavery*, 31 Yale J.L. & Human. 205, 229 (2020) (describing the abolitionist teachings of minister James Pennington); Vaughn E. James, *The African-American Church, Political Activity, and Tax Exemption*, 37 Seton Hall L. Rev. 371, 390 (2007) ("True to the mission of the African-American Church to be an agent for social change, during the period of slavery, African-American clergy, lay leaders, and churches in the South were involved in the Underground Railroad, working with white abolitionists to help Southern slaves escape to the North."); Theodore Parker, *Of Justice and the Conscience, in Ten Sermons of Religion* 84–85 (Boston, Crosby, Nichols & Co. 1853).

[16] W. Frank Steely, *Commentary on Presentation by Professor Frederick J. Blue on Chase and the Antislavery Movement*, 21 N. Ky. L. Rev. 33, 36 (1993).

Amendment.[17] And sermons motivated the 20th century civil-rights movement,[18] including Dr. Martin Luther King Jr.'s sermons on civil rights.[19]

In sum, the United States inherited and sustained a longstanding tradition supporting the right of religious organizations to apply their religious beliefs to critical moral issues and their members' responsibilities through the political order.

## II.    History and tradition support exempting religious organizations from taxes without political conditions.

For centuries, governments have exempted houses of worship from taxes to preserve religious freedom and avoid governmental entanglement with religion. Tax exemptions for temples or houses of worship date to at least Constantine's 4th-

---

[17] *See* Kristin E. Kandt, *Historical Essay: In the Name of God; an American Story of Feminism, Racism, and Religious Intolerance: The Story of Alma Bridwell White.*, 8 Am. U. J. Gender Soc. Pol'y & L. 753, 778–79 (2000) ("During her sermons, Alma White [of the Pentecostal Union] continued to demand passage of the Suffrage Amendment."); *see also* Alice G. McAfee, *The All-Woman Texas Supreme Court: The History Behind A Brief Moment on the Bench*, 39 St. Mary's L.J. 467, 495 (2008) ("When it came time to lobby for ratification of the Nineteenth Amendment, the women ... asked ministers to endorse woman suffrage in their Mother's Day sermons.").

[18] *See* Chris Kemmitt, *Rfra, Churches and the Irs: Reconsidering the Legal Boundaries of Church Activity in the Political Sphere*, 43 Harv. J. on Legis. 145, 168 (2006) ("Black churches in America have an even more well-established tradition of political action, both reformist and radical. This tradition has shown its prominence ... by the churches' leading and organizing the Civil Rights Movement." (citations omitted)); The Honorable Michael A. Wolff, *Ted Mcmillian: The Happy Coincidence of Timing, Talent, and Persistence*, 43 St. Louis U. L.J. 1297, 1298 (1999) (describing a "sermon of a Jesuit priest, Father Claude Heithaus, whose words were apparently the first talk on race from a St. Louis pulpit"); Vaughn E. James, *supra* note 15 at 393–95 (describing "[e]xamples ... of African-American clergy who, during the first half of the twentieth century, were either politically active or, through their conduct, made 'political statements'" in the civil-rights movement).

[19] *See, e.g.*, *"First Things First,"* Stanford Martin Luther King Jr. Research and Education Inst., https://kinginstitute.stanford.edu/king-papers/documents/first-things-first.

century rule,[20] and some scholars have traced such exemptions back to ancient Sumeria.[21] Religious tax exemptions in England began as far back as 1188 and continue to this day.[22]

England's practice of exempting religious organizations from taxes carried over to the American colonies.[23] Such exemptions were "widespread during [America's] colonial days." *Walz v. Tax Comm'n of City of N.Y.*, 397 U.S. 664, 681 (1970).[24] And upon its founding, the United States continued exempting religious organizations from state and federal taxes and continues to do so today. *Walz*, 397 U.S. at 681. States have exempted religious organizations from taxes for all this country's history. *Id.* And "[f]or so long as federal income taxes have had any

---

[20] Chris Kemmitt, *supra* note 18 at 147; *see also* Vaughn E. James, *Reaping Where They Have Not Sowed: Have American Churches Failed to Satisfy the Requirements for the Religious Tax Exemption?*, 43 Cath. Law. 29, 36 (2004) ("Indeed, by the time Constantine died in 337 A.D., the Christian Church was the beneficiary of several forms of tax exemptions.").

