# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | |
|---|---|
| NATIONAL RELIGIOUS BROADCASTERS, ET AL, | |
| Plaintiffs, | |
| v. | Civil No. 6:24-cv-00311-JCB |
| THE INTERNAL REVENUE SERVICE, ET AL, | |
| Defendants. | |

**BRIEF OF *AMICUS CURIAE* INSTITUTE FOR FREE SPEECH AND BRADLEY A. SMITH IN SUPPORT OF PLAINTIFFS**

## TABLE OF CONTENTS

Table of Authorities..................................................................................3

Interest of Amici....................................................................................7

Introduction..........................................................................................8

Argument..............................................................................................9

    I.    Claims that the consent judgment will lead to unconstrained "dark money" are unfounded ......................................................9

      A.    Churches that make political activity their major purpose are subject to PAC registration and reporting .............................11

      B.    Even without PAC status, churches would have to comply with requirements for independent expenditures, electioneering communications, and earmarked contributions......................15

      C.    Accounts of the FEC's dysfunction are greatly exaggerated...20

    II.    The Consent Judgment will resolve constitutional issues, not cause them ................................................................................24

    III.    Real churches will not convert into political entities.................28

Conclusion ...........................................................................................36

## TABLE OF AUTHORITIES

**Cases**

*Buckley v. Valeo,*
424 U.S. 1 (1976)............................................................................ passim

*Citizens United v. Fed. Election Comm'n,*
558 U.S. 310 (2010)............................................................ 17, 18, 23, 28

*Colo. Right to Life Comm., Inc. v. Coffman,*
498 F.3d 1137 (10th Cir. 2007)......................................................... 12

*Cutter v. Wilkinson,*
544 U.S. 709 (2005).......................................................................... 34

*Davis v. Fed. Election Comm'n,*
554 U.S. 724 (2008).......................................................................... 22

*Fed. Election Comm'n v. Mass. Citizens for Life, Inc.,*
479 U.S. 238 (1986).................................................................... passim

*Fed. Election Comm'n v. Wis. Right to Life, Inc.,*
551 U.S. 449 (2007)...................................................................... 21, 23

*Grayned v. City of Rockford,*
408 U.S. 104 (1972).......................................................................... 24

*Inst. for Free Speech v. Johnson,*
No. 24-50712, 2025 U.S. App. LEXIS 18855 (5th Cir. July 28, 2025)..7

*Int'l Soc'y for Krishna Consciousness, Inc. v. Barber,*
650 F.2d 430 (2d Cir. 1981) ............................................................ 35

*Markley v. State Elections Enf't Comm'n,*
313 A.3d 1170 (Conn. 2024)............................................................... 7

*MFS Sec. Corp. v. N.Y. Stock Exch., Inc.,*
277 F.3d 613 (2d Cir. 2002) .............................................................. 8

*Moussazadeh v. Tex. Dep't of Criminal Justice,*
703 F.3d 781 (5th Cir. 2012)............................................................ 35

*NAACP v. Button,*
371 U.S. 415 (1963).......................................................................... 25

*Regan v. Taxation with Representation,*
461 U.S. 540 (1983).......................................................................... 27

*U.S. v. Williams,*
553 U.S. 285 (2008).......................................................................... 24

*Van Hollen v. FEC*,
   811 F.3d 486 (D.C. Cir. 2016) .......................................................... 18, 22
*Wis. Right to Life State PAC v. Barland*,
   664 F.3d 139 (7th Cir. 2011) ................................................................. 22

## Statutes

26 U.S.C. § 501(c)(3) ..................................................................... 24, 25
52 U.S.C. § 30101(17) ........................................................................ 15
52 U.S.C. § 30101(4) .......................................................................... 12
52 U.S.C. § 30101(8)(A)(i) ................................................................... 12
52 U.S.C. § 30101(9)(A)(i) ................................................................... 12
52 U.S.C. § 30101(9)(B)(iii) .................................................................. 19
52 U.S.C. § 30103 .............................................................................. 14
52 U.S.C. § 30104 .............................................................................. 14
52 U.S.C. § 30104(c) .......................................................................... 17
52 U.S.C. § 30104(c)(1) ....................................................................... 16
52 U.S.C. § 30104(e) .......................................................................... 25
52 U.S.C. § 30104(f)(3)(A) ................................................................... 17
52 U.S.C. § 30106(a)(1) ....................................................................... 20
52 U.S.C. § 30106(c) .......................................................................... 20
52 U.S.C. § 30107(a) .......................................................................... 20
52 U.S.C. § 30109(a) .......................................................................... 34
52 U.S.C. § 30109(a)(2) ....................................................................... 20
52 U.S.C. § 30109(a)(8) ....................................................................... 22
52 U.S.C. § 30109(d) .......................................................................... 34
52 U.S.C. § 30120 .............................................................................. 24

## Regulations

11 C.F.R. § 100.12 ............................................................................. 14
11 C.F.R. § 100.134(e) ........................................................................ 19
11 C.F.R. § 100.29(b)(2) ...................................................................... 18
11 C.F.R. § 102 ................................................................................. 14
11 C.F.R. § 104 ................................................................................. 14
11 C.F.R. § 104(a)(4)(i) ....................................................................... 14
11 C.F.R. § 104.14 ............................................................................. 19

