UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

|  |  |
|---|---|
| NATIONAL RELIGIOUS BROADCASTERS, *et al.*,<br><br>    *Plaintiffs*,<br><br>        v.<br><br>BILLY LONG, *in his official capacity as* COMMISSIONER OF THE INTERNAL REVENUE SERVICE, *et al.*,<br><br>    *Defendants*. | Case No. 6:24-cv-311-JCB |

BRIEF OF *AMICUS CURIAE* STUDENTS AND ACADEMICS FOR FREE
EXPRESSION, SPEECH, AND POLITICAL ACTION IN CAMPUS EDUCATION,
INC. (SAFE SPACE) IN SUPPORT OF THE PARTIES' JOINT MOTION FOR
ENTRY OF CONSENT JUDGMENT

Allen J. Dickerson* (D.C. Bar No. 1003781)
BAKER & HOSTETLER LLP
1050 Connecticut Avenue, NW, Ste. 1100
Washington, DC  20036
(202) 861-1500
adickerson@bakerlaw.com

Rachel Palmer Hooper
BAKER & HOSTETLER LLP
811 Main Street, Ste. 1100
Houston, TX  77002
(713) 751-1600
rhooper@bakerlaw.com

*Counsel for* Amicus Curiae

*\*Admitted* Pro Hac Vice

1

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... 3

INTEREST OF AMICUS CURIAE .......................................................................... 6

STATEMENT OF ISSUES ...................................................................................... 6

SUMMARY OF ARGUMENT ................................................................................. 7

ARGUMENT ........................................................................................................... 8

    I.    The Johnson Amendment was intended to silence political speech
       critical of its sponsor and his allies. .................................................... 8

    II.   The Johnson Amendment invaded the long-standing speech rights of
       churches and other civil society organizations. ................................. 12

    III.  Application of the Johnson Amendment here is unconstitutional. ................. 15

        a.   *Regan v. Taxation with Representation* does not support
            the Johnson Amendment's application here because there is
            no arguable subsidy ..................................................................... 16

        b.   Mere endorsements by churches cannot be regulated
            under any of the spending categories recognized by the
            campaign finance laws. ............................................................... 18

        c.   The Consent Judgment is appropriate under the
            "substantial nonexempt purpose" test applied to
            501(c)(3) entities in the Fifth Circuit. ...................................... 22

    IV.  Against this backdrop, sound principles of constitutional avoidance
       support a narrow interpretation of the Johnson Amendment. ....................... 24

CONCLUSION ....................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Campaign Acad. v. Comm'r,*
  92 T.C. 1053 (1989)................................................................................................21

*Better Bus. Bureau of Washington, D.C., v. United States,*
  326 U.S. 279 (1945) ...............................................................................................23

*Buckley v. Valeo,*
  424 U.S. 1 (1976) ................................................................................... 16, 19, 22

*Citizens United v. Fed. Election Comm'n,*
  558 U.S. 310 (2010) ..................................................................................... 16, 19

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. &*
  *Constr. Trades Council,*
  485 U.S. 568, 575 (1988) .......................................................................................24

*Eu v. S.F. Cnty. Democratic Cent. Comm.,*
  489 U.S. 214 (1989) ...............................................................................................15

*Federal Election Comm'n v. Mass. Citizens for Life, Inc.,*
  479 U.S. 238 (1986) ...............................................................................................20

*Garrison v. Little,*
  75 Ill. App. 402 (Ill. App. Ct. 1898).....................................................................14

*Haines v. Allen,*
  78 Ind. 100 (1881)..................................................................................................14

*Jackson v. Philips,*
  96 Mass. 539 (1867)...............................................................................................14

*In re Lewis' Estate,*
  152 Pa. 477 (1893) .................................................................................................14

*McConnell v. Federal Election Comm'n,*
  540 U.S. 93 (2003) ........................................................................................... 8, 21

*Memorial Hermann Accountable Care Org. v. Comm'r of Internal*
  *Revenue,*
  120 F.4th 215 (5th Cir. 2024).................................................................................23

*Miami Herald Publishing Co. v. Tornillo,*
    418 U.S. 241 (1974) ............................................................................... 16

*Old Colony Tr. Co. v. Welch,*
    25 F. Supp. 45 (D. Mass. 1938) ............................................................. 15

*Regan v. Taxation with Representation of Washington,*
    461 U.S. 540 (1983) .................................................................... 16, 17, 23

*Students and Academics for Free Expression, Speech, and Political
    Action in Campus Educ., Inc. v. Comm'r of Internal Revenue,*
    163 T.C. 175 (2024)................................................................................. 6

*Taylor v. Hoag,*
    273 Pa. 194 (1922) ................................................................................ 15

*Thomas v. Collins,*
    323 U.S. 516 (1945) ............................................................................... 22

