IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | |
|---|---|
| NATIONAL RELIGIOUS BROADCASTERS, *et al.*,<br><br>     *Plaintiffs*,<br><br>  v.<br><br>INTERNAL REVENUE SERVICE, *et al.*,<br><br>     *Defendants*. | Civil Action No. 6:24-cv-00311 |

**PROPOSED INTERVENOR'S MEMORANDUM IN RESPONSE TO *AMICI CURIAE*
AND IN OPPOSITION TO ENTRY OF CONSENT JUDGMENT**

1

**TABLE OF CONTENTS**

**Page(s)**

Table of Authorities.................................................................................................. 3

Introduction............................................................................................................. 5

Argument ................................................................................................................ 6

I.      Amici Highlight Prior Failures to Achieve the Parties' Desired Outcome Through the Political Process ..........................................................................................8

II.     Amici Underscore that the Parties Seek an Advisory Ruling ................................................9

III.    Amici's Arguments Illustrate Why the Court Should Not Endorse the Parties' Flawed Statutory and Constitutional Analysis.........................................................................13

IV.     Amici's Arguments, Combined with Defendants' Position as Expressed in the Proposed Consent Decree, Illustrate Why AU's Motion to Intervene Should Be Granted.........................................................................................................19

Conclusion ............................................................................................................. 19

Certificate of Service ............................................................................................. 21

**TABLE OF AUTHORITIES**

**Cases**            **Page(s)**

*Branch Ministries v. Rossotti,*
211 F.3d 137 (D.C. Cir. 2000) ................................................................. 11, 12

*Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n,*
145 S. Ct. 1583 (2025) ................................................................................. 15

*Christian Echoes Nat'l Ministry, Inc. v. United States,*
470 F.2d 849 (10th Cir. 1972) ................................................................. 11, 12

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ...................................................................................... 12

*Clinton v. City of New York,*
524 U.S. 417 (1998) ........................................................................................ 9

*Emp. Div., Dep't of Hum. Res. of Or. v. Smith,*
494 U.S. 872 (1990) ...................................................................................... 16

*Espinoza v. Montana Dep't of Revenue,*
591 U.S. 464 (2020) ...................................................................................... 18

*Fulton v. City of Philadelphia,*
593 U.S. 522 (2021) ...................................................................................... 18

*Gilmer v. Stone,*
120 U.S. 586 (1887) ...................................................................................... 17

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC,*
565 U.S. 171 (2012) ...................................................................................... 16

*Jones v. Wolf,*
443 U.S. 595 (1979) ...................................................................................... 16

*Kennedy v. Bremerton Sch. Dist.,*
597 U.S. 507 (2022) ...................................................................................... 18

*Larson v. Valente,*
456 U.S. 228 (1982) ...................................................................................... 15

*League of United Latin Am. Citizens Council No. 4434 v. Clements,*
999 F.2d 831 (5th Cir. 1993) .......................................................................... 9

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024) ................................................................................. 12, 14

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992) ...................................................................................... 11

3

*Mem'l Hermann Accountable Care Org. v. Comm'r*,
120 F.4th 215 (5th Cir. 2024) .................................................................................. 6

*Md. & Va. Eldership of Churches of God v. Church of God at Sharpsburg, Inc.*,
396 U.S. 367 (1970) ............................................................................................... 18

*Serbian E. Orthodox Diocese for U.S. of Am. & Canada v. Milivojevich*,
426 U.S. 696 (1976) ............................................................................................... 16

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
591 U.S. 732 (2020) ............................................................................................... 16

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020) ............................................................................................... 13

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) ............................................................................................... 11

*Trinity Church v. City of New York*,
10 How. Pr. 138 (N.Y. Sup. Ct. 1854) ................................................................... 17

*United States v. City of Miami*,
614 F.2d 1322 (5th Cir. 1980) ................................................................................. 6

*United States v. Dykema*,
666 F.2d 1096 (7th Cir. 1981) ............................................................................... 17

*West Virginia v. EPA,*
597 U.S. 697 (2022) ............................................................................................... 14

*Whitmore v. Arkansas*,
495 U.S. 149 (1990) ............................................................................................... 11

*Williams v. City of New Orleans*,
729 F.2d 1554 (5th Cir. 1984) ................................................................................. 6