[21] *See* Erik W. Stanley, *Lbj, the Irs, and Churches: The Unconstitutionality of the Johnson Amendment in Light of Recent Supreme Court Precedent*, 24 Regent U. L. Rev. 237, 241 (2012) ("Legal scholars have traced tax exemption for churches at least as far back as ancient Sumeria.").

[22] *See* Vaughn E. James, *supra* note 20 at 36 ("While the 1188 ordinance taxed all other persons, property and sources of revenue, it exempted the 'books and apparatus of clergymen' from the tax.").

[23] *See* Chris Kemmitt, *supra* note 18 at 149 ("American practices largely mimicked the English tradition of tax exemptions, though the specifics varied from colony to colony.").

[24] *See also* Erik W. Stanley, *supra* note 21 at 242 ("Churches were considered exempt from taxation during the colonial period. The very first federal level income taxes also contained an exemption for churches."); Vaughn E. James, *supra* note 20 at 38 ("Within the colonies having established churches, various statutes and constitutional provisions existed whereby those churches either received governmental aid or some form of tax exemption.").

10

potential impact on churches … religious organizations have been expressly exempt from the tax." *Id.*

America has thus engaged in "more than 200 years of virtually universal practice imbedded in our colonial experience and continuing into the present." *Lemon v. Kurtzman*, 403 U.S. 602, 624 (1971), *abrogated on other grounds*, *Groff v. DeJoy*, 600 U.S. 447, 460 (2023). And this "unbroken practice" of exempting religious organizations from taxes has been done "openly and by affirmative state action." *Walz*, 397 U.S. at 681.

So tax exemptions for religious organizations "are deeply rooted in our history, as in that of England." *Bob Jones Univ. v. United States*, 461 U.S. 574, 587–88 (1983). As Justice Brennan declared in a U.S. Supreme Court case addressing tax exemptions for religious organizations, "[r]arely if ever has this Court considered the constitutionality of a practice for which the historical support is so overwhelming." *Walz*, 397 U.S. at 681. Thus, history and tradition strongly support tax exemptions for religious organizations without imposing conditions on religious speech or exercise.

### III.    Congress enacted the "Johnson Amendment."

Despite this country's long history of allowing religious organizations to engage in politics while remaining exempt from taxes, in 1954, Congress amended the Internal Revenue Code to withhold a tax exemption from religious organizations that engage in politics ("Johnson Amendment"). Religious organizations have long been able to organize under § 501(c)(3) of the Internal Revenue Code and receive the

11

§ 501(c)(3) tax-exempt status. But by passing the Johnson Amendment, Congress placed a condition on that status: to retain their § 501(c)(3) tax exemption, religious organizations cannot "participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office." 26 U.S.C. § 501(c)(3).

In 1954, as Congress worked to revise the Internal Revenue Code, then-Senator Johnson faced a heated challenge to reelection from Republican Dudley Dougherty.[25] During Johnson's reelection campaign, two secular, nonprofit organizations—the Facts Forum and the Committee for Constitutional Government ("CCG")—supported Senator Johnson's opponent. Senator Johnson took steps to investigate the Facts Forum and CCG but discovered that the tax code did not prohibit their support for political campaigns.[26]

On July 2, 1954, Senator Johnson was recognized from the Senate floor and offered a three-sentence statement describing his amendment. 100 Cong. Rec. 9,604 (1954). "This provision, which has had such significant impact on the role of tax-exempt organizations in the political sphere, was added without the benefit of hearings, testimony, or comment from affected organizations by then-Senator

---

[25] *See* Patrick L. O'Daniel, *More Honored in the Breach: A Historical Perspective of the Permeable IRS Prohibition on Campaigning by Churches*, 42 B.C. L. Rev. 733, 742–45 (2001).
[26] *See id.*; Deirdre Dessingue Halloran & Kevin M. Kearney, *Federal Tax Code Restrictions on Church Political Activity*, 38 Cath. Law. 105, 107 (1998).