11 C.F.R. § 104.20(c) ........................................................................ 18
11 C.F.R. § 104.20(c)(10) ................................................................ 18
11 C.F.R. § 104.20(d) ...................................................................... 19
11 C.F.R. § 104.3(b)(3)(vii) ............................................................ 17
11 C.F.R. § 104.6 ............................................................................ 19
11 C.F.R. § 109.10 .................................................................... 17, 24
11 C.F.R. § 109.21 .......................................................................... 15
11 C.F.R. § 114.10 .......................................................................... 17

## Other Authorities

Brad Smith and David Keating, *Is FEC deadlock good or not? To partisans, it depends on when you ask*, Washington Examiner (June 3, 2025) ............................................................................... 21

Bradley A. Smith, *Feckless: A Critique of Critiques of the Federal Election Commission*, 27 Geo. Mason L. Rev. 503 (2020) ............. 20, 21

Capitol Hill Baptist Church, *Bulletin* (Aug. 10, 2025) ........................... 31

Capitol Hill Baptist Church, *Homepage* ................................................. 31

David Primo, *Full Disclosure: How Campaign Finance Disclosure Laws Fail to Inform Voters and Stifle Public Debate*, Institute for Justice (October 2011) ......................................................................... 11

David Primo, *Information at the Margin: Campaign Finance Disclosure Laws, Ballot Issues, and Voter Knowledge*, 12 Election Law Journal 114 (2013) ............................................................................... 11

Don Thorsen, *Priesthood of Believers*, What's True about Christianity? An Introduction to Christian Faith and Practice (2020) ................... 30

Francois Marie Arouet de Voltaire, *Essai sur les Moeurs et l'Esprit des Nations* (1769) ....................................................................... 8

George Orwell, *Politics and the English Language* (1946) ...................... 9

Institute for Free Speech, *Petition for Rulemaking to Revise 11 C.F.R. § 100.52.* (submitted Aug. 27, 2018) ................................................. 14

Pew Research Center, *Why Americans Go (and Don't Go) to Religious Services* (Aug. 1, 2018) .............................................................. 32, 33

Robert Fowler, et al, *Religion and Politics in America* (3d ed. 2004) .... 34

Saint John's Church, *The Transfiguration* (Aug. 10, 2025) ................... 31

Steven Dworetz, *The Unvarnished Doctrine: Locke, Liberalism, and the American Revolution* (1990) ................................................................34

Timothy O'Neill, *Constitutional Argument as Jeremiad*, 45 Val. U.L. Rev. 33 (2010) ....................................................................................35

Washington National Cathedral, *The Holy Eucharist* (Aug. 10, 2025) .31

## INTEREST OF AMICI

The Institute for Free Speech is a nonpartisan, nonprofit organization dedicated to the protection of the First Amendment rights of speech, assembly, petition, and press. The Honorable Bradley A. Smith—who served as a Commissioner on the Federal Election Commission (FEC) from 2000 through 2005, including serving as the Vice Chairman of the commission in 2003 and Chairman in 2005—founded the Institute and is its Chairman. Along with scholarly and educational work, the Institute is actively involved in targeted litigation against unconstitutional laws at both the state and federal level. The Institute represents individuals and civil society organizations in litigation securing their First Amendment liberties. *See, e.g., Inst. for Free Speech v. Johnson*, No. 24-50712, 2025 U.S. App. LEXIS 18855 (5th Cir. July 28, 2025); *Markley v. State Elections Enf't Comm'n*, 313 A.3d 1170, 1173 (Conn. 2024). A principal part of the Institute's mission is ensuring that the FEC and other agencies constitutionally interpret laws regulating election campaign speech.

## INTRODUCTION

Voltaire quipped that the Holy Roman Empire was "neither holy, nor Roman, nor an empire." *MFS Sec. Corp. v. N.Y. Stock Exch., Inc.*, 277 F.3d 613, 622 (2d Cir. 2002) (citing Francois Marie Arouet de Voltaire, *Essai sur les Moeurs et l'Esprit des Nations* 70 (1769)). Something similar could be said of the claim that the Consent Judgment would "allow [churches] to transform into unregulated vehicles for partisan campaigning, funded by taxpayers and shielded from public scrutiny." Br. of *Amici Curiae* Campaign Legal Ctr., Public Citizen, and Common Cause Opposing the Parties' Joint Mot. for Entry of Consent J. at 1, ECF No. 51-1 (hereafter "CLC"). Evidence demonstrates that the Consent Judgment will not transform churches into vehicles for political advocacy, nor leave them "unregulated," nor shield them from public scrutiny in the form of disclosure.

To the contrary, Congress established an extensive regulatory framework to compel disclosure from organizations engaging in political advocacy, particularly if advocacy becomes the organization's major purpose. This includes disclosure for communications that expressly advocate the election or defeat of a candidate, or that mention a

candidate close to an election. If the Consent Judgment is approved, the Federal Election Commission will enforce those laws against churches engaging in political advocacy, subject to the First Amendment's demands and statutory requirements of bipartisan enforcement.