*United States v. Rumely,*
    345 U.S. 41 (1953) ....................................................................... 10, 11, 24

## Statutes, Regulations, and Rules

2 U.S.C. § 192............................................................................................ 10

26 U.S.C. § 527.......................................................................................... 19

52 U.S.C. § 30101...................................................................................... 20

52 U.S.C. § 30103...................................................................................... 19

52 U.S.C. § 30104.................................................................................. 20, 21

11 C.F.R. § 100.26..................................................................................... 21

Local Rule CV-7(a)(1)................................................................................. 6

## Other Authorities

100 Cong. Rec. 9604 (1954) ....................................................................... 12

Benjamin M. Leff, *Fixing the Johnson Amendment Without Totally
    Destroying It,* 6 Univ. Pa. J. of L. & Pub. Affairs 115, 120 (2020) ....................... 17

Bradley A. Smith, *Feckless: a Critique of Critiques of the Federal
    Election Commission,* 27 Geo. Mason L. Rev. 503 (2020)................................... 21

James D. Davidson, *Why Churches Cannot Endorse or Oppose
Political Candidates,* 40 Review of Religious Research 16 (1998)................passim

Oliver A. Houck, *On the Limits of Charity: Lobbying, Litigation, and
Electoral Politics by Charitable Organizations Under the Internal
Revenue Code and Related Laws*, 69 Brook. L. Rev. 1 (2003)......................8, 9, 10

POLITICAL SERMONS OF THE FOUNDING ERA, 2 vols
(Ellis Sandoz ed., 2nd ed. 1998)....................................................................passim

Robert D. Lenhard and Ellen L. Weintraub, *FEC Internet Rulemaking
– Background and FAQ* (March 27, 2006)............................................................21

*Yorktown Battlefield: Brigadier General John Peter Gabriel
Muhlenberg*, Nat'l Park Service ........................................................................13

5

## INTEREST OF AMICUS CURIAE

Students and Academics for Free Expression, Speech, and Political Action in Campus Education, Inc. (SAFE SPACE) is a nonprofit organization currently seeking qualification under Internal Revenue Code ("IRC") Section 501(c)(3). It is devoted to educating students, faculty, educational institutions, and the general public about the importance of advancing free speech and intellectual diversity in higher education. To that end, it intends to endorse candidates that support its principles as an incidental component of its larger educational mission and has engaged in litigation to vindicate its First Amendment right to do so. *See Students and Academics for Free Expression, Speech, and Political Action in Campus Educ., Inc. v. Comm'r of Internal Revenue*, 163 T.C. 175 (2024). Accordingly, SAFE SPACE has an interest in the application of the Johnson Amendment consistent with First Amendment principles.

## STATEMENT OF ISSUES

In accordance with Local Rule CV-7(a)(1), *amicus curiae* states that the issues presented in this brief include: (1) the history of the Johnson Amendment and its origin as a partisan political device; (2) the substantial history, dating to the Revolution, of political participation by American religious and nonprofit organizations; (3) the Johnson Amendment's constitutional infirmities as applied here; and (4) the advisability of accepting the proposed Order an Final Judgment, ("Consent Judgment"), ECF No. 35-1, pursuant to sound principles of constitutional avoidance.

## SUMMARY OF ARGUMENT

The Johnson Amendment, far from being a benign instrument of good government, was designed to advance the career of Senator Lyndon B. Johnson by stifling the speech of his political opponents. It represented a departure from historical practice where nonprofit groups, including churches, regularly discussed the political issues of the day. And its application here would be unconstitutional.

Opposition to the parties' proposed Consent Judgment relies upon a blinkered view of the law whereby the Johnson Amendment, standing alone, "protects" churches from being "transform[ed] . . . into campaign entities." Americans United for Separation of Church and State ("Americans United") Br. at 8, ECF No. 48; Campaign Legal Center, *et al.* ("CLC") Br. at 14, ECF No. 51-1. This gets things exactly backwards. Political speech, including the endorsement of candidates, is subject to the highest constitutional protection. There is no governmental interest in protecting Americans from their own constitutional rights.

None of the exceptions to the First Amendment's protections applies here. The Supreme Court has permitted some limitations on nonprofit advocacy, but only where the regulated activity is substantial and subsidized by taxpayer funds. Where, as here, there is no marginal cost for speech to a religious congregation through "customary channels of communication," that rationale fails. Consent Judgment at 2, ECF No. 35-1. Similarly, the incidental activity at stake in this case would trigger neither the "major purpose" requirement under the campaign finance laws nor the "substantial nonexempt purpose" test applicable to 501(c)(3) organizations in this Circuit.

7

Accordingly, the First Amendment fully protects the parties' proposed course of action, and the Johnson Amendment would be unconstitutional if it stood in the way. Fortunately, it does not: Sound principles of constitutional avoidance counsel in favor of adopting the proposed Consent Judgment and leaving the broader constitutionality of the Johnson Amendment to another day.