**Statutes**

26 U.S.C. § 501(c)(3) .......................................................................................... *passim*

26 U.S.C. § 7421(a) .....................................................................................................10

26 U.S.C. § 7611(a), (b) ................................................................................. 11, 17, 18

32 Ill. Rev. Stat. § 42 (1874) ...................................................................................... 17

**Other Authorities**

John Witte, Jr., Tax Exemption of Church Property: Historical Anomaly or
Valid Constitutional Practice?,
64 S. Cal. L. Rev. 363 (1991) ................................................................................ 17

4

**INTRODUCTION**

Presently, there are two motions pending before this Court: (1) the Parties' Joint Motion for Entry of Consent Judgment, ECF No. 35 ("Proposed Consent Decree" or "Decree"); and (2) Americans United for Separation of Church and State ("AU")'s motion to intervene as defendant, ECF No. 37.[1] Between August 5 and August 11, six groups of amici filed briefs in support of Plaintiffs and entry of the Proposed Consent Decree. These amicus briefs address a wide array of topics, many of which relate to the merits of Plaintiffs' claims under the First Amendment and the Religious Freedom Restoration Act.

Consideration of the merits is neither appropriate nor warranted at this stage of the case. Neither Defendants nor Proposed Intervenor has responded to Plaintiffs' Motion for Partial Summary Judgment on the Free Speech claims. Nor has there been full briefing on the merits of Plaintiffs' claims under the Free Exercise Clause or the Religious Freedom Restoration Act. Moreover, Amici's submissions highlight factual and legal disputes that should not be decided without the benefit of a complete factual record and merits briefing.

At this juncture, the Court must decide only whether the Proposed Consent Decree—not the Johnson Amendment itself—is unlawful or contrary to public policy, and whether, in light of the positions Defendants take in the Decree, AU can intervene to defend its interests in this case. To the extent that Amici address these issues, their arguments only strengthen AU's position that entry of the Proposed Consent Decree is improper and that AU has a right to intervene in this case.

---

[1] The Court stayed all deadlines pertaining to Plaintiffs' Motion for Partial Summary Judgment, ECF No. 23, pending review of the Proposed Consent Decree. Order, ECF No. 36.

**ARGUMENT**

The Court must reject the Proposed Consent Decree if it determines that the Decree is "unconstitutional, unlawful . . . contrary to public policy, or unreasonable," *United States v. City of Miami*, 614 F.2d 1322, 1333 (5th Cir. 1980), or if it determines that the Decree would have an "unreasonable [or] proscribed" effect on third parties, *Williams v. City of New Orleans*, 729 F.2d 1554, 1560 (5th Cir. 1984) (citation modified). *See also* Br. Amicus Curiae Americans United Separation Church and State Opp'n Mot. Consent J. 20, ECF No. 48 ("AU Br.") (discussing criteria for evaluating consent decrees).[2] This decision turns on the content and impact of the Consent Decree itself—not on Plaintiffs' likelihood of success on the merits of their underlying statutory and constitutional challenge to the Johnson Amendment, 26 U.S.C. § 501(c)(3).

The Proposed Consent Decree would enjoin the IRS from enforcing the Johnson Amendment against the Plaintiff churches for speech made "in connection with religious services through . . . customary channels of communications on matters of faith, concerning electoral policies viewed through the lens of religious faith." Proposed Consent Decree ¶ 6, ECF No. 35-1. More broadly, the Decree states that a house of worship does not "participate" or "intervene" in a political campaign—and thus does not run afoul of the Johnson Amendment—when it endorses or opposes political candidates in the context of such communications. *Id.* at ¶ 3. To justify this novel

---

[2] Amicus SAFE SPACE incorrectly urges the Court to approve the Proposed Consent Decree on the theory that the "substantial nonexempt purpose test" forgives the "[in]substantial" political intervention the Decree would allow. *See* Br. Amicus Curiae SAFE SPACE Supp. Mot. Consent J. 22–23, ECF No. 80. This test, which has been used to determine whether an organization is "operated exclusively for the promotion of social welfare" under 26 U.S.C. § 501(c)(4), has no relevance here. *See Mem'l Hermann Accountable Care Org. v. Comm'r*, 120 F.4th 215, 219 (5th Cir. 2024). The question is not whether, in the absence of the Johnson Amendment, an organization that endorses or promotes political candidates would otherwise qualify for tax exempt status. Rather, the question before the Court is whether the Parties can use the Proposed Consent Decree to reinterpret the Tax Code and authorize previously prohibited conduct.