Lyndon B. Johnson during Senate floor debate on the 1954 Code."[27] The legislative history provides no evidence that Congress enacted the Political Speech Ban to restrict churches' religious speech and conduct. To the contrary, Johnson's chief aide in 1954, George Reedy, insisted that "Johnson would never have sought restrictions on religious organizations."[28]

In short, churches were swept up in a political maneuver that targeted Johnson's secular opponents. As one scholar explained: "Johnson was not trying to address any constitutional issue related to separation of church and state; and he did not offer the amendment because of anything that churches had done."[29] "Churches were not banned from endorsing candidates because they are religious organizations; they were banned because they have the same tax-exempt status as Facts Forum and the Committee for Constitutional Government, the right-wing organizations that Johnson was really after." *Id.* Congress later incorporated the same prohibition into other tax laws, including § 170, which allows § 501(c)(3) organizations to receive tax-deductible charitable contributions unless they are "disqualified for tax exemption under section 501(c)(3)" because they "participate in, or intervene in (including the publishing or distributing of statements), any political

---

[27] Deirdre Dessingue, *Prohibition in Search of A Rationale: What the Tax Code Prohibits; Why; to What End?*, 42 B.C. L. Rev. 903, 905 (2001).
[28] See *supra* note 26. .
[29] James D. Davidson, *Why Churches Cannot Endorse or Oppose Political Candidates*, 40 Rev. Religious Res. 16, 28–29 (1998).

campaign on behalf of (or in opposition to) any candidate for public office." § 170(c)(2)(D).

## IV. The Johnson Amendment is not a refusal to subsidize political activity; it is an unconstitutional condition on a government benefit.

Other amici claim that the Johnson Amendment does not infringe Plaintiffs' First Amendment rights because it merely sets eligibility requirements for an organization to be eligible for a government subsidy and Congress's refusal to subsidize lobbying and other political activity through tax benefits does not infringe the First Amendment. Doc. 54 at 2. But that argument falls flat. History, tradition, and the differences between subsidies and tax exemptions show that the § 501(c)(3) tax exemption is not a subsidy; it is a government benefit that the government cannot condition on the forfeiture of constitutional rights. *See Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 462–63 (2017). Yet that is what the Johnson Amendment does; it forces Plaintiffs and other religious organizations like Cornerstone Chapel and First Baptist to choose between that government benefit and their religious exercise and protected speech.

### A. The § 501(c)(3) tax exemption is not a subsidy.

History, tradition, and the differences between tax exemptions and subsidies show that the § 501(c)(3) tax exemption is not a subsidy. Rather, the exemption is a government benefit designed to avoid government hostility toward and entanglement with religion.

14

### 1.    History and tradition establish that the § 501(c)(3) tax exemption is not a subsidy.

The history and tradition outlined above show that the § 501(c)(3) tax exemption is not a subsidy. A subsidy is a "grant or gift of money." *Subsidy*, Merriam-Webster Dictionary. The § 501(c)(3) tax exemption does not meet that definition because Congress did not "grant or gift" religious organizations any money in exempting them from taxes; it merely continued to exclude religious organizations from the tax base. For all this country's history, religious organizations have enjoyed exemptions from taxes. "History is particularly compelling ... because of the undeviating acceptance given religious tax exemptions from our earliest days as a Nation." *Walz*, 397 U.S. at 681. Indeed, "[f]ew concepts are more deeply embedded in the fabric of our national life, beginning with pre-Revolutionary colonial times." *Id.* at 676.