Furthermore, far from creating constitutional issues, the Consent Judgement will resolve vagueness issues in the Johnson amendment. And the characteristics of religious practice, as well as FECA provisions prohibiting willful and knowing violations of the law, obviate concerns about churches transforming into concealed political operatives.

## ARGUMENT

### I. CLAIMS THAT THE CONSENT JUDGMENT WILL LEAD TO UNCONSTRAINED "DARK MONEY" ARE UNFOUNDED

The term "dark money" lacks legal meaning and is imprecise even in colloquial use. As George Orwell observed of the word "fascism," it has been so abused that it "has now no meaning except in so far as it signifies 'something not desirable.'" George Orwell, *Politics and the English Language* (1946), https://perma.cc/EGA8-VJP9. So it is with "dark money." The ominous sound of the phrase, without any evidence, triggers fear of a dangerous problem. Here, *amici* express concern that a sermon in a church, aimed at members (typically donors) sitting in the

pews, and where the church's name is typically plastered on the entrance to the facility, would be funded by "dark money." That is a great deal known about the speaker. But, like the readers of the National Enquirer, enquiring minds want to know, and Congress has created multiple processes to deliver further information about the political advocacy that churches might engage in.

The extensive regulatory framework already in place under the Federal Election Campaign Act ("FECA") and the Bipartisan Campaign Reform Act ("BCRA") contradict the claim that the Consent Judgment will "open a gaping loophole," creating "new entities [that] would operate in near-total secrecy, with no public financial disclosures and incomplete reporting of their political expenditures." CLC at 3, 14; *see also id.* at 14 (claiming that "[t]he public would have no way to follow the money" as neither donors nor spending "could . . . be tracked").[1] To

---

[1] Amici claim that disclosure is the "cornerstone of the federal campaign finance system," CLC at 4, but it is questionable whether the informational interest underlying it has ever given the system stability or direction. The Supreme Court in *Buckley v. Valeo*, 424 U.S. 1 (1976) (*per curiam*) said that disclosure served an informational interest, giving voters information that allows them "to place each candidate in the political spectrum more precisely than is often possible solely on the basis of party labels and campaign speeches." *Id.* at 67. It is doubtful that disclosure ever served the claimed informational purposes—that a voter in 1976 ever flew to the District of Columbia, hired a car to take her to the FEC offices, requested the records of

the contrary, churches engaging in political advocacy could be subject to disclosure as political committees or for individual expenditures.

### A. Churches that make political activity their major purpose are subject to PAC registration and reporting

The claim that the "consent decree could be interpreted as allowing churches to engage in political messaging *without limit*," CLC at 15, ignores the fact that churches engaging in such messages would have to register as political committees (PACs) with concomitant heavy regulation. FECA defines as a "political committee" any "group of persons" that makes more than $1,000 in "expenditures" in a calendar year or receives more than $1,000 in "contributions" in a calendar year.

---

contributors to her Senator, looked through the list, and then decided to vote against the candidate because of neighbor's contribution. The usefulness of disclosure in informing voters, except for the purposes of doxing, is just as questionable today. Studies focusing on ballot issues campaigns, where only the informational interest applies, show that it does not. *See* David Primo, *Full Disclosure: How Campaign Finance Disclosure Laws Fail to Inform Voters and Stifle Public Debate* at 1, 3, Institute for Justice (October 2011), https://perma.cc/864A-86MP (noting lack of evidence for traditional assumption that disclosure benefits the informational interest, and finding that "[v]oters have little interest in disclosure data" and that "[v]iewing disclosure information had virtually no impact on participants' knowledge"); David Primo, *Information at the Margin: Campaign Finance Disclosure Laws, Ballot Issues, and Voter Knowledge*, 12 Election Law Journal 114, 128 (2013), https://perma.cc/AC5Q-5ER4 (finding that "disclosure information in news accounts does not help voters better identify the positions of interest groups," such that disclosure is not "serving a cue-giving function").

52 U.S.C. § 30101(4). FECA in turn defines a contribution as "any gift . . . for the purpose of influencing any election," 52 U.S.C. § 30101(8)(A)(i), and an expenditure as "any purchase, payment, . . . or anything of value, made by any person for the purpose of influencing any election," *id*. at 30101(9)(A)(i).

Because those definitions are unconstitutionally vague, the Supreme Court limited FECA's registration and reporting requirements to groups "that are under the control of a candidate," or to groups that have as their "major purpose . . . the nomination or election of a candidate." *Buckley*, 424 U.S. at 79. To determine whether an organization has political advocacy as its major purpose, courts may "(1) examin[e] . . . the organization's central organizational purpose; or (2)" examine "whether the preponderance of [the organization's] expenditures are for express advocacy." *Colo. Right to Life Comm., Inc. v. Coffman*, 498 F.3d 1137, 1152 (10th Cir. 2007) (citing *Fed. Election Comm'n v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 252 n.6 (1986) ("*MCFL*")). Thus, if a church begins spending more than $1,000 in a calendar year on political activity, and if that spending begins to be the preponderance of its expenditures, it must register as a PAC.