## ARGUMENT

The proposed Consent Judgment is narrow and appropriate. Permitting churches to discuss, and even endorse, partisan outcomes through their usual channels of communication with parishioners is consistent with historical practice and necessary to avoid violation of their First Amendment rights.

I.     **The Johnson Amendment was intended to silence political speech critical of its sponsor and his allies.**

The historical record amply demonstrates that then-Senator Lyndon B. Johnson introduced his eponymous amendment for reasons of "partisan politics." James D. Davidson, *Why Churches Cannot Endorse or Oppose Political Candidates,* 40 Review of Religious Research 16, 30 (1998); *see also, e.g.,* Oliver A. Houck, *On the Limits of Charity: Lobbying, Litigation, and Electoral Politics by Charitable Organizations Under the Internal Revenue Code and Related Laws*, 69 Brook. L. Rev. 1, 28 (2003). Far from being a principled blow for the separation of church and state, it was targeted at his secular political opponents and directed toward his own reelection.[1] *See McConnell v. Federal Election Comm'n,* 540 U.S. 93, 249 (2003)

---

[1] *Amici* Campaign Legal Center, *et al.* argue that the Johnson Amendment was passed "with little debate or controversy," CLC Br. at 8, ECF No. 51-1, but they draw too strong an inference from official silence. Senator Johnson and his allies "had a

(Scalia, J., concurring in part, concurring in judgment, dissenting in part) ("If *all* electioneering were evenhandedly prohibited, incumbents would have an enormous advantage . . . *any* restriction upon the type of campaign speech that is equally available to challengers and incumbents tends to favor incumbents." (emphasis in the original)).

"Senator Johnson was motivated by the activities of charities allied to his opponent in a recent campaign," specifically "material circulated during the 1954 [Texas] Democratic primary campaign by a nonprofit organization called the Committee for Constitutional Government ["CCG"]."[2] Houck, *supra*, at 24. CCG had circulated an article stating that a "vote for Johnson—many Texans feel—will be a vote for more centralization of power and socialism in Washington," while Johnson's opponent, Dudley Dougherty, was "hailed as collecting under one banner the aspirations of countless disillusioned Americans." Davidson, *supra*, at 26.

The mailing infuriated Johnson, who "pursued his grievance." Houck, *supra*, at 27. In June of that election year, "apparently after communication with Johnson,

---

good record on the Hill of leaving little evidence as to what they did." Houck, *supra*, at 28 (quoting Non-Profit Organization Tax Letter, Vol. 22, Mar. 23, 1984, at 2.). Professor Houck "spoke with four Washington, D.C. tax attorneys" who worked for relevant governmental bodies at the time, and "[e]ach stated that [Lawrence] Woodworth [of the Joint Committee on Taxation] introduced the amendment in haste, at Senator Johnson's urging, in response to the election activity of unnamed foundations against him." *Id.* at 28 n.163.

[2] CCG was not the only organization that drove Senator Johnson's effort. His ire was directed generally at "right-wing" or "anti-communist groups" he perceived as opposed to his "desire to challenge McCarthyism, protect the liberal wing of the Democratic Party in Texas, and win reelection." Davidson, *supra*, at 18, 29.

9

Representative John McCormack of Massachusetts wrote to T. Coleman Andrews, Commissioner of Internal Revenue, inquiring about the tax-exempt status of CCG." Davidson, *supra*, at 28. The Commissioner's response promised to take "appropriate steps" to see "what, if anything, [could] be done" concerning CCG's tax status. *Id.; see also* Houck, *supra*, at 28. This was forwarded to Johnson who, apparently dissatisfied, introduced the Johnson Amendment "the very next day." Houck, *supra*, at 28.

This was not the only targeting to which CCG had been subjected. The organization had been the subject of an important constitutional ruling before the Supreme Court only the year before. There, CCG's secretary was convicted under 2 U.S.C. § 192 for refusing to provide the House Select Committee on Lobbying Activities with "the names of those who made bulk purchases of [its] books for further distribution"—that is, those who supported the practice that led to the distribution of anti-Johnson materials in Texas. *United States v. Rumely,* 345 U.S. 41, 42 (1953).

The Court held that constitutional avoidance principles required that Rumely's conviction be set aside. Construing the House resolution that established the Special Committee's jurisdiction, the Court found that the broad interpretation pressed by the government, whereby the House would have "power to inquire into all efforts of private individuals to influence public opinion through books and periodicals," would "raise[] doubts of constitutionality in view of the prohibition of the First Amendment." *Id.* at 46. Rather than resolve the constitutional issue, the Court rejected a reading of "lobbying activities" that would include "attempts 'to saturate the thinking of the community.'" *Id.* at 47 (quoting Special Committee's chairman). It instead found that

10

"[a]s a matter of English, the phrase 'lobbying activities'" could be read narrowly, as "representations made directly to the Congress, its members, or its committees." *Id.* Two justices concurred, stating that they would reach the First Amendment issue and find the House's demand unconstitutional on the merits. *Id.* at 48 (Douglas, J., concurring). The case stands for the proposition that Congress cannot chill an organization's speech by demanding that it disclose the identities of its members and financial supporters.