reinterpretation of the Tax Code, the Decree improperly invokes the doctrine of constitutional avoidance and suggests that applying the Johnson Amendment to houses of worship might violate the Establishment Clause. *Id.* at ¶ 5. But as AU has explained, if the Proposed Consent Decree were entered in its present form, the Plaintiffs, as houses of worship, would receive more favorable treatment than secular nonprofits like AU—thereby creating a different constitutional problem. *See* AU Br. 30–31, ECF No. 48; *see also* Mot. Intervene 11, ECF No. 37 (explaining that AU has an interest in receiving equal treatment under the Johnson Amendment, which justifies intervention); Reply Supp. Mot. Intervene 3, 9, ECF No. 50 (same). In addition, the Court lacks jurisdiction over this action and thus lacks authority to enter any consent decree. *See* AU Br. 9–10, ECF No. 48.

Amici spill significant ink arguing that the Court should approve the Proposed Consent Decree because the Johnson Amendment violates the First Amendment and/or the Religious Freedom Restoration Act. *See, e.g.*, SAFE SPACE Br., ECF No. 80 (Proposed Consent Decree should be approved because the Johnson Amendment violates the First Amendment); Br. Amicus Curiae Institute Free Speech and Bradley A. Smith Supp. Pls. 24–28, ECF No. 79 (same); Br. Cornerstone Chapel and First Baptist Church Dallas Amici Curiae Supp. Pls 14–24, ECF No. 77 (Johnson Amendment violates the free speech and free exercise rights of religious organizations); Br. Amicus Curiae Liberty Counsel Supp. Mot. Consent J., ECF No. 76 (Johnson Amendment violates the First Amendment and the Religious Freedom Restoration Act); Br. Amicus Curiae Grace Church St. Louis and New Way Church Supp. Mot. Consent J. 9–23, ECF No. 67 (Johnson Amendment violates free speech and religious liberty). But these arguments are largely irrelevant to the Court's assessment of the Proposed Consent Decree—except to the extent that the presence of such questions suggests that the Court should be cautious about entering a Consent Decree with constitutional ramifications.

In some instances, Amici also expose the existence of factual disputes, further illustrating why consideration of the merits at the consent decree stage is premature. For example, Amici offer conflicting accounts of the history and enforcement of the Johnson Amendment against houses of worship. *Compare, e.g.*, Liberty Counsel Br. 12, ECF No. 76 (alleging that "[t]he IRS has selectively chosen to punish churches who support Christian conservative candidates while refusing to punish left-leaning organizations like the NAACP"), *with* Liberty Counsel Br., Ex. A, at 24–26, ECF No. 76-1 ("Commission Report") (citing, out of four total enforcement actions, an action against the NAACP and an action against a church that endorsed a Democratic candidate); *compare* Liberty Counsel Br. 12, ECF No. 76 (claiming that the IRS "requir[es] religious organizations to comply with a law when secular nonprofit organizations violate the law with impunity"), *with* Commission Report 18–19, ECF No. 76-1 (describing the IRS's longstanding failure to enforce the Johnson Amendment against pastors participating in "Pulpit Freedom Sunday"); *compare* Br. Amici Curiae Campaign Legal Center et al. Opposing Mot. Consent J. 8, ECF No. 54 ("Congress's enactment of the Johnson Amendment reflected a longstanding bipartisan recognition that tax exempt charitable entities should not serve as conduits for political advocacy"), *with* Liberty Counsel Br. 3, ECF No. 76 (Johnson Amendment was enacted to "silence [Johnson's] political critics, who were comprised of religious organizations and churches"), *and* Cornerstone Br. 13, ECF No. 77 (arguing that "churches were swept up in a political maneuver that targeted . . . secular [organizations]").

## I.    Amici Highlight Prior Failures to Achieve the Parties' Desired Outcome Through the Political Process.

As detailed by AU, Congress has had multiple opportunities to repeal the Johnson Amendment or to carve out an exception for houses of worship. It has declined to do so. *See* AU Br. 22–23, ECF No. 48; *see also* Commission Report 47–48, ECF No. 76-1; Liberty Counsel Br.