So Congress did not "give" religious organizations anything new when it chose to exempt religious organizations from federal taxes; Congress merely continued a longstanding tradition of exempting religious organizations from taxes. Congress did not convey any economic benefit that churches did not already enjoy.[30]

---

[30] While Congress did nothing new in granting religious organizations a tax exemption, Congress did do something new in 1954 when it conditioned religious organizations' longstanding tax exemption on the forfeiture of their religious exercise and political speech through the Johnson Amendment. *See* Paul Weitzel, *Protecting Speech from the Heart: How Citizens United Strikes Down Political Speech Restrictions on Churches and Charities*, 16 Tex. Rev. L. & Pol. 155, 170 (2011) ("Federal tax subsidies to charities predate most of the tax code. Tax subsidies by states began before the American Revolution. In contrast, the restrictions prohibiting endorsement of candidates by 501(c)(3) organizations only

15

As scholars have asserted, because the government has always viewed the income of religious organizations as not part of the normative tax base, to "exempt" a religious organization is not a subsidy but a refusal to penalize that organization.[31] "So viewed, the Internal Revenue Code's 'exemption' of nonprofit organizations is simply a way of recognizing the inapplicability to them of a concept that is central to the tax itself."[32]

### 2.    Tax exemptions differ from subsidies in relevant respects.

What's more, rather than finding that tax exemptions are subsidies, the U.S. Supreme Court has distinguished them and noted their relevant differences.

"Although tax exemptions and subsidies serve similar ends, they differ in important and relevant respects, and [the Court's] cases have recognized these distinctions." *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S.

---

emerged in 1954, when then-Senator Lyndon B. Johnson added an amendment to the Revenue Act of 1954 ....").

[31] Johnny Rex Buckles, *The Penalty of Liberty: Liberal Suppression: Section 501(c)(3) and the Taxation of Speech. Philip Hamburger. Chicago: University of Chicago Press, 2018. 432 Pages. $55.00*, 25 Tex. Rev. L. & Pol. 159, 179 (2020); *see also* Jeffrey Mikell Johnson, *The 501(c)(3) Campaign Prohibition As Applied to Churches: A Consideration of the Prohibition's Rationale, Constitutionality, and Possible Alternatives*, 2 Liberty U.L. Rev. 557, 562 (2008) ("If exemption is a recognition of church sovereignty and thus a definition of the appropriate tax base, the campaign prohibition is impermissible because Congress lacks the authority to tax churches in the first place.").

[32] *See* Boris I. Bittker, *Churches, Taxes and the Constitution*, 78 Yale L.J. 1285, 1288 (1969) ("In specifying the ambit of any tax, the legislature cannot avoid 'exempting' those persons, events, activities, or entities that are outside the territory of the proposed tax." So "the assertion that an exemption is equivalent to a subsidy is untrue, meaningless, or circular, depending on context, unless we can agree on a 'correct' or 'ideal' or 'normal' taxing structure as a benchmark from which to measure departures.").

564, 589 (1997). In *Walz*, for example, Justice Brennan explained that tax exemptions and monetary subsidies "are qualitatively different." 397 U.S. at 690 (Brennan, J., concurring). "A subsidy involves the direct transfer of public monies to the subsidized enterprise and uses resources exacted from taxpayers as a whole"; an "exemption, on the other hand, involves no such transfer." *Id.* (Brennan, J., concurring). Rather, a tax exemption operates "passively," merely "relieving" the benefited organization "of the burden of paying taxes." *Id.* (Brennan, J., concurring). The *Walz* majority also distinguished a "direct money subsidy" from an exemption, noting that through an exemption, "the government does not transfer part of its revenue to churches but simply abstains from demanding that the [organization] support the state." *Id.* at 675.

The Court has found similar differences between tax credits and subsidies. In *Arizona Christian School Tuition Organization v. Winn*, 563 U.S. 125 (2011), the U.S. Supreme Court noted the difference between when the government spends money and "[w]hen the government declines to impose a tax" through a tax credit. *Id.* at 142. Contrary to a tax exemption or credit, the Court observed, "[w]hen the government collects and spends taxpayer money, governmental choices are responsible for the transfer of wealth." *Id.* at 131.