12

PAC status carries with it a host of "extensive" and "stringent" restrictions." *MCFL*, 479 U.S. at 254 (plurality op.).[2] A committee "must file a statement of organization containing its name, address, the name of its custodian of records, and its banks, safety deposit boxes, or other depositories." *Id.* at 253. "[I]t must appoint a treasurer," who must keep records of every contribution, of the names and addresses of contributors who give over $50, and the names and addresses of persons to whom any disbursement is paid; and "preserve receipts for all disbursements over $200." *Id.*

Committees "must file" reports either monthly or on another schedule with many irregular dates to track. *Id.* Among other information, these reports must include total "cash on hand"; total receipts, organized into 10 categories; total disbursements, organized into 12 categories; names of persons to whom loan repayments were made; and the totals of all contributions, expenses, and debts. *Id.* at 253-54. Committees must also include name, address, occupation, employer, and aggregate contribution amounts for donors giving more

---

[2] Unless otherwise noted, *MCFL* citations are to the plurality opinion.

than $200. 11 C.F.R. § 104.3(a)(4)(i); § 100.12 (defining identification).

And they must continue making these reports until they can dissolve.

*MCFL*, 479 U.S. at 253.

These "duties require a far more complex and formalized organization than many small groups [can] manage," thus "create[ing] a disincentive for" organizations—which would include churches—"to engage in political speech." *Id.* at 254-55. And this burden is only heightened by the need to hire expert compliance counsel to track the statutory and regulatory requirements spanning multiple sections of the U.S. Code and Federal Register, *see, e.g.,* 52 U.S.C. § 30103 and 11 C.F.R. § 102 (registration) *and* 52 U.S.C. § 30104(a), (b), & (g) and 11 C.F.R. § 102 & § 104 (reporting), as well as all the requirements altered by judicial decisions but never incorporated into statute or regulation, *see, e.g,* Institute for Free Speech, *Petition for Rulemaking to Revise 11 C.F.R. § 100.52.* (submitted Aug. 27, 2018), https://perma.cc/QAA7-N2YS (discussing need to revise definition of contribution). Thus, even if churches take advantage of the Consent Judgment, their incentives would be to avoid extensive political advocacy.

### B. Even without PAC status, churches would have to comply with requirements for independent expenditures, electioneering communications, and earmarked contributions

Even if a church's political activity doesn't rise to the level triggering the requirement to register as a PAC, the church may still have to disclose its activity under FECA's event-driven disclosure rules. That is, claims that "churches would likely become the preferred entities for donors seeking to anonymously fund electioneering targeted to religious audiences," CLC at 13, ignore FECA's disclosure requirements for independent expenditures and BCRA's disclosure requirements for electioneering communications.

An independent expenditure is "an expenditure . . . expressly advocating the election or defeat of a clearly identified candidate . . . that is not made in concert or cooperation with or at the request or suggestion of such candidate." 52 U.S.C. § 30101(17).[3] Because the definition of "expenditure" was itself unconstitutionally vague, the Supreme Court limited independent expenditure reporting

---

[3] Note that any expenditure made in concert or cooperation with a candidate or party is treated as a "contribution" under the FECA, and it would have to be reported as such. *See* 11 C.F.R. § 109.21.

requirements to individuals and groups in two circumstances: "(1) when they make contributions earmarked for political purposes," or "(2) when they make expenditures for communications that expressly advocate the election or defeat of a clearly identified candidate." *Buckley*, 424 U.S. at 80. So, if a church were to contribute to another explicitly for political advocacy, or if it were to make a communication in cooperation with a candidate, that would be a contribution that must be reported.

A group may also trigger independent expenditure reporting requirements if it makes expenditures for express advocacy. Such advocacy encompasses "communications containing express words of advocacy of election or defeat, such as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' [and] 'reject.'" *Buckley*, 424 U.S. at 44 n.52.[4] A church making such communications would become subject to FECA's disclosure requirements once it spent in total more than "$250 during a calendar year" on those communications. 52 U.S.C. § 30104(c)(1).

---

[4] This became known as the "magic words" test, and courts limited express advocacy to communications that had those eight words/phrases, despite Buckley's inclusive language. As a result, Congress created BCRA's disclosure regime for electioneering communications.

16

Churches triggering the independent expenditure disclosure requirements would be required to report the following: (1) the identity of all its contributors who had given it "over $ 200 in the aggregate in funds to influence elections"; (2) the names and addresses of those to whom it had given more than $200 for its independent expenditures, including information about the candidate; and (3) the identity of any donor who made more than $200 in contributions that were earmarked for independent expenditures. *MCFL*, 479 U.S. at 252; *see also* 52 U.S.C. § 30104(c) (giving information to disclose); 11 C.F.R. § 104.3(b)(3)(vii); § 109.10; § 114.10.

If a church's communication fails to qualify as an independent expenditure, it may still trigger reporting requirements as an electioneering communication. BCRA defined "[a]n electioneering communication . . . as 'any broadcast, cable, or satellite communication' that 'refers to a clearly identified candidate for Federal office' and is made within 30 days of a primary or 60 days of a general election." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 321 (2010) (quoting what is now codified at 52 U.S.C. § 30104(f)(3)(A)). The regulations broadly define the phrase "refers to a clearly identified

17

candidate" to mean a "candidate's name, nickname, photograph, or drawing," or anything else that would otherwise make "apparent [the candidate's identity] through an unambiguous reference." 11 C.F.R. § 100.29(b)(2). If a speaker "spends more than $10,000 on electioneering communications within a calendar year," they trigger BCRA's reporting requirements. *Citizens United*, 558 U.S. at 366.