The passage of the Johnson Amendment effectively circumvented *Rumely* by depriving groups like CCG of their tax status. Why merely harass nonprofits about the funding of their political speech when that speech could simply be prohibited?

In short, Senator Johnson introduced the amendment to retaliate against his political opponents, including CCG, who "stood between him and his goals." Davidson, *supra*, at 29. The very organization he targeted had vindicated the right to keep its financial matters private only the year before, in a Supreme Court decision effectively mooted by the Amendment. And none of this had anything to do with high-minded questions of religion, public finance, or constitutional government, much less concern over donor disclosure (which was never mentioned). *Contra* CLC Br. at 8, ECF No. 51-1.[3] "Johnson was not trying to address any constitutional issue related to

_____

[3] CLC suggests that the "provision responded to concerns about the growing use of tax-exempt organizations to influence electoral outcomes while shielding donors from public scrutiny." CLC Br. at 8, ECF No. 51-1. Its sole support for this assertion is a page from the 1954 Congressional Record: 100 Cong. Rec. 9128. This appears to be an error—that page does not contain discussion of the Amendment. On page 9604, which does, Senator Johnson refers only to "denying tax-exempt status" to certain organizations; he makes no reference to organizations "shielding donors from public

11

separation of church and state; and he did not offer the amendment because of anything that churches had done." Davidson, *supra*, at 29.

## II.    The Johnson Amendment invaded the long-standing speech rights of churches and other civil society organizations.

The notion that the Johnson Amendment "protects . . . churches and other houses of worship[] from becoming conduits for partisan politics" and "preserves" their "integrity . . . in keeping with the principles underlying the constitutional separation of church and state" is backwards. *See* Americans United Br. at 8, ECF No. 48. Moreover, the idea that the government must "protect" churches by limiting their speech about politics, or that their "integrity" is somehow undermined when they engage with worldly concerns, would surprise the Founders. While the Framers were doubtless jealous of religious liberty, and in that sense wary of state entanglements, the pulpit was a source of explicit political commentary from the time of the Revolution.

Take Samuel Sherwood's sermon of 1776, *The Church's Flight into the Wilderness.*[4] Preaching on the application of the Book of Revelation to the events of the day, he referenced the British in apocalyptic terms before expressly approving "the great law of retaliation" that was, in his words, "wisely adopted . . . by the

---

scrutiny." *Compare* 100 Cong. Rec. 9604 (1954) *with* CLC Br. at 8, ECF No. 51-1. In fact, he does not mention donors at all. 100 Cong. Rec. 9604 (1954).

[4] These references all come from the appropriately named, two-volume collection POLITICAL SERMONS OF THE FOUNDING ERA, 2 vols (Ellis Sandoz ed., 2nd ed. 1998) (hereinafter "POLITICAL SERMONS"). Both volumes are available here: https://oll.libertyfund.org/titles/sandoz-political-sermons-of-the-american-founding-era-1730-1805-2-vols.

honourable Continental Congress." 1 POLITICAL SERMONS 493, 522; *see also id.* at 520 ("the administration seems described, and appears to have many of the features, and much of the temper and character of the image of the beast").

Sherwood was hardly alone. Religious services often contained explicit advocacy concerning the Revolution. John Allen, as early as 1773, raged against British excesses, proclaiming that "it is no rebellion to oppose any king, ministry, or governor, that destroys by any violence or authority whatever, the rights of the people." John Allen, *An Oration Upon the Beauties of Liberty,* in 1 POLITICAL SERMONS 301, 323. Abraham Keteltas, in 1777, exhorted his flock to "promote [the American] cause" and "[b]e ready to fight for it, and maintain it to the last drop of [their] blood." Abraham Keteltas, *God Arising and Pleading his People's Cause,* in 1 POLITICAL SERMONS 579, 604. And John Muhlenberg, later Brigadier General, famously went so far as to exclaim that "there is a time to preach and a time to fight, and now is the time to fight!" before displaying the "uniform of a Continental colonel and promptly recruit[ing] 300 members of his parish" to military service. *Yorktown Battlefield: Brigadier General John Peter Gabriel Muhlenberg,* Nat'l Park Service.[5]

Even those who did not regularly engage in political sermons felt free to do so. John Witherspoon, speaking amidst the events of 1776, explained that it was "the first time of [his] introducing any political subject into the pulpit," but went on to state that it was "not only lawful but necessary," and he "willingly embrace[d] the

---

[5] Available at: www.nps.gov/york/learn/historyculture/muhlenbergbio.htm (last accessed August 10, 2025).

opportunity of declaring [his] opinion without any hesitation, that the cause in which America is now in arms, is the cause of justice, of liberty, and of human nature." John Witherspoon, *The Dominion of Providence over the Passions of Men,* in 1 POLITICAL SERMONS 529, 549.