1–2, ECF No. 76. Several Amici acknowledge that the Proposed Consent Decree is necessary precisely *because* Congress refuses to repeal the Johnson Amendment. These Amici profess that "[u]ntil Congress deletes the Johnson Amendment from the Internal Revenue Code," the Executive has the authority and responsibility to "direct the IRS to agree to the consent decree . . . and urge the Court to bind its enforcement power." Grace Church Br. 16–17, ECF No. 67.

A consent decree is not a vehicle to overturn legislation. The Executive cannot preempt Congress by assuming, in the face of contrary evidence, that the Johnson Amendment will eventually be repealed. Nor can it enlist the Court's assistance in writing a disfavored law out of existence. *See Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the [Executive] to enact, to amend, or to repeal statutes."); *see also League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 846 (5th Cir. 1993) ("Consent is not enough when litigants seek to grant themselves powers they do not hold outside of court."). Several Amici acknowledge that "absent the repeal of the Johnson Amendment by Congress, and without this Court's entry of the proposed Consent Judgment," the Johnson Amendment will remain applicable to houses of worship. Grace Church Br. 9, ECF No. 67. That the IRS has only enforced the law in rare and extreme circumstances does not change this analysis. Because the Proposed Consent Decree attempts to bypass Congress, it is constitutionally suspect and contrary to public policy.

## II.    Amici Underscore that the Parties Seek an Advisory Ruling.

The Proposed Consent Decree attempts both to evade Article III restrictions on the Court's powers and to usurp the Court's role by imposing the Parties' preferred interpretation of the law. As AU previously explained, the Court lacks subject matter jurisdiction to hear the present matter. *See* AU Br. 9–20, ECF No. 48. Because this suit is, at its core, "for the purpose of restraining the

9

assessment or collection of [a] tax," it is barred by the Anti-Injunction Act. *See id.* at 10–12 (quoting 26 U.S.C. § 7421(a)). Congress carefully calibrated—and intentionally limited—the means through which Section 501(c)(3) organizations can challenge tax laws and IRS rulings. *See id.* at 13–16; *contra* Br. America's Future et al. Supp. Mot. Consent J. 16–17, ECF No. 78 (incorrectly asserting that Plaintiffs would have no remedy if this lawsuit were dismissed). Under Congress's scheme, nonprofit organizations can challenge the Johnson Amendment in the context of an actual, adverse determination of their own tax classification. 26 U.S.C. § 7428(a), (b)(1). Plaintiffs, like all other nonprofit organizations, must follow the procedure that Congress prescribed: allowing them to circumvent this requirement by consent decree is unfair, unlawful, and contrary to public policy.

Moreover, Plaintiffs lack standing to bring this challenge. Advocates, including some Amici, have repeatedly tried to obtain a judicial ruling that the Johnson Amendment is unconstitutional in its entirety or as applied to houses of worship. For example, Alliance Defending Freedom (counsel for Amici Cornerstone Chapel and First Baptist Church of Dallas) organizes an annual event known as "Pulpit Freedom Sunday," in which pastors endorse or oppose political candidates from the pulpit. Commission Report 18–19, ECF No. 76-1. The IRS has never attempted or threatened to revoke participating churches' Section 501(c)(3) status, an approach it has consistently maintained across the past five presidential administrations, Republican and Democratic alike. *See id.*

Two Amici openly lament that Article III standing requirements have so far prevented objectors from challenging the Johnson Amendment in court. Grace Church Br. 14–15, ECF No. 67 (describing the general public's inability to challenge the Johnson Amendment pursuant to taxpayer standing doctrine). In the first instance, this is not true: courts have previously considered

(and upheld) the Johnson Amendment when it has been presented in the context of an actual controversy. *See, e.g.*, *Branch Ministries v. Rossotti*, 211 F.3d 137, 144–45 (D.C. Cir. 2000); *Christian Echoes Nat'l Ministry, Inc. v. United States*, 470 F.2d 849, 857 (10th Cir. 1972). More fundamentally, however, Article III's "case and controversy" requirement keeps certain cases out of court for a reason, ensuring that courts only consider issues that can be "appropriately resolved through the judicial process." *Whitmore v. Arkansas*, 495 U.S. 149, 154–55 (1990). Article III standing guards against judicial overreach and preserves the constitutional separation of powers by preventing courts from issuing purely advisory opinions. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559–60 (1992). The Parties cannot use a consent decree to obtain the ruling they want in the absence of an actual, justiciable controversy.