The U.S. Supreme Court has thus found a "constitutionally significant difference between subsidies and tax exemptions." *Camps Newfound/Owatonna*,

520 U.S. at 590.[33] And other courts have reiterated that finding. *See, e.g., Buettner-Hartsoe v. Balt. Lutheran High Sch. Ass'n*, 96 F.4th 707, 713–15 (4th Cir. 2024) (holding that tax exemptions and deductions are not subsidies or cash grants because "no funds actually change hands" and the benefits merely allow private individuals and organizations "to keep the money they otherwise would owe in income tax"); *Steele v. Indus. Dev. Bd. Of Metro. Gov't Nashville*, 301 F.3d 401, 410 (6th Cir. 2002) (finding that tax-exempt bonds are not a subsidy); *Johnson v. Econ. Dev. Corp.*, 241 F.3d 501, 512 (6th Cir. 2001) ("[T]he benefit provided by the tax-exempt status of the bonds does not amount to a cash subsidy."); *see also Gaylor v. Mnuchin*, 919 F.3d 420, 434 (7th Cir. 2019) ("[T]he Supreme Court has already found a constitutionally significant difference between the two on taxing religion. Providing a tax exemption does not 'connote[] sponsorship, financial support, and active involvement of the [government] in religious activity." (cleaned up)).[34]

---

[33] The Supreme Court has compared tax exemptions and deductions to subsidies or cash grants but expressly limited the analogy by recognizing that "we of course do not mean to assert that they are in all respects identical." *Regan v. Tax'n with Representation of Wash.*, 461 U.S. 540, 544 n.5 (1983).

[34] Scholars agree that tax exemptions are not subsidies. *See, e.g.*, Erik W. Stanley, *supra* note 21 at 279 ("After *Winn*, it is highly doubtful that the exemptions as subsidies argument can be used to justify speech restrictions."); Jeffrey Mikell Johnson, *The 501(c)(3) Campaign Prohibition As Applied to Churches: A Consideration of the Prohibition's Rationale, Constitutionality, and Possible Alternatives*, 2 Liberty U.L. Rev. 557, 565 (2008) ("Zelinsky argues that these cases view exemptions not as subsidies but as dependent on the appropriate tax baseline. This general approach is faithful to the cases; it is clear that the majority opinions did not treat exemption as a subsidy."); Edward A. Zelinsky, *Are Tax "Benefits" for Religious Institutions Constitutionally Dependent on Benefits for Secular Entities?*, 42 B.C. L. Rev. 805, 807 (2001) ("In the context of tax exemptions, exclusions, and deductions, the 'subsidy' label is usually deployed in a conclusory and unconvincing fashion.").

18

### 3. Rather than subsidizing religious organizations, tax exemptions prevent government hostility toward or entanglement with religion.

Finally, the U.S. Supreme Court has held that tax exemptions for religious organizations are not an "aid" to religious organizations but are a "reasonable and balanced attempt to guard against [the] dangers" of government hostility toward and entanglement with religion. *Walz*, 397 U.S. at 673. The Court has explained that to protect "the autonomy and freedom of religious bodies," states can decide that such bodies "should not be inhibited in their activities by property taxation or the hazard of loss of those properties for nonpayment of taxes." *Id.* at 672. Indeed, the Court has noted that exempting religious organizations creates less government entanglement with religion than taxing them, *see id.* at 676 ("The exemption creates only a minimal and remote involvement between church and state and far less than taxation of churches."), explaining that "[e]limination of exemption would tend to expand the involvement of government by giving rise to tax valuation of church property, tax liens, tax foreclosures, and the direct confrontations and conflicts that follow in the train of those legal processes," *id.* at 674.[35]

So the § 501(c)(3) tax exemption is not a subsidy; it is a way to avoid government hostility toward or entanglement with religion. Because the § 501(c)(3) tax exemption is merely a continuation of religious organizations' longstanding