An electioneering communication disclosure statement must include the identity of the person making the expenditure and anyone supervising that person; the identity of the person or organization's custodian of books and accounts; for each disbursement over $200, the amount of the disbursement, the date it was made, and the recipient's identity; the identity of the candidates referred to in the communication and the elections in which they ran; and the name and address of each donor who gave $1,000 or more to the speaker. 11 C.F.R. § 104.20(c).[5] They must also keep records—including bank records, "vouchers,

---

[5] If a church triggering the electioneering communication reporting requirements is organized as a corporation, it would only report persons who had made $1,000 or more in donations "made for the purpose of furthering electioneering communications." 11 C.F.R. § 104.20(c)(10); *see also Van Hollen v. FEC*, 811 F.3d 486, 491, 497, 499-501 (D.C. Cir. 2016) (explaining and upholding FEC's earmarking requirement for corporations and unions).

worksheets, receipts, [and] bills and accounts"—for three years. 11 C.F.R. § 104.14(b); *see also* 11 C.F.R. § 104.20(d).

Furthermore, the FEC could require reporting of churches as membership organizations. The FEC defines these as organizations composed of their members, where at least some members have power to administer the organization, the organization has bylaws available to its members, and it solicits individuals to become members and acknowledges acceptance of membership. 11 C.F.R. § 100.134(e). If they spent more than $2,000 total in any election on communications to their members that expressly advocate the election or defeat of a candidate, they would be required to file a report the costs attributable to such advocacy. *See* 52 U.S.C. § 30101(9)(B)(iii); 11 C.F.R. § 104.6.

The argument that the consent decree would turn churches into sham political fronts appears to be based on the theory that there are no laws governing campaign finance, whereas, in fact, campaign finance law is a heavily regulated field with statutes and regulations running hundreds of pages.

C. Accounts of the FEC's dysfunction are greatly exaggerated

Claims that the FEC is dysfunctional and does not enforce existing laws reveal frustration, *see* CLC at 5, 16-17, but it is a frustration with the fact that Congress designed FECA to protect core First Amendment rights against partisan and ideological lawfare.

In creating the Commission, "both parties feared the possibility of partisanship in enforcement," and "neither was eager to have campaign finance restrictions . . . enforced by an agency under partisan control of the other party." Bradley A. Smith, *Feckless: A Critique of Critiques of the Federal Election Commission*, 27 Geo. Mason L. Rev. 503, 513 (2020). Accordingly, Congress required bipartisan approval for any decision by the FEC to go forward with an investigation or to hold anyone responsible for a violation: it created a six-member Commission in which "[n]o more than 3 members" of the commission "may be affiliated with the same political party," 52 U.S.C. § 30106(a)(1), and it then required that four of the six members approve even an investigation, 52 U.S.C. §§ 30106(c), 30107(a)(6) & (9), 30109(a)(2).

Without giving actual numbers, *amici* claim that charitable organizations are a "popular" way to circumvent regulation, and that

20

FEC inaction has allowed "many . . . organizations [to] operate as *de facto* political committees without registering or reporting as such." CLC at 6.

But the FEC decisions that *amici* portray as widespread dysfunction also occur only in a "small number of matters." Brad Smith and David Keating, *Is FEC deadlock good or not? To partisans, it depends on when you ask*, Washington Examiner (June 3, 2025), also available at https://perma.cc/9VQ7-MUAX; *see id.* (noting that 3-3 deadlocks happen in "typically less than 5% of substantive votes, although on rare occasions in the agency's 50-year history, the percentage of tie votes has risen to the 20 to 30% range"); Smith, 27 Geo. Mason L. Rev. at 527-534 (compiling and reviewing studies on Commission votes). More importantly, what *amici* call a "fail[ure] to enforce," CLC at 6, is an intentional feature of the system, created to protect speech watched over by the First Amendment, which requires that "the tie go[] to the speaker, not the censor." *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 474 (2007). And if a complainant believes that the Commission has violated the law in not pursuing a complaint, the person can seek court permission to bring a private suit against the

complaint respondent. *See* 52 U.S.C. § 30109(a)(8). The mere fact that *amici* CLC believes that the law was not "enforced" doesn't make it so— it is the FEC, not CLC, that interprets the law, and the FEC is subject to statutory procedures, including the requirement of a majority vote, before finding a violation.

Finally, in attempting to delegitimize what are properly called independent expenditure groups or independent expenditure-only groups, *see, e.g., Wis. Right to Life State PAC v. Barland*, 664 F.3d 139, 154 (7th Cir. 2011), with ominous names like "501(c)(4) dark money groups" and "Super Dark Money Groups," CLC at 6, 13, *amici* fail to acknowledge the reasons why so much disclosure is exempted.