Nor were all sermons matters of political or military theory, although both were considered sound subjects for religious inquiry. It was common to praise political figures, particularly George Washington. *See* Samuel Langdon, *The Republic of the Israelites an Example to the American States,* in 1 POLITICAL SERMONS 941, 958 (identifying divine interposition in "giving us a Washington to be captain-general of our armies"). And once the tumult of partisan politics took hold of the early Republic, religious leaders took to making political endorsements. *Compare* Tunis Wortman, *A Solemn Address to Christians and Patriots, upon the Approaching Election of a President of the United States,* in 2 POLITICAL SERMONS 1477, 1483 (spelling modernized) ("the interest of the people; the preservation of public liberty, and the safety of our present constitution, irresistibly demand that Mr. Jefferson should be elected president of the United States"); *with* John Mitchell Mason, *The Voice of Warning to Christians,* in 2 POLITICAL SERMONS 1447, 1453 ("I dread the election of Mr. Jefferson, because I believe him to be a confirmed infidel . . . .").

Nonprofits, including but not limited to religious organizations, continued to engage with the biggest political issues of the day. *See, e.g., Jackson v. Philips*, 96 Mass. 539 (1867) (slavery); *Haines v. Allen*, 78 Ind. 100 (1881) (temperance); *In re Lewis' Estate*, 152 Pa. 477 (1893) (segregation); *Garrison v. Little*, 75 Ill. App. 402

14

(Ill. App. Ct. 1898) (women's suffrage); *Taylor v. Hoag*, 273 Pa. 194 (1922) (electoral reform); *Old Colony Tr. Co. v. Welch*, 25 F. Supp. 45 (D. Mass. 1938) (anti-vivisection). And even well into the Twentieth Century, "some churches were willing to be quite political" in opposition to the campaign of Al Smith (a Catholic) for the Presidency, concerned that he would favor Catholic interests and undermine the "advantages that Protestants enjoyed." Davidson, *supra*, at 29. John F. Kennedy came in for similar treatment by "evangelical and fundamentalist Protestant churches," such as when "the influential pastor of the First Baptist Church in Dallas, Texas, preached a sermon against a Roman Catholic in the White House." *Id.* (quotation marks and citation omitted).

Some of this rhetoric was intemperate. But it was no more intemperate than Revolutionary-era identification of the British Empire with the biblical monsters of Revelation. A sharp barrier between the free exercise of religion and the discussion of political events and officeholders is unsupported by the sweep of American history and tradition. In that context, the government "protects . . . churches and other houses of worship," Americans United Br. at 8, ECF No. 48, by declining to interfere in their religious mission and respecting their freedom of speech.

## III.    Application of the Johnson Amendment here is unconstitutional.

Endorsements and discussions of candidates are core First Amendment speech enjoying the highest level of constitutional protection. *Eu v. S.F. Cnty. Democratic Cent. Comm.,* 489 U.S. 214, 223 (1989) (explaining "the First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office" (quotation marks omitted)). This is true for all, not merely candidates. *See,*

15

*e.g., Buckley v. Valeo,* 424 U.S. 1, 49-50 (1976) (independent spending on campaign speech); *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 256-57 (1974) (newspapers); *Citizens United v. Fed. Election Comm'n,* 558 U.S. 310, 371-72 (2010) (corporations). The speech at issue here—political endorsements made through religious organizations' usual channels of communication with their parishioners—is subject to none of the exceptions recognized by precedent. Conversely, the settlement-opposing *amici*'s "parade of horribles" argument fails to meaningfully engage with the application of those exceptions in this case.

> a.  **Regan v. Taxation with Representation does not support the Johnson Amendment's application here because there is no arguable subsidy.**

*Amici* opposing the Consent Judgment rely upon *Regan v. Taxation with Representation of Washington,* 461 U.S. 540 (1983), but that case turned entirely upon taxpayer subsidies the organization would receive for its "substantial" lobbying work. This case presents very different facts, and the subsidy argument that underpins the Court's ruling is inapplicable here.

In *Regan*, a nonprofit organization "attack[ed] the prohibition against substantial lobbying in [26 U.S.C.] § 501(c)(3) because it want[ed] to use tax-deductible contributions to support substantial lobbying activities." *Id.* at 543-44. The Court rejected the effort. It stated that "[d]eductible contributions are similar to cash grants of the amount of a portion of the individual's contribution"—that is, the amount deducted by the contributor from his or her personal income taxes is money lost to the Treasury and functionally equivalent to a payment from the government

16

directly to the recipient nonprofit. *Id.* at 544. Extending the analogy, "Congress has merely refused to pay for the lobbying out of public monies." *Id.* at 545.