The IRS has not made an adverse determination about any of the Plaintiffs' nonprofit statuses, nor do Plaintiffs face a "substantial risk" of imminent enforcement that would justify court intervention or the entry of a consent decree. *See* AU Br. 16–19, ECF No. 48 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). To begin with, the Church Audit Procedures Act, 26 U.S.C. § 7611, provides robust protections and imposes significant restrictions on when, how, and to what extent the IRS can investigate houses of worship. *See Branch Ministries*, 211 F.3d at 168–69 (describing the multiple layers of action that must occur before a church's tax exempt status can be investigated). Moreover, the IRS has publicly disavowed its intent to enforce the Johnson Amendment against houses of worship, *see* AU Br. 18–19, and it has declined to enforce the Johnson Amendment against churches that endorse or oppose political candidates from the pulpit, *see* Commission Report 18–20, ECF No. 76-1. In outlining the potential penalties the IRS may impose on organizations for violating the Johnson Amendment, *see, e.g.*, Grace Church Br. 13–14, ECF No. 67, Amici further underscore that any possibility of future

11

enforcement rests on a "speculative chain of possibilities" that is insufficient to confer standing. *See* AU Br. 17, ECF No. 48 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413–14 (2013)). Since 1954, just one church has ever had its Section 501(c)(3) status revoked—and Plaintiffs have represented that the type of speech at issue in that case is neither illustrative of the type of speech that they wish to engage in nor authorized under their interpretation of the Proposed Consent Decree. *See* Grace Church Br. 9–10, ECF No. 67 (discussing *Branch Ministries*, 211 F.3d 137); Pls.' Opp'n Mot. Intervene 7, ECF No. 43 (same). For the same reasons, Plaintiffs claims are not ripe for adjudication. *See* AU Br. 19–20, ECF No. 48.

In addition to standing and jurisdictional hurdles, Plaintiffs face another roadblock to securing their preferred policy outcome: When courts have considered the Johnson Amendment in the context of an actual controversy, they have uniformly upheld it as constitutional. *See, e.g.*, *Branch Ministries*, 211 F.3d at 144–45; *Christian Echoes*, 470 F.2d at 857. Rather than grapple with these past decisions, the Proposed Consent Decree sidesteps them. Prior courts have rejected challenges brought under the Religious Freedom Restoration Act and the First Amendment's Free Exercise and Free Speech Clauses. *See Branch Ministries*, 211 F.3d 142–45; *Christian Echoes*, 470 F.2d at 856–57. The Proposed Consent Decree, however, states that constitutional avoidance is necessary to avoid issues under the Establishment Clause—notwithstanding that Plaintiffs have not alleged an Establishment Clause violation. *See* Proposed Consent Decree ¶ 5, ECF No. 35-1; Am. Compl. ¶¶ 110–157, ECF No. 20. Ironically, the Proposed Consent Decree usurps the Court's authority in announcing what the law is, *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024), while simultaneously asking the Court to exceed its constitutional authority and endorse the Parties' legal analysis in what amounts to an improper advisory opinion. The Court should refuse to do so.

12

### III.    Amici's Arguments Illustrate Why the Court Should Not Endorse the Parties' Flawed Statutory and Constitutional Analysis.

As AU previously explained, the Proposed Consent Decree is flawed as a matter of statutory interpretation and with respect to constitutional principles. AU Br. 24–30, ECF No. 48. Various Amici argue that constitutional avoidance requires, or at least justifies, the Parties' radical reimagining of the Johnson Amendment. *See, e.g.*, SAFE SPACE Br. 8, ECF No. 80; Institute Free Press Br. 9, ECF No. 79; Liberty Counsel Br. 25, ECF No. 76.[3] But this is not how constitutional avoidance or statutory interpretation work. A court cannot rewrite the plain text of a statute to avoid a constitutional problem, much less the mere *suggestion* of a constitutional problem. *See Seila Law LLC v. CFPB*, 591 U.S. 197, 230 (2020). "Without a proffered interpretation that is rooted in the statutory text and structure, and would avoid the constitutional violation" in question, courts must "take Congress at its word that it meant to impose a meaningful restriction" on certain rights. *Id.*