---

[35] *See* Edward A. Zelinsky, *supra* note 29 at 807 ("[T]he First Amendment is best understood as permitting governments to refrain from taxation to accommodate the autonomy of religious actors and activities; hence, tax benefits extended solely to religious institutions should pass constitutional muster as recognition of that autonomy.").

exclusion from the tax base and involves no transfer of public money, the exemption is not a subsidy. Thus, as explained above, the government cannot withhold it from religious organizations just because they engage in certain protected speech and conduct. This Court should reject the argument of other amici that mislabels the § 501(c)(3) tax exemption as a subsidy that allows the government to engage in religious discrimination and content-based regulation of political speech.

> ### B.    The Johnson Amendment puts religious organizations to an unconstitutional choice between a government benefit for which they would otherwise qualify and their religious exercise and protected speech.

The Johnson Amendment unlawfully conditions otherwise available government benefits upon the surrender of First Amendment rights. "Section 501(c)(3) does not merely deny a subsidy for [political] activities; it deprives an otherwise eligible organization of its tax-exempt status and its eligibility to receive tax-deductible contributions for all its activities" if it engages in certain religious exercise and protected speech. *Regan v. Tax'n With Representation of Wash.*, 461 U.S. 540, 552 (1983) (cleaned up).

> ### 1.    The Johnson Amendment infringes on free exercise rights.

The U.S. Supreme Court has "repeatedly held" that the government cannot "exclude[] religious observers from otherwise available public benefits" just because they are religious or do religious things. *Carson v. Makin*, 142 S. Ct. 1987, 1996 (2022); *see also Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 484 (2020); *Trinity Lutheran*, 582 U.S. at 462. But that is what the Johnson Amendment does. It

conditions religious organizations' receipt of a tax benefit on the forfeiture of their

religious exercise: their ability to speak, preach, or post online about how the views

of political candidates compare to the Bible's teachings on such matters. Doc. 1 ¶¶

41, 114–15. The "imposition of such a condition upon even a gratuitous benefit

inevitably deter[s] or discourage[s] the exercise of First Amendment rights." *Trinity

Lutheran*, 582 U.S. at 463. It is no defense that a law burdens both religious and

secular claimants alike; when the government makes a generally available public

benefit conditional in a way that excludes those who exercise their religion, it

violates the Free Exercise Clause. *See id.* at 460–62. Even when a law applies to

both religious and secular actors, it is unconstitutional to impose burdens that

effectively penalize the free exercise of religion. *Church of the Lukumi Babalu Aye,

Inc. v. City of Hialeah*, 508 U.S. 520, 536 (1993)

Other amici assert that "the Johnson Amendment does not unconstitutionally

interfere with Plaintiffs' free exercise of religion; [rather,] Congress has simply

declined to subsidize Plaintiffs' free exercise if that exercise involves political

campaign intervention." Doc. 54 at 15. But the U.S. Supreme Court has rejected

that argument. In *Trinity Lutheran*, the state similarly tried to excuse its exclusion

of a church preschool from a grant program by asserting that it "ha[d] simply

declined to allocate to [the preschool] a subsidy the State had no obligation to

provide in the first place." 582 U.S. at 462–63. The Court rejected that argument,

asserting that the preschool "[wa]s not claiming any entitlement to a subsidy. It

instead assert[ed] a right to participate in a government benefit program without

21

having to disavow its religious character." *Id.* at 463. So the state's exclusion of the preschool was unconstitutional. *Id.* at 462. Here, too, Plaintiffs are "not claiming any entitlement to a subsidy"; they "instead assert[] a right to participate in a government [tax] benefit without having to disavow [their] religious character" and exercise. *Id.* at 463.