The Supreme Court has "repeatedly found that compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 744 (2008) (quoting *Buckley*, 424 U.S. at 64); *see Buckley*, 424 U.S. at 64 (citing Civil Rights cases on privacy of association); *see also Van Hollen,* 811 F.3d at 500 ("The deleterious effects of disclosure on speech have been ably catalogued."). As *Buckley*'s citation of the Civil Rights cases reminds us, disclosure can be used to intimidate and

22

silence ideological opponents. And placing disclosure information on the internet has only increased the potency of the threat. *See Citizens United*, 558 U.S. at 484-85 (Thomas, J., dissenting) (discussing use of disclosure to "subject[] citizens of this Nation to death threats, ruined careers, damaged or defaced property").

Thus, to protect those who are "engaged purely in issue discussion," *Buckley*, 424 U.S. at 79, the courts have generally limited disclosure of a speaker's donors to those whose contributions are used for express advocacy or its functional equivalent or those who earmarked their contributions for political purposes, *id*. at 79-80; *WRTL*, 551 U.S. at 485 (Scalia, J., concurring) (noting that, with respect to electioneering communications, the "vast majority of ads aired during the 30-day and 60-day periods before elections were the functional equivalent of express advocacy" (internal quotation marks omitted)). Thus, despite *amici*'s frustrations, the limitations on disclosure that exist are features of our constitutional system, not bugs. Regardless, the vast majority of disclosure requirements—especially for communications by major purpose organizations and for electioneering communications—have been upheld. And it is not as if the public won't know who is engaged in

23

advocacy—the church's name itself must go on a broad array of communications, 52 U.S.C. § 30120, and be included in reports of expenditures exceeding $250, 11 C.F.R. § 109.10(b) & (e).

## II. THE CONSENT JUDGMENT WILL RESOLVE CONSTITUTIONAL ISSUES, NOT CAUSE THEM

The Johnson amendment limits 501(c)(3) status to churches that "do[] not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office." 26 U.S.C. § 501(c)(3). This language suffers from similar constitutional infirmities to the FECA provisions struck down or modified in *Buckley*.

Statutory provisions are "void for vagueness" when they "trap the innocent by not providing fair warning." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Such a statute "fails to provide a person of ordinary intelligence fair notice of what is prohibited." *U.S. v. Williams*, 553 U.S. 285, 304 (2008). And "[w]here First Amendment rights are involved," as here, "an even greater degree of specificity is required." *Buckley*, 424 U.S. at 77 (internal quotation marks omitted).

The Johnson amendment, as historically interpreted by the IRS, uses broad language to sweep in as much political activity as possible—

24

covering any "participat[ion] in, or interven[tion] in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office." 26 U.S.C. § 501(c)(3). Given that "[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms," *NAACP v. Button*, 371 U.S. 415, 438 (1963), the Supreme Court has already held that attempts "to be all-inclusive" through such phrases is unconstitutional, *Buckley*, 424 U.S. at 76.

In particular, the Supreme Court held that "indefinite" phrases like "'relative to' a candidate" and "for the purpose of . . . influencing" "fail[] to clearly mark the boundary between permissible and impermissible speech." *Id*. at 41, 77. The use of the former in § 608(e)(1) failed to alert individuals what activity might be "relative to" a candidate and thus forbidden, and the Court limited the provision's reach. *Id*. at 42-44. The use of the latter in definitions incorporated into the current 52 U.S.C. § 30104(e) improperly tried to "reach[] 'every kind of political activity.'" *Id*. at 76. As discussed above, *Buckley* construed the provision to reach only certain groups and communications. *See id*. at 80.

The Johnson amendment commits the same offenses as FECA's expenditure limits and disclosure provisions. The phrases "participate in" and "intervene in" are as expansive and undefined as FECA's "relative to" and "for the purpose of . . . influencing." The IRS could easily decide that any mention of a candidate in discussing an issue, or speaking about issues hotly contested in a campaign and urging congregants to go vote, constituted participation or intervention in the campaign. Indeed, as Plaintiffs noted, the IRS tax guide states that the law covers voter registration and education activities when they might "oppose a candidate *in some manner*" or when they might "have the *effect of favoring* a candidate." Pls.' Mot. For Partial Summ. J. at 8, ECF No. 23 (emphasis added); *see also* CLC at 12-13 (arguing that the definitions for terms in the Johnson amendment are broader than the parties discuss). And, unlike FECA's expenditure limit, the Johnson amendment not only limits speech, it cuts it off entirely.

Because of its inhibiting effect on issue speech, the Johnson amendment is already void for vagueness. Thus, far from creating constitutional issues, the consent judgment will resolve some of the

constitutional infirmities already inherent in the amendment, and this Court should approve the Consent Judgment.

The suggestion that churches could simply create a separate 501(c)(4) entity, CLC at 20, does not resolve the Johnson amendment's constitutional infirmities and is not a practical remedy for most churches. The creation of an affiliated organization carries with it significant burdens. The organizations would be required to show that the 501(c)(3) did not subsidize the 501(c)(4), by separately incorporating and keeping records to show that contributions to the church were not being used for any of the (c)(4)'s political activities. *See Regan v. Taxation with Representation*, 461 U.S. 540, 544 n.6 (1983). Which would only augment the financial burden for protected speech.

Imposing such organizational and financial burdens, while sustained in *Regan*, *id*., runs into constitutional difficulties when applied to core political speech. In discussing the unconstitutional burdens created by forcing non-profit corporations to form separate segregated funds to speak, Justice Brennan's *MCFL* plurality noted that the "[d]etailed record-keeping and disclosure obligations, along with the" additional burdens in creating another organization, would "impose administrative

27

costs that many small entities may be unable to bear." *MCFL*, 479 U.S. at 254-55. The opinion also noted that the restrictions on financing for the separate fund would "directly limit[] the ability of such organizations to engage in core political speech." *Id*. at 255. Altogether, the "disincentive for such organizations to engage in political speech" resulted in a First Amendment violation triggering strict scrutiny. *Id*. at 254, 256;[6] *see also Citizens United*, 558 U.S. at 337 (the option to create a separate organization "does not alleviate the First Amendment problems" where it limits an organization's speech.)

The suggestion that churches form 501(c)(4) organizations raises the same organizational and financial burdens as in *MCFL*. And, as in *MCFL*, the constraints on core political speech render this suggestion unconstitutionally burdensome.

## III.   REAL CHURCHES WILL NOT CONVERT INTO POLITICAL ENTITIES

People do not belong to churches or participate in religious life for political reasons. Accordingly, real churches would not "transform into

---

[6] Justice O'Connor similarly found an unconstitutional burden in the additional organizational burdens and financial constraints. *See MCFL*, 479 U.S. at 266 (O'Connor, J., concurring) ("engaging in campaign speech requires MCFL to assume a more formalized organizational form and significantly reduces or eliminates the sources of funding").

unregulated vehicles for partisan campaigning," CLC at 1, nor would they "be pressured to accept partisan contributions[] and their leaders" become "campaign operatives rather than spiritual guides," *id.* at 16. And, were they to cease being churches and become disguised political operatives that hide their political advocacy under a cloak of piety, they would be subject to enhanced enforcement.

The Consent Judgment applies only to messages "concerning electoral politics viewed through the lens of religious faith," when those messages are shared by a church as part of "speak[ing] to its congregation, through its customary channels of communication on matters of faith in connection with religious services." Proposed Order ¶ 3, ECF No 35-1. To have customary channels of communication, a church must have regular services. Speaking to its congregation through customary channels requires that it have a community—a group of people bound together by shared purpose and belief in a greater power acting in the universe—that it regularly speaks to. Customary channels of communication on matters of faith requires that such a church have regular ways in which it communicates with its

congregation, and that it already be using those modes of communication to talk about matters of faith.

Moreover, joining with such communities and engaging in their services requires no small commitment from a congregation's members. While it is impossible to cover what a service in all faiths is like, a few examples are instructive. The worship service for August 10, 2025, at Saint John's Church, an Episcopal parish in Washington, D.C., gives an example of what has sometimes been called a high-church Christian service.[7] The service includes nine hymns sung by the congregation, some standing and some seated; two hymns sung by the choir; four readings of scripture; multiple prayers with congregational participation; seven recitations or calls and responses of creeds, confessions, and statements, including the Nicene Creed; a welcome and

---

[7] High church services tend to have more elaborate ritual—with processions and formal clothing—and prescribed prayers. *See* Don Thorsen, *Priesthood of Believers*, What's True about Christianity? An Introduction to Christian Faith and Practice 165 (2020), https://www.jstor.org/stable/j.ctv138wrs6.25. The services have a sermon, but it is often only around 10 minutes long, and the services reach their climax in a ritual, often the Eucharist/Holy Communion. *Id.*

Low church services on the other hand, while also having biblical preaching, music, and singing, focus more on preaching and singing than on ritual. *See id.* "[T]he climax is the sermon, which is often thirty minutes or longer." *Id.*

announcements; a sermon; an invitation for the entire congregation to partake of the Holy Communion; a blessing by the priest; and a dismissal. Saint John's Church, *The Transfiguration* (Aug. 10, 2025), https://perma.cc/MZ54-NXHN; *see also* Washington National Cathedral, *The Holy Eucharist* (Aug. 10, 2025), https://perma.cc/YXK2-VARZ, (another example of an Episcopalian service).

The August 10, 2025 service at Capitol Hill Baptist Church in Washington, D.C., provides an example of what has sometimes been called a low-church service. The service includes four scripture readings/calls to worship; six hymns; six prayers; a welcome; the sermon; and a time of silence for reflection. Capitol Hill Baptist Church, *Bulletin* (Aug. 10, 2025), https://perma.cc/35RL-VF7K. Apart from the Sunday morning worship service, the members of that congregation are invited to "Core Seminars" for religious study an hour before the main service on Sunday mornings, a prayer service Sunday evening, and Bible study on Wednesday nights. *See id.*; *see also* Capitol Hill Baptist Church, *Homepage*, https://perma.cc/NS9S-UEPC.

Reviewing the programs for those and other churches, one would be hard-pressed to see how a "political operative" would be able to

31

transform congregations into "newly politicized churches," CLC at 13, with their leaders transformed into "campaign operatives," *id.* at 16. There would be no way to fit the extensive, costly political activity that the Court has been warned of into such crowded customary services.

Nor would the members of the religious communities put up with it. Being bound to a religious community is a commitment in time and energy, if only in taking the time to sit through such services when there are so many other avenues of entertainment available. The reward for that commitment, the reason why people go to church, is not for political advertising. Rather, the most important reason individuals give for attending church is to become closer to God. Pew Research Center, *Why Americans Go (and Don't Go) to Religious Services* (Aug. 1, 2018), https://perma.cc/6PBS-BWXX. The other primary reasons individuals give for going to church are to give their children a "moral foundation," to make themselves better people, and for comfort in times of trouble and sorrow. *Id.* "Smaller majorities" say they attend because they find the sermons valuable or want to be part of a community, and "[f]ar fewer" said that they attend because of their family traditions, a

sense of obligation, socializing, and to please family. *Id*. Being educated about political activity is nowhere on that list.

Thus, there is a basic contradiction between fears of churches being taken over by politics and why church members are willing to attend. If "wealthy individuals and political operatives" were to spend large sums of money to pay for political messaging, CLC at 13, they would demand a return on investment, which at the very least would require significant time spent during a church services on some sort of political activity. But giving such time would completely disrupt the customary services that churches offer, and it would not be what members would be willing to spend their time and energy to participate in. Real churches that attempted such a transformation would cease to exist.

That is not to say that religious beliefs—such as belief in the dignity of each individual or the idea of a stewardship in caring for the earth— have no effect on other beliefs and actions. To the contrary, messages from the pulpit have deeply influenced political action, including the Civil Rights Movement. Indeed, as one scholar writes, it would be "difficult to understand either [American politics or American religion] without a sense . . . of how the interplay among religion, politics, and

33

culture has shaped the story of the United States." Robert Fowler, et al,
*Religion and Politics in America* 5 (3d ed. 2004). This influence goes all
the way back to ministers "preaching the fundamentals of Lockean
political theory" to their congregations in the lead-up to the American
Revolution. Steven Dworetz, *The Unvarnished Doctrine: Locke,
Liberalism, and the American Revolution* 135 (1990). The churches here
similarly want to have the ability to comment on political issues and
candidates as that is relevant to their religious beliefs. But that is a far
cry from the transformation that *amici* describe.

Moreover, churches that made such a transformation "into
unregulated vehicles for partisan campaigning," CLC at 1, or that were
created as facades for political entities, would no longer appear to be
churches with customary religious services. And the FEC would have
the power to investigate and fine such churches for knowingly and
willfully violating FECA, with enhanced penalties. *See* 52 U.S.C.
§ 30109(a)(5) and (6); § 30109(d). The courts and agencies have a long
history of inquiring into the sincerity of religious belief before allowing
defenses under statute or the First Amendment. *See, e.g., Cutter v.
Wilkinson*, 544 U.S. 709, 725 n.13 (2005) (noting respondents' claim

34

that "prison gangs use religious activity to cloak their illicit and often violent conduct," and that prison officials could "appropriately question whether a prisoner's religiosity . . . is authentic"); *Moussazadeh v. Tex. Dep't of Criminal Justice*, 703 F.3d 781, 790-91 (5th Cir. 2012) (noting that courts "look[] to the words and actions" in determining sincerity); *Int'l Soc'y for Krishna Consciousness, Inc. v. Barber*, 650 F.2d 430, 441 (2d Cir. 1981) (noting—relative to charitable solicitation bans—that courts can examine whether individuals are "fraudulently hiding secular interests behind a veil of religious doctrine"). Thus, there is little concern that churches would be transformed into political operatives beyond the reach of regulatory disclosure.

What the plaintiffs appear to seek, and what this proposed consent decree does, is remove a sword of Damocles that hangs over any spiritual leader whose conscience compels him to connect the dictates of his faith to the political issues of the day in the course of an ordinary service. *See* Timothy O'Neill, *Constitutional Argument as Jeremiad*, 45 Val. U.L. Rev. 33, 37-38, 40 (2010) (discussing the history and purpose of the jeremiad). A pastor or other leader should not be precluded from pointing to which candidates support core elements of the faith, such as

which has a platform that better aligns with the church's understanding of social justice and charity, the sanctity of life or the right to control one's body, tolerance and respect for all races, or end of life issues. What the Johnson Amendment currently prevents is the open proclamation, in the ordinary course of services and member communication, of such core religious beliefs, through the threat of potentially devastating legal and financial repercussions for the church.

## CONCLUSION

For the reasons above, the Court should grant the parties' Consent Judgement.

Dated: August 11, 2025          Respectfully submitted,

/s/ Owen Yeates
Owen Yeates
DC Bar No. 1034825
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., NW, Ste 801
Washington, DC 20036
202-985-1644
oyeates@ifs.org

*Counsel for* amici curiae

## CERTIFICATE OF SERVICE

I certify that on August 11, 2025, I electronically filed the foregoing document via the Court's ECF system, which will send notice of such filing to all counsel of record entitled to ECF notice.

*/s/ Owen Yeates*
OWEN YEATES

37