*Regan,* then, held that the government may choose not to subsidize lobbying speech through tax deductions. But, here, there is no arguable government subsidy for the political speech in question. The speech addressed by the Consent Judgment—endorsements and political discussion during regularly scheduled religious services—entails no marginal cost to the churches. Unlike the "substantial" lobbying activity Taxation with Representation wished to engage in, which would have been discrete activity constituting a significant portion of the organization's activity, these religious services will occur regardless. The only question is whether the government will police what is said.

In this regard, as one scholar has noted, the "remarkable thing about the partisan divide over the Johnson Amendment is that while the rhetoric is extreme, it is not clear that the distance between the camps is very far apart." Benjamin M. Leff, *Fixing the Johnson Amendment Without Totally Destroying It,* 6 Univ. Pa. J. of L. & Pub. Affairs 115, 120 (2020). *Regan* relies upon the concept of "subvention," whereby "the cost of campaign-related speech is subsidized" by a given charitable contribution. *Id.* at 122; *see also id.* at 120 n.17 (discussing *Regan* and "subvention" term). If, for instance, a donor subject to a 25% tax bracket gives $1,000 to a church, his cost for the contribution would be only $750 while the church receives the full $1,000. If the church then passed the contribution along to a candidate, or took out a campaign ad for $1,000, the $250 "savings is 'subvention,' because the US government effectively

17

subsidizes [the] political contribution by permitting" the donor "to reduce his taxes." *Id.* at 121-122.

By contrast, when an endorsement is made during a sermon "no 'incremental funds' are spent on the speech because the leader would be speaking to the community at that time even if they weren't speaking about a candidate." *Id.* at 122. There is, accordingly, no basis for the government to restrict what is said.

That hypothetical is, of course, precisely this case. These "house[s] of worship" engage in "religious services" through "customary channels of communication." Joint Motion for Entry of Consent Judgment at 2, ¶ 7, ECF No. 35 ("Joint Consent Motion"). There is no marginal cost to them, and no marginal subsidy by the taxpayer, when religious statements "concerning electoral politics viewed through the lens of religious faith" are made to parishioners using these ordinary channels. *Id.* In other words, the concerns *Regan* raised about the government funding "substantial," stand-alone lobbying activity by a nonprofit do not justify regulation of the speech at issue here.

### b.    Mere endorsements by churches cannot be regulated under any of the spending categories recognized by the campaign finance laws.

*Amici* assert that the proposed Consent Judgment, if adopted, would pose significant risks for the federal campaign finance law. CLC Br. at 3, ECF No. 51-1 (asserting Consent Judgment would "open a gaping loophole in the nation's campaign finance disclosure system"); Americans United Br. at 8, ECF No. 48 (Johnson Amendment "ensures that special interests, corporations, and wealthy donors cannot co-opt nonprofits in the service of political campaigns or candidates"). These concerns

18

are misplaced. The campaign finance rules would not reach the Consent Judgment's proposed activity and would pose substantial constitutional difficulties if they did.

Campaign Legal Center, *et al.* string together three quotations spanning thirty pages to assert that "enlightened self-government" relies upon disclosure of election spending. CLC Br. at 4, ECF No. 51-1.[6] But, as they explain, existing campaign finance laws already cover the field, "establish[ing] a two-tiered disclosure regime." *Id.* But under neither tier would allow the speech at issue here to be regulated.

First, organizations with the "major purpose" of campaign advocacy may be required to register as PACs (and are themselves nonprofit organizations free from taxation pursuant to Section 527 of the Internal Revenue Code). *Buckley*, 424 U.S. at 79 ("major purpose"); 52 U.S.C. § 30103; 26 U.S.C. § 527. There is no serious argument that even overt political statements made "in the connection with religious services" will transform a church into an organization meeting the major purpose test. Consent Judgment at 1-2, ¶ 3, ECF No. 35-1. Nevertheless, should a church's "independent [election] spending become so extensive that the organization's major purpose may be regarded as campaign activity, the [church] would be classified as a

---

[6] The quotation bears no resemblance to what the Court actually said. The reference to "enlightened self-government" concerns the need for strict scrutiny of restrictions on political speech. The second and third quotations, extolling the need to inform voters "in the political marketplace," concern two separate statutory provisions – both of which were evaluated under exacting, not strict, scrutiny. The Court's authentic quote is this: that "the right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government" and "[f]or these reasons, political speech must prevail against laws that would suppress it, whether by design or inadvertence." *Citizens United,* 558 U.S. at 339-40. *Amici* have allowed their rhetorical zeal to obscure the law.

political committee." *Federal Election Comm'n v. Mass. Citizens for Life, Inc.,* 479 U.S. 238, 262 (1986) ("MCFL"). Accordingly, like the nonprofit organization in MCFL, "there is no need for the sake of disclosure to treat [churches] any differently than other organizations that only occasionally engage in independent spending on behalf of candidates." *Id.* Any 501(c)(3) organization, including a church, that transformed into a political committee would be treated as one. That is already the law, and the proposed Consent Judgment does nothing to change it.[7]

Second, these churches would also be unregulated under the "event-driven reports" for "certain electoral spending" detailed by *amici.* CLC Br. at 5, ECF No. 51-1. An exhortation from the pulpit is not an "ad[] expressly advocating the election or defeat of a candidate"—indeed, it is not an "ad" at all. CLC Br. at 5, ECF No. 51-1. And while "broadcast messages targeting voters shortly before an election" are regulated in some circumstances, those messages are subject to careful limitations *amici* decline to mention. *Id.* (citing 52 U.S.C. § 30104(c)).[8]

To be regulated as an "electioneering communication," a communication must be made by means of "broadcast, cable, or satellite communications"—it must be a

---

[7] Moreover, existing tax laws, even without the Johnson Amendment, would prevent a 501(c)(3) organization from becoming a political organization because doing so would convey a substantial private benefit on the supported political party or candidate. *See Am. Campaign Acad. v. Comm'r,* 92 T.C. 1053 (1989) (American Campaign Academy could not be regarded as an educational organization because its training program for political campaign professionals conferred a substantial private benefit on the Republican party).

[8] Moreover, the "event-driven" disclosures *amici* reference require spending in excess of $10,000 (for an "electioneering communication") or $1,000 in advertisements "expressly advocating" the election or defeat of a candidate. *See* 52 U.S.C. §30104(f)(1) & (g); *id.* § 30101(17).

20

broadcast ad, not an internet communication. 52 U.S.C. 30104(f)(3)(A); *McConnell,* 540 U.S. at 207 (Electioneering Communications definition not underinclusive although "it does not apply to advertising in the print media or on the Internet."). Of note, the FEC, by bipartisan agreement, has excluded unpaid internet communications from federal regulation. 11 C.F.R. § 100.26; *see* Robert D. Lenhard and Ellen L. Weintraub, *FEC Internet Rulemaking – Background and FAQ* (March 27, 2006) ("Paid advertisements are the only Internet activity covered by the new definition.").[9] For these reasons, *amici*'s breathless complaints that "Plaintiff Churches publish recorded and live versions of their sermons on the internet," namely on their own webpages and YouTube channels, fall flat. CLC Br. at 11, ECF No. 51-1.

*Amici* cannot have things both ways. Americans United urges plaintiffs to "create a § 501(c)(4) entity through which to" speak about candidates for office.[10] Americans United Br. at 11, ECF No. 48. But CLC complains that "the FEC, through regulatory loopholes and nonenforcement, has allowed 501(c)(4) organizations to conceal their donors while engaging in substantial campaign activity." CLC Br. at 6, ECF No. 51-1. Their only factual support for this assertion is self-serving internal reports by *amici* themselves. *But see* Bradley A. Smith, *Feckless: a Critique of Critiques of the Federal Election Commission,* 27 Geo. Mason L. Rev. 503, 527-30

---

[9] *Available at:* https://www.fec.gov/resources/about-fec/commissioners/weintraub/nprm/statement20060327.pdf.

[10] Americans United is likely mistaken. A § 501(c)(4) entity may engage in candidate advocacy, but not as its primary purpose.

(2020). Even if they were correct, their complaint is with political regulation generally, not the proposed Consent Judgment. If the churches here were to convert to 501(c)(4) organizations, that change would, on their own telling, have no effect on their disclosure concerns.

Fundamentally, *amici's* position is at odds with longstanding principles safeguarding political speech. The Supreme Court long ago recognized that the distinctions between discussions of issues, candidates, and elections are untenable and "dissolve in practical application." *Buckley,* 424 U.S. at 42. Problems of vagueness would force speakers to "hedge and trim" their messages. *Id.* at 43 (quoting *Thomas v. Collins,* 323 U.S. 516, 535 (1945)). It carefully circumscribed the scope of political law—creating the very "loopholes" *amici* decry—to avoid constitutional overbreadth that would facially wreck the relevant statutes. *Id.* at 78-79 (imposing limiting constructions on statutory language). What was true for issues of public policy is equally true for matters of faith. As this case shows, the government is poorly equipped to police "the supposedly clear-cut distinction between discussion, laudation, general advocacy, and solicitation." *Buckley,* 424 U.S. at 43 (quotation marks omitted). And just as in the expressly political sphere, these "distinction[s] offer[] no security for free discussion." *Id.*

c.    The Consent Judgment is appropriate under the "substantial nonexempt purpose" test applied to 501(c)(3) entities in the Fifth Circuit.

Finally, the proposed Consent Judgment is appropriate under the relevant tax laws. As the Fifth Circuit has explained, in a case neither *amici* cite, the proper test for a 501(c)(3) organization is that it not have a "*substantial* nonexempt purpose."

22

*Memorial Hermann Accountable Care Org. v. Comm'r of Internal Revenue,* 120 F.4th 215, 218 (5th Cir. 2024) ("This 'substantial nonexempt purpose' test governs cases under I.R.C. § 501(c)(3)."), *applying Better Bus. Bureau of Washington, D.C., v. United States,* 326 U.S. 279, 283 (1945) ("[T]he presence of a single non-educational purpose, *if substantial in nature,* will destroy the exemption regardless of the number or importance of truly educational purposes." (emphasis added)).[11] That test also comports with the "substantial lobbying activities" addressed in *Regan.* 461 U.S. at 543-44.

The incidental political speech at stake here, which does not pose the subvention concerns undergirding the limitations on 501(c)(3) activity, is not "substantial in nature" under that test. As but one component of a regular religious service whereby political matters are "viewed through the lens of religious faith," *see* Consent Judgment at 3-4, ¶ 7, ECF No. 35-1, these political statements, even if they include exhortations to take action, and even if that action includes voting, cannot be said to be "substantial."

*    *    *

*Amici*'s parade of horribles fails to meaningfully engage with any of these restrictions. *E.g.* CLC Br. at 14, ECF No. 51-1. This reflects the disconnect between

---

[11] *Memorial Hermann* concerned a 501(c)(4) organization but interpreted the term "exclusively" to harmonize §§ 501(c)(4) and 501(c)(3). *Memorial Hermann,* 120 F.4th at 218-19 ("It makes little sense to treat the same phrase differently in two neighboring paragraphs of the same statute.").

*amici*'s over-the-top rhetoric and circumstances addressed by the proposed Consent Judgment.

**IV.    Against this backdrop, sound principles of constitutional avoidance support a narrow interpretation of the Johnson Amendment.**

None of the exceptions to the First Amendment's robust protection of political speech apply here. Neither *Regan*'s subsidy principles, campaign finance's limited scope, nor the Fifth Circuit's "substantial nonexempt purpose test" can oust the baseline assumption that the government may not regulate the political statements made by Americans, even from the pulpit. As explained above, then, the Johnson Amendment is unconstitutional as applied here.

Thus *United States v. Rumely,* has double relevance here, both as a window into the retaliatory intent of the Johnson Amendment and as potential cure. Just as there, here prudence and law "strongly counsel abstention from [Constitutional] adjudication unless no choice is left." 345 U.S. at 46. And just as in *Rumely,* "[c]hoice is left." *Id.* at 47.

As the parties explain, courts "will construe [a] statute to avoid such [Constitutional] problems unless such construction is plainly contrary to the intent of Congress." Joint Consent Motion at 3, ¶ 9, ECF No. 35 (quoting *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 575 (1988)). There is no indication that the Johnson Amendment was intended to reach churches' speech through their usual channels of communication with petitioners. *See* Argument § I, above. Nor does it "strain" the text to suggest that "participate," "take part," and "intervene" should be interpreted to require some marginal

24

expenditure—this is, after all, the Tax Code. *See* Joint Consent Motion at 2, ¶ 7, ECF No. 35.

Accordingly, the court should follow the example of *Rumley* and accept the sound principles of constitutional avoidance articulated by the parties in their proposed Consent Judgment.

## CONCLUSION

For the foregoing reasons, and for those stated by the parties, this Court should grant the Joint Consent Motion, ECF No. 35, and enter the proposed Consent Judgment order, ECF No. 35-1.

Dated: August 11, 2025                    Respectfully submitted,


                                          */s/ Rachel Palmer Hooper*
                                          Allen J. Dickerson* (D.C. Bar No. 1003781)
                                          BAKER & HOSTETLER LLP
                                          1050 Connecticut Avenue, NW, Ste. 1100
                                          Washington, DC  20036
                                          (202) 861-1500
                                          adickerson@bakerlaw.com

                                          Rachel Palmer Hooper
                                          BAKER & HOSTETLER LLP
                                          811 Main Street, Suite 1100
                                          Houston, TX  77002
                                          (713) 751-1600
                                          rhooper@bakerlaw.com

                                          *Counsel for* Amicus Curiae

                                          **Admitted* Pro Hac Vice

## CERTIFICATE OF SERVICE

I hereby certify that on August 11, 2025, I electronically filed this motion with the Clerk of the Court for the United States District for the Eastern District of Texas using the CM/ECF system. Counsel in this case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/ Rachel Palmer Hooper
Rachel Palmer Hooper

26