The Johnson Amendment unambiguously states that religious organizations that "participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office" are not Section 501(c)(3) organizations. 26 U.S.C. § 501(c)(3). A pastor's instruction to their congregation to endorse or oppose a political candidate, regardless of whether this statement is made from behind the pulpit, is squarely encompassed within the ordinary definitions of "participate" and "intervene." In fact, the statute specifically includes the "publishing or distribution of statements"

---

[3] Several Amici argue that the Parties' interpretation of the Johnson Amendment is justified by constitutional avoidance on Free Speech and Free Exercise grounds. *See, e.g.*, SAFE SPACE Br. 8, 24, ECF No. 80; Institute Free Speech Br. 9, ECF No. 79. Because the Proposed Consent Decree does not explicitly evoke these arguments, *see* ECF No. 35-1—and because, as previously noted, courts have previously rejected similar arguments—this brief focuses solely on the Establishment Clause question.

as actions that constitute participation or intervention. *See id.*; *see also* AU Br. 25–26, ECF No. 48; Campaign Legal Center. Br. 12–13, ECF No. 54. When churches "publish recorded and live versions of their sermons on the internet"—as both of the Plaintiff churches do—they are plainly "publishing or distributing . . . statements." *See* Campaign Legal Center Br. 10–11, ECF No. 54 (quoting 26 U.S.C. § 501(c)(3)). And if those statements endorse or oppose political candidates, they violate the clear text of the Johnson Amendment.

Even if the text of the Johnson Amendment were ambiguous, the Court must still engage in independent analysis to identify the "best" reading of the statute. *Loper Bright*, 603 U.S. at 400. Construing the Johnson Amendment as applying to houses of worship is consistent with prior judicial rulings as well as longstanding IRS regulations—underscoring that the law has long been understood to apply in this way. *See* AU Br. 24–25, ECF No. 48. Moreover, Congress has previously declined to amend the Tax Code to permit houses of worship to endorse or oppose political candidates "in the ordinary course of the organization's regular and customary activities." *See id.* at 22–23. As a result, the Court should not assume that Congress intended to permit houses of worship to engage in this type of conduct. *Cf. West Virginia v. EPA*, 597 U.S. 697, 731–32 (2022) (inferring from Congress's lack of action to grant the EPA authority to regulate greenhouse gas emissions in a certain way that Congress did not desire for the EPA to have this power). The Court should not upend seventy years of administrative and judicial precedent simply because the Parties prefer, and have agreed upon, a less plausible reading of the statute.

Indeed, even if the Parties' reading of the statute were acceptable, the Proposed Consent Decree can hardly be characterized as avoiding constitutional questions. On the contrary, it invites debate and introduces a new set of new constitutional issues, including the equal protection problems that AU has elsewhere described. *See, e.g.*, AU Br. 30–31, ECF No. 48; Reply Supp.

14

Mot. Intervene 4–6, ECF No. 50 (same). The Proposed Consent Decree also puts the Court's stamp of approval on a misguided interpretation of the Establishment Clause.

As AU has previously argued, the Proposed Consent Decree's discussion and interpretation of the Establishment Clause is tenuous at best. *See* AU Br. 27–30, ECF No. 48. The Parties ask the Court to accept that a newly-minted Supreme Court decision—which has yet to be analyzed or applied by the Fifth Circuit—mandates their preferred policy outcome. *See* Proposed Consent Decree ¶ 5, ECF No. 35-1 (citing *Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n*, 605 U.S. 238, 247 (2025)).  Before discounting the IRS and other courts' longstanding view of the Johnson Amendment, this Court must first determine whether the constitutional issue that the Parties raise does, in fact, exist.

The Parties ask this Court to say that the Johnson Amendment, as it has always been understood, "create[s] serious tension with the First Amendment's Establishment Clause" by treating "religions that do not speak directly to matters of electoral politics more favorably than religions that do." *Id.* Certain Amici agree, arguing not only that the Johnson Amendment discriminates between religions but also that it requires impermissible government involvement in religion. *See* America's Future Br. 10, ECF No. 78. These arguments stretch both the law and the facts.

Although the government may not officially prefer one religious denomination over another, "'secular' criteria that 'happen to have a disparate impact upon different religious organizations'" do not inherently violate the Establishment Clause. *See Cath. Charities*, 145 S. Ct. at 1592 (quoting *Larson v. Valente*, 456 U.S. 228, 247 n.23 (1982)). Rather, an Establishment Clause issue arises when the government "explicitly differentiat[es] between religions based on theological practices." *Id.* Even if it is true that some faiths require adherents to endorse political

candidates—and that Plaintiff churches are among these denominations—the Johnson Amendment does not differentiate between religions, nor does it seek to "punish[] . . . churches, on the basis of their differing religious beliefs," *see* Br. America's Future 15, ECF No. 78. It is black letter law that the "regulation of conduct whose reason or effect merely happens to coincide or harmonize with the tenets of some or all religions" does not violate the Establishment Clause. *McGowan v. Maryland*, 366 U.S. 420, 442 (1961); *cf. Emp. Div. Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 879, 884–85(1990) (neutral and generally applicable laws do not trigger strict scrutiny under the Free Exercise Clause). The Johnson Amendment regulates the ability of all Section 501(c)(3) tax exempt entities—religious or secular, and across all faith denominations—to endorse or oppose political candidates. This does not violate the principle of government neutrality, *contra* America's Future Br. 15, ECF No. 78.

Amici's argument that the Johnson Amendment fosters excessive government entanglement with religion, *see* America's Future Br. 15, ECF No. 78, is equally unavailing. The First Amendment "does not mean that religious institutions enjoy a general immunity from secular laws." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020). Administering secular laws requires some necessary, minimal government involvement with religious matters. If an issue can be resolved by application of "neutral principles of law," *Jones v. Wolf*, 443 U.S. 595, 602 (1979), and without disturbing ecclesiastical rulings on doctrine or interfering with "internal church government," enforcement and judicial involvement is permissible, *Serbian E. Orthodox Diocese for U.S. of Am. & Canada v. Milivojevich*, 426 U.S. 696, 709, 721 (1976); *see also. Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 190 (2012).

The Johnson Amendment is one such neutral principle of law, and enforcing it does not create excessive entanglement with religion or require disturbing matters of church governance.

16

So long as "[o]bjective criteria for examination of an organization's activities" are available, the IRS can "make the determination required by the statute without entering into any subjective inquiry with respect to religious truth which would be forbidden by the First Amendment." *United States v. Dykema*, 666 F.2d 1096, 1100 (7th Cir. 1981); *see also* 26 U.S.C. § 7611(a), (b) (church records may be examined only "to the extent necessary to determine" tax liability).

Since the Founding, the government has administered statutes that require government agents and the courts to sometimes parse religious practices. For example, at the time of the Founding, property-tax exemptions for churches were widespread, but they were not "automatic and unrestricted." John Witte, Jr., Tax Exemption of Church Property: Historical Anomaly or Valid Constitutional Practice?, 64 S. Cal. L. Rev. 363, 371 (1991). Common law governed taxation of church property in both England and the colonies; church property devoted to "religious uses" was generally exempted, but property held for "nonreligious uses" was taxable. *Id.* at 372–73. The proper scope of religious property tax exemptions was frequently contested before nineteenth-century courts. *See, e.g.*, *Trinity Church v. City of New York*, 10 How. Pr. 138, 138–39 (N.Y. Sup. Ct. 1854) (considering whether a church-owned property fell under the state's property-tax exemption for "building[s] for public worship"). And in *Gilmer v. Stone*, the Supreme Court distinguished between types of religious practice in considering an Illinois corporate law regulating the acquisition of land by "[a]ny corporation that may be formed for religious purposes." 120 U.S. 586, 593 (1887) (quoting 32 Ill. Rev. Stat. § 42 (1874)). The Court specifically addressed what it means to be "formed for religious purposes" and held that, at least in the context of that statute, "religious purposes" meant "religious worship" and not "organizations commonly called benevolent or missionary societies." *Id.* at 594.

17

Similarly, today, some parsing of religious practice has been specifically enshrined in court doctrine. For example, under the "ministerial exception" doctrine, religious entities are shielded from many laws when it comes to employment decisions pertaining to ministerial employees. *See Morrissey-Berru*, 591 U.S. at 746. Determining whether an employee qualifies as a "minister" requires courts to examine the secular and religious duties of the employee through a fact-intensive analysis, taking into account "all relevant circumstances" and assessing whether an employee "performed vital religious duties." *Id.* at 756, 758. So long as there is "no inquiry into religious doctrine," *see Md. & Va. Eldership of Churches of God v. Church of God at Sharpsburg, Inc.*, 396 U.S. 367, 368 (1970), the government can adjudicate certain religious disputes. Further, to apply the Free Exercise Clause's tests for whether a government burdens a person's "sincere religious practice," *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022), prohibits "religious conduct while permitting secular conduct," *Fulton v. City of Philadelphia*, 593 U.S. 522, 534 (2021), or discriminates against organizations "based on the[ir] religious character," *Espinoza v. Montana Dep't of Revenue*, 591 U.S. 464, 484 (2020), the government must be able to determine what "sincere religious practice," "religious conduct," or "religious character" is; *see also* 26 U.S.C. § 7611(b)(1)(B) (permitting the IRS to scrutinize religious activities "to the extent necessary to determine whether an organization claiming to be a church is a church for any period").

Each of these tests requires government inquiry, to a degree, into religious behavior. And none of this is even at issue with respect to the Johnson Amendment. Surely, if the government can assess certain *religious* practices for the sake of applying the Free Exercise Clause, the government can inquire into whether a church is engaging in politics—a purely *secular* question. In short, the Parties cannot rely on constitutional avoidance to justify their preferred reading of the Johnson Amendment, and the Court should decline to endorse this faulty analysis.

18

**IV.    Amici's Arguments, Combined with Defendants' Position as Expressed in the Proposed Consent Decree, Illustrate Why AU's Motion to Intervene Should Be Granted.**

Amici raise statutory and constitutional arguments that, if accepted, would subject AU to unequal treatment under the Johnson Amendment. *See, e.g.*, America's Future Br. 14, 16, ECF No. 78 (Johnson Amendment cannot be enforced against houses of worship without establishing religion); Grace Church Br. 17–18, ECF No. 67 (Johnson Amendment cannot be enforced against churches and religious nonprofits). Defendants have stated that they "will continue to" defend the Johnson Amendment if the Proposed Consent Decree is rejected. *See* Defs.' Opp'n Mot. Intervene 12, ECF No. 46. Yet the Decree and accompanying motion reveal Defendants' stance on key issues related to the federal Establishment Clause. The Parties could subsequently seek to enter into a revised consent decree that would not alleviate AU's concerns about unequal treatment. These important constitutional arguments deserve the full briefing and attention of this Court—and AU must be able to fully defend its interests for the duration of this litigation. *See generally* Mot. Intervene, ECF No. 37; Reply Supp. Mot. Intervene, ECF No. 50.[4]

**CONCLUSION**

For the foregoing reasons, and for the reasons described in AU's prior briefing, the Court should reject the Proposed Consent Decree and grant Americans United status as Defendant-Intervenor.

---

[4] *Amici* SAFE SPACE, Grace Church St. Louis, New Way Church, Institute for Free Speech, Bradley A. Smith, and Liberty Counsel do not specify whether counsel for any Party to this case authored or financially contributed to the preparation of their brief. *See* ECF Nos. 67, 76, 79, 80. If either Party's counsel was involved in the preparation of these briefs, it would raise concerns about fairness and collusion, and would weigh heavily in favor of AU's intervention.

Dated: August 15, 2025

Respectfully submitted,

/s/ Alexandra Zaretsky

Alexandra Zaretsky**
Bar No. 5833561 (NY)
Jessica Zalph
Bar No. DC 90017719
Rebecca Markert**
Bar No. WI 1063232
AMERICANS UNITED FOR SEPARATION
OF CHURCH AND STATE
1310 L Street NW, Suite 200
Washington, DC 20005
zaretsky@au.org
zalph@au.org
markert@au.org
(202) 898-2145

** *Not a member of the D.C. Bar. Authorized to practice before federal courts pursuant to D.C. App. Rule 49(c)(3).*

Martin Woodward
Kitner Woodward PLC
13101 Preston Road, Suite 110
Dallas, TX 75240
martin@kitnerwoodward.com

20

## CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2025, I electronically filed this motion with the Clerk of the Court for the United States District for the Eastern District of Texas by using the CM/ECF system. Counsel in this case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/ Alexandra Zaretsky