The amici who defend the Johnson Amendment are also wrong to assert that the law does not infringe the exercise of religion because religious organizations are free to forgo the tax exemption provided by Section 501(c)(3). But "it is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." *Trinity Lutheran*, 582 U.S. at 463; *see also McDaniel v. Paty*, 435 U.S. 618, 633 (1978) (Brennan, J., concurring) (The "proposition—that the law does not interfere with free exercise because it does not directly prohibit religious activity, but merely conditions eligibility for office on its abandonment—is also squarely rejected by precedent."). While "[i]t is true the [government] has not criminalized the way [Plaintiffs and other religious organizations like Cornerstone Chapel and First Baptist] worship[] or told [them] that [they] cannot subscribe to a certain view of the Gospel[,] the Free Exercise Clause protects against indirect coercion or penalties on the free exercise of religion, not just outright prohibitions." *Trinity Lutheran*, 582 U.S. at 463.

"The express discrimination against religious exercise here is not the denial of a grant, but rather the refusal to allow" religious organizations like Plaintiffs, Cornerstone Chapel, and First Baptist to receive an otherwise available tax benefit

without giving up their religious exercise. *Id.* This Court should declare that the Johnson Amendment cannot lawfully sanction religious discrimination under the guise of merely placing a condition on a subsidy.

> ### 2.    The Johnson Amendment infringes on free speech rights.

Under the First Amendment's Free Speech Clause, "the government may not deny a benefit to a person on a basis that infringes his constitutionally protected freedom of speech even if he has no entitlement to that benefit." *Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 668, 674 (1996) (cleaned up); *see also Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 351 (2010) ("It is rudimentary that the State cannot exact as the price of [corporations'] special advantages the forfeiture of First Amendment rights."). But that is what the Johnson Amendment does. It conditions a tax benefit on religious organizations' forfeiture of their protected political speech.

Other amici claim the Johnson Amendment merely sets qualifications for an organization to be eligible for a government subsidy. *See* Br. of Amici Campaign Legal Ctr. et al., Doc. 54 at 18. But again, the § 501(c)(3) tax exemption is not a subsidy; it is a government benefit on which the government cannot condition religious organizations' free speech rights. Yet the Johnson Amendment requires

organizations to choose between the tax exemption and their protected political speech.[36]

Such a "denial of a tax exemption for engaging in certain speech necessarily will have the effect of coercing the claimants to refrain from the proscribed speech," *Speiser v. Randall*, 357 U.S. 513, 519 (1958), and violates the Free Speech Clause. "To deny an exemption to claimants who engage in certain forms of speech is in effect to penalize them for such speech. Its deterrent effect is the same as if the State were to fine them for this speech." *Id.* at 518. Plaintiffs and other religious organizations like Cornerstone Chapel and First Baptist should not have to forgo their constitutional speech rights to receive the same tax benefit that similar organizations receive.

## CONCLUSION

The § 501(c)(3) tax exemption is not a subsidy on which the government can place any conditions. The government cannot require religious organizations that would otherwise qualify for the exemption to give up their free exercise and free speech rights to receive that exemption. But that is what the Johnson Amendment does.

---

[36] *See* Johnny Rex Buckles, *supra* note 26 at 183 ("Accordingly, section 501(c)(3) forces entities 'to choose between paying a tax and suppressing themselves,' thereby taxing them for speech and imposing 'a direct facial constraint.'").

Respectfully submitted this 11th day of August, 2025,

s/ Ryan Tucker

Ryan Tucker, AZ Bar No. 034382
   rtucker@ADFLegal.org
Mark Lippelmann, AZ Bar No. 036553*
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020

David Cortman, GA Bar No. 188810
   dcortman@ADFLegal.org
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd NE,
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774

*Attorneys for Proposed Amici*
***Application for** Pro Hac Vice Admission*
*Approved*

*Attorneys for Amici Curiae*

25

**CERTIFICATE OF SERVICE**

I hereby certify that on August 11, 2025 I electronically filed this brief with the Clerk of the Court for the United States District Court for the Eastern District of Texas by using the CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

*/s/ Ryan Tucker*
Attorney for *Amici Curiae